**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ARE-EAST RIVER SCIENCE PARK, LLC, | |
| Plaintiff, | Civil Action No.: _____ |
| v. | **Jury Trial Requested** |
| NEW YORK CITY HEALTH AND HOSPITALS CORPORATION and NEW YORK CITY ECONOMIC DEVELOPMENT CORPORATION, | |
| Defendants. | |

## VERIFIED COMPLAINT

Plaintiff ARE-East River Science Park, LLC ("Plaintiff" or "ARE"), by and through its attorneys, alleges for its complaint against defendants New York City Health and Hospitals Corporation ("H+H") and New York City Economic Development Corporation ("EDC" and together with H+H, "Defendants"), as follows:

## NATURE OF THE ACTION

1.      This action arises from Defendants' fraudulent scheme to induce ARE into an agreement to integrate a costly, burdensome, and indeterminate "floodwall" into the foundation of a commercial life science facility on East 30th Street along Manhattan's East River (the "North Tower"), notwithstanding that Defendants granted to ARE (and ARE duly exercised) a binding contractual option to build the North Tower without any such requirement.  In reliance on Defendants' repeated representations that the floodwall's design criteria were final, that ARE's cooperation with Defendants would not delay the North Tower's development or construction, and that ARE would be reimbursed for floodwall-related design, construction, and

operational costs, ARE contracted with Defendants in an attempt to reach mutually agreeable written parameters for the floodwall.

2.      As ARE later discovered, however, such representations were false, as Defendants knew at the time they made them.  As a direct result of Defendants' fraudulent scheme, ARE is left with a severely impaired contractual option it spent enormous resources pursuing but cannot implement in the face of Defendants' floodwall demands, which are impossible to satisfy.  Defendants' egregious misconduct has also jeopardized tens of millions of dollars ARE has already invested in the project.

3.      Indeed, since at least December 2020, Defendants knew, but deliberately concealed from ARE, that the floodwall's design criteria were not final (and would not be for *years*); that the North Tower's development and construction would be delayed, for an indeterminate multiyear period; and that ARE would *never* be reimbursed for its floodwall-related costs.  Defendants' misrepresentations and omissions were critical in inducing ARE into a contract in which it agreed to dedicate its unique and widely regarded design and construction expertise to the floodwall—spending massive sums on the floodwall's design, development, construction, and operation—without appropriate remuneration or reimbursement.  As part of their scheme, Defendants also pocketed millions of dollars in other payments they forced ARE to make in attempting to proceed with its option to build the North Tower.

4.      ARE is an indirect subsidiary of Alexandria Real Estate Equities, Inc. ("Alexandria"), the foremost developer of specialized commercial life science properties in the world.  Founded in 1994, Alexandria is renowned for its AAA collaborative life science mega campuses in Boston, San Francisco, and other major cities, and for catalyzing a commercial-market for commercial life science facilities with its proven cluster model.  Over the past two

decades, Alexandria has been the pioneering leader in catalyzing, building, and growing New York City's life science ecosystem by, among other things, investing over $1.5 billion in NYC's life science industry through Alexandria Venture Investments, creating the Alexandria Summit platform to host events and strategic programs to foster collaboration and innovation within the life science industry, and developing the Alexandria Center for Life Science campus ("ACLS"), NYC's first and only commercial life science campus.

5.     The ACLS is an integrated commercial life science campus located on City-owned property along the FDR East River Drive in Manhattan between East 28th Street and East 30th Street. EDC and H+H selected ARE to develop the ACLS in 2005 given ARE's technical expertise and ability to recruit and grow commercial life science companies in NYC, even though ARE had no employees in NYC and did not transact in the city at the time. Following ARE's selection for the project, the parties entered into a ground lease, under which ARE has the sole and exclusive right (for up to ninety-nine years) to develop, operate, and own three integrated commercial life science towers on a state of the art commercial life science campus (now known as the ACLS).

6.     By 2013, two of the three towers that H+H and EDC tasked ARE to develop at the ACLS—the East Tower and the West Tower (defined below)—were fully constructed and they both remain fully subleased to this day due to Alexandria's tremendous efforts in starting and growing companies on the campus. This is especially notable given significantly constrained life science demand with not a single lab lease being signed to date in 2024 in all of NYC.

7.     The third structure to be developed—the North Tower (defined below)—is the subject of this action and Defendants' fraudulent scheme. Pursuant to the ground lease, and as

contemplated in the original request for proposals, ARE holds a valuable option (the "Option") to develop the North Tower. Since 2014, and following successful completion of the East and West towers, ARE has undertaken substantial work, incurred significant costs in time, money, and resources, and navigated substantial delays resulting from Defendants' misconduct, as detailed below.

8.      In and after November 2012, the devastating impact of Superstorm Sandy led Defendants to determine it was imperative for the City to erect a floodwall along the FDR East River Drive (the "Flood Protection System" or "FPS"). Unlike NYU Hospital, the Veterans' Administration Hospital, and other businesses in that area, most of which have successfully erected floodwalls since 2012, H+H has made little to no progress developing its FPS, despite being showered with hundreds of millions of dollars in grants from FEMA.

9.      Defendants' fraudulent scheme was fueled by their abject failure to make progress on the FPS, which is vitally needed to protect New York residents who live and work in the area. Defendants fraudulently induced ARE into an agreement in which ARE agreed to "cooperate" with Defendants to develop mutually agreeable parameters to integrate the FPS into the North Tower's foundation. To deceive ARE into signing this agreement, Defendants knowingly mispresented and concealed critical material facts central to ARE's decision to enter into the agreement.

10.     Specifically, in or around October 2015, H+H approached ARE with a plan to use FEMA funds to build a floodwall running from East 25th to East 30th Street. From that time until early August 2019, H+H repeatedly and consistently represented that the FPS would not materially impact the North Tower's development, construction, or operation, and that FEMA funding would cover all floodwall costs, including reimbursing ARE in full for any FPS-related

costs.  On July 24, 2019, when ARE exercised the Option to build the North Tower, it believed and understood—based on H+H's repeated representations and omissions—that the FPS would neither impair nor burden the North Tower.

11.    Just days later, on August 5, 2019, H+H advised it was proceeding aggressively with the FPS, informing ARE that to obtain FEMA accreditation, it needed to enter into a formal agreement to "cooperate" with Defendants concerning the FPS.  Notwithstanding years of discussions regarding the floodwall, however, H+H in fact had no concrete plan concerning critical floodwall issues such as timeline, cost, committed funding, FEMA requirements and approvals, and, most importantly, basic technical design criteria.  Underscoring the uncertainty surrounding H+H's FPS plan, in December 2019, H+H notified ARE it was pursuing *two separate* design alternatives for the FPS.  In one design, the floodwall would intrusively bisect the ACLS, thereby separating the North Tower from the East and West Towers and destroying ARE's plans for the integrated three-tower life science campus *Defendants themselves* had envisioned and requested at the project's outset.  In the second design, the floodwall would be integrated with the North Tower's foundation.

12.    In the absence of such fundamental floodwall information, and without any sense of which option it should be incorporating in the North Tower's design, ARE declined to enter into an open-ended contractual obligation entitling Defendants arbitrarily and unilaterally to dictate ARE's FPS obligations.  In the spirit of good faith, however, and given ARE's years-long partnership with H&H, ARE agreed to continue its ongoing cooperation with H+H on an exploratory basis, so that the parties could address the potential impact of various floodwall designs on the North Tower.  Over the next year, H+H pressured ARE to enter into its

"cooperation" agreement, but flatly refused to provide ARE with the technical specificity necessary to carry out such a project.

13.    Finally, in December 2020, after years of back-and-forth and substantial expenditures by ARE in time, money, and personnel, H+H gave ARE definitive, unequivocal assurances that the FPS design criteria were final.  H+H expressly confirmed, among other things, that an October 2020 Report (defined below) reflected final design criteria for the floodwall segment to be integrated into ARE's North Tower foundation.  Fully aware that these technical criteria were integral to ARE's decision to cooperate with respect to the FPS, and that the North Tower's foundation design could not be finalized without the FPS design criteria, H+H again urged ARE to enter into an amendment to the ground lease which H+H misleadingly described as a "cooperation agreement."

14.    H+H's "cooperation agreement," though, was hardly a good faith attempt to facilitate a mutually agreed-upon contractual amendment between two longtime partners (though H+H took pains to portray it as such).  To the contrary, H+H's "cooperation agreement" was simply an attempt to gain unilateral control over ARE's ability to design and construct the North Tower.  Unbeknownst to ARE, and contrary to Defendants' express and repeated assurances, the design criteria in the October 2020 Report were nowhere near final, as H+H knew at the time.  As has now become clear, FEMA had not signed off on either the October 2020 Report, or even H&H's retention of Arcadis (the engineering firm H+H engaged to issue the October 2020 Report).  Defendants knew and understood that FEMA's approval was required, and that ARE would be forced to delay construction of the North Tower until FEMA reviewed and approved the final criteria.  Confirming the extent of H+H's falsehoods, ARE has recently learned that FEMA's review process not only has yet to be completed, but will not be complete *for years*.

15.     Ultimately, after years of back and forth, ARE agreed to H+H's fraudulent "cooperation agreement" in full reliance on H+H's knowingly false representations, including its assurances that the floodwall design criteria were final, that the FPS would not delay the North Tower, and that ARE would be reimbursed for any costs it incurred.

16.     Now, nearly three years after assuring ARE that the floodwall design criteria were final, H+H has changed course yet again, moving the goalposts one more time by demanding, under the extortionary "cooperation agreement," that ARE agree to an *entirely new* set of FPS design criteria.  Astonishingly, on November 28, 2023, H+H also demanded that ARE include a totally separate and previously unmentioned seepage wall in its design for the North Tower's foundation, again failing to provide even basic details (much less technical criteria) regarding seepage wall drainage, integration with adjoining city-owned buildings, and the seepage wall's impact on other construction projects near the FDR East River Drive.  H+H has further demanded that ARE incorporate *and fund* any and all future FPS design modifications, including modifications Defendants will unilaterally demand *after* ARE commences the North Tower's construction.

17.     Defendants have essentially conceded that their prior representations in 2020 concerning the finality of the FPS design criteria were false, as were their assurances of an appropriate reimbursement mechanism.  Defendants nevertheless continue to demand that ARE proceed with construction of the North Tower despite the glaring absence of final design criteria for a floodwall that Defendants insist must be part of the North Tower's foundation and that are supposed to somehow satisfy federal floodwall requirements Defendants refuse to articulate.

18.     Had ARE known the truth—namely, that the design criteria were not final, and that Defendants deliberately sought to induce ARE into a vague and extortionary commitment to

meet all of Defendants' floodwall-related demands, no matter how arbitrary, and without regard for cost, delays, or impact on North Tower construction—ARE would never have agreed to enter into Defendants' fraudulent "cooperation agreement."

19.    As a result of Defendants' fraud and bad faith, ARE has sustained tens of millions of dollars in damages, including costs associated with the design of the floodwall and North Tower, and millions of dollars in lost profits resulting from ARE's inability to complete and sublease the North Tower.  ARE also has suffered substantial delays and has been denied the benefits and fruits of its contractual option.  ARE brings this action to recover these damages and to seek reformation of the parties' contract to restore the intended benefits of the Option.

## **PARTIES**

20.    Plaintiff ARE-East River Science Park, LLC is a Delaware limited liability company.  Plaintiff's sole member is Alexandria Real Estate Equities, L.P., a Delaware limited partnership.  None of the partners of Alexandria Real Estate Equities, L.P. are citizens of New York.  Plaintiff is an indirect subsidiary of Alexandria Real Estate Equities, Inc., a Maryland corporation with its principal place of business in Pasadena, California.

21.    Defendant H+H is a public benefit corporation under N.Y. Unconsol. Law § 7384 with its principal place of business in New York, New York.  H+H is reputed to be the largest public health care system in the United States.

22.    Defendant EDC is a non-profit corporation with its principal place of business in New York, New York.  EDC's business includes, among other things, developing real estate; administering financing tools; overseeing transportation and infrastructure; managing rail freight lines and food markets; and developing and managing waterfront properties.   Defendant H+H engaged defendant EDC to serve as lease administrator under the ground lease of the Premises (as hereinafter defined).

**JURISDICTION AND VENUE**

23.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332 based on the diversity of citizenship of the parties, and because the amount in dispute, excluding interest and costs, well exceeds $75,000.

24.     This Court has personal jurisdiction over Defendants because both are based in this District, engage in continuous and systematic business in this District, and engaged in the conduct giving rise to this lawsuit in this District.

25.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)-(d) because all Defendants reside in this District, a substantial part of the events and omissions giving rise to the claims occurred in this District, and the subject property is in this District.

**FACTS**

**I.     Background**

26.     ARE is an indirect subsidiary of Alexandria, a publicly-traded real estate investment trust (NYSE: ARE) that develops, owns, operates, and leases commercial real estate to companies in the academic, scientific, medical, research and development, and technology fields.  Alexandria pioneered the market for properties dedicated to scientific and technology enterprises, particularly in the commercial life sciences space, as well as the concept of collaborative business and scientific research campuses.

27.     On or about November 12, 2004, Defendants issued a request for proposals (the "RFP") for the development of the East River Science Park as the City's first biotechnology and life sciences research and development campus.  The RFP identified the site as Block 962, part of Lot 100 on the Borough of Manhattan Tax Map (the "Original Premises").  The RFP also noted that an additional parcel located between East 29th and East 30th Streets, just north of and adjacent to the Original Premises, would be made available to the winner of the RFP as an option

at a later date, anticipated to be in or around 2010 (the "Option Premises," and collectively with the Original Premises, the "Premises").

28.    The RFP advertised the Premises as offering the "unique advantage of having existing permits for bioscience development," compliant with the "City Charter's Uniform Land Use Review Procedure," which would save "the Developer significant time, effort, and expense."

29.    As the pioneering leader in developing commercial life sciences properties and campuses, ARE submitted a response to the RFP on or about February 2005, followed by revised responses on May 2, 2005 and June 2, 2005, to address Defendants' follow-up redesign requests. During and after this process, Defendants repeatedly cited ARE's track record and expertise in this unique industry, expressing enthusiasm that ARE would be the perfect partner to develop the City's first life science campus.

30.    On or about August 4, 2005, Defendants notified ARE that H&H had conditionally designated ARE for the project, including an option to add the Option Premises to the project as soon as the City's Office of Chief Medical Examiner ("OCME") vacated a portion of the Premises.  In press releases, Andrew Alper, then-President of EDC stated EDC was "thrilled to team up with a world class developer" that would "develop a commercial cluster that will allow our institutions to forge stronger ties with the life science industry, help our academic institutions attract top talent and create many new high-paying jobs."[1]

31.    On November 21, 2005, H+H sent a letter to the New York City Council ("City Council") to request its approval to ground lease the Premises to ARE, including the contractual option to ground lease the Option Premises.  On December 8, 2005, the City Council passed a resolution approving the ground lease of the Premises to ARE.

---

[1]    *See* Exhibit 1.

## II.    H+H and ARE Enter into the Ground Lease

32.    After substantial negotiations, on December 29, 2006, ARE and H+H entered into an agreement for H&H to lease the Original Premises to ARE (as amended, the "Ground Lease"), under which ARE has the obligation to "develop a commercial bioscience and scientific research and development facility, in furtherance of the City's goal of creating additional space in New York City for commercial bioscience companies."

33.    Pursuant to the Ground Lease, ARE would develop, construct, and own two buildings on the Original Premises (the "East Tower" and "West Tower").  The site became known as the Alexandria Center for Life Science.

34.    As contemplated by the RFP, the Ground Lease provided Alexandria with an option to lease the Option Premises to "develop[], use and operat[e] the Option Premises as a commercial bioscience and scientific research and development facility."  ARE's development of the Option Premises would include the construction of a third tower (the "North Tower"), to be incorporated into the ACLS.  Alexandria's option for the development of the North Tower was of material importance to Alexandria and its subsequent space users ("Sub-Tenants") who sought and were given expansion and relocation options to the North Tower as a strategic consideration in committing to long-term leases at the ACLS to ensure their ability to grow contiguously and remain in the only commercial life science campus in New York City.

35.    Pursuant to the express terms of the Ground Lease, on December 29, 2006, H+H delegated to EDC, as the Lease Administrator under the Ground Lease, "all rights, obligations and duties of Landlord under the Lease," except certain rights not relevant to this action.

III.    **ARE Completes the East and West Towers and, in conjunction with Alexandria, Catalyzes, Nurtures, and Grows NYC's Commercial Life Science Ecosystem**

36.    ARE worked diligently to create NYC's first and only commercial life science campus, focused primarily on recruiting, nurturing, and growing start-up and early-stage companies, which comprise the vast majority of New York City's life science substrate.

37.    Over the four years following the Ground Lease execution, ARE developed the first tower on the Original Premises—the 310,000 square-foot East Tower—on schedule and within budget, achieving this milestone without significant disruption. Alexandria broke ground on the East Tower in 2007, building through the 2008 financial crisis and delivering in 2010 with it full leased. At the time of the East Tower's opening, Mayor Michael Bloomberg acknowledged that prior to the ACLS, only a handful of life science companies were dispersed throughout NYC, and there was essentially no commercial life science ecosystem in the City.[2] Mayor Bloomberg described the ACLS as a "world-class complex, which is already attracting both established and startup entities," and explained that the ACLS "will foster innovation within the growing life science industry, create jobs and help diversify [NYC's] economy. Alexandria Real Estate Equities has a proven track-record of developing enormously successful commercial life science campuses around the nation, and its investment in the new center signals a major vote of confidence in [NYC]'s future."[3]

38.    Since its inception, the East Tower's tenants have included cutting-edge life science companies such as Eli Lilly (which Alexandria convinced to stay and grow in NYC

---

[2]    *See* Exhibit 2 (Mayor Michael Bloomberg stating that "[NYC] has all the makings of a major center for commercial life science—an unparalleled workforce, top academic and medical institutions and prime access to investment capital—but we've lacked sufficient state-of-the-art commercial lab space to capitalize on those advantages. The new Alexandria Center for Life Science is addressing that need in a major way.")

[3]    *Id.*

following their acquisition of a local biotech company in 2009), Eikon Therapeutics, BlueRock (acquired by Bayer), Stablix, Loxo Oncology (acquired by Eli Lilly), and Osmo, as well as amenity providers RiverPark and Apella.

39.     Alexandria began construction of the West Tower in 2010 and built it through Superstorm Sandy, delivering it in 2013 and attracting an exceptional tenant base which includes Intra-Cellular Therapeutics, Prevail (acquired by Eli Lilly), Immunai, and Kallyope, along with dozens of early-stage companies which Alexandria directly recruited (the majority of which Alexandria also invested in) and whose growth Alexandria supported on campus.

40.     Although Superstorm Sandy caused massive disruption to NYC in 2012, including Bellevue Hospital, the ACLS remained fully operational due to the superior design of the campus and East and West Towers.

**IV.    ARE Conducts Due Diligence for the North Tower and Works with H+H to Design a Floodwall**

41.     Following completion of the East and West Towers in or around early 2014, ARE commenced due diligence for the design and construction of the North Tower, developing plans that contemplated construction starting in 2016 and project completion approximately 48 months thereafter.  Within a year of ARE commencing its due diligence for the Option Premises, H+H notified ARE that H+H planned to build the FPS for Bellevue Hospital ("Bellevue") and the surrounding neighborhood, including the Option Premises.  At all relevant times, H+H assured ARE that ARE would not be responsible for any costs associated with the development or design of the FPS, and that ARE could continue with its plans to design and construct the North Tower without impairment by the FPS.

42.     Following the substantial damage caused to Bellevue by Hurricane Sandy in October 2012, Mayor Bill De Blasio and U.S. Senator Charles Schumer announced, on

November 6, 2014, that FEMA had committed $1.6 billion to repair NYC's public hospitals from damage sustained during Hurricane Sandy and to protect NYC neighborhoods from severe weather events in the future.  Approximately $376 million of the FEMA package was allocated to Bellevue to, among other things, fund construction of a floodwall for Bellevue.  At the time, H+H intended to build the FPS as a U-shaped independent structure that would surround only the Bellevue campus.

43.    In or around October 2015, however, H+H changed tack.  Michael Rawlings (then H+H's Chief Operating Officer) informed Connie Hildesley of ARE that H+H was considering a "linear" design for the FPS.  Instead of encircling the Bellevue campus alone, the new linear design concept contemplated a barrier beginning near East 26th Street and extending north as far as East 34th Street.  As H+H's new design for the FPS now extended up to (and past) the Option Premises, Rawlings agreed to update ARE about any future design efforts concerning the FPS and any FPS-related impacts on the Option Premises.

44.    On or about November 19, 2015, Hildesley and Michael Mohin (ARE Security Director) met with Rawlings, Steven Alexander (Executive Director of Bellevue Hospital), John Levy of Base Tactical (H+H's FEMA funding consultant), and Peter Glus of Arcadis (H+H's engineering firm for flood protection design) to discuss the FPS and any potential impacts on the Option Premises.  During that meeting, Rawlings told Hildesley that H+H was working with the Mayor's Office of Resiliency to develop a new design for the FPS.

45.    Also during that meeting, H+H stated that it hoped to work with ARE to build a linear floodwall between East 23rd and East 30th Street, including along the north edge of the Option Premises.  Rawlings explained that H+H intended to use FEMA funds for the contemplated wall and did not expect ARE to contribute to the wall's funding, but desired for

ARE to cooperate.  In response, Hildesley told Rawlings that ARE would consider collaborating with H+H on the FPS, and they agreed to keep in touch about H+H's plans.

46.     On or about April 26, 2016, Rawlings sent Hildesley H+H's then-current plans for the FPS, as well as a proposal for geotechnical field work, showing the proposed FPS just *outside* the Option Premises' property line.  At this time, ARE had no reason to anticipate that its ability to develop the North Tower would be impacted by H+H's plans, and ARE continued to work with H+H by, among other things, providing geotechnical reports and boring studies that ARE commissioned and paid for.

47.     In or around early November 2016, Rawlings informed Hildesley for the first time that the contemplated FPS design might capture unwanted stormwater runoff flowing east and down East 30th Street from First Avenue.  ARE immediately sought a meeting with H+H and its technical and design consultants to better understand these potential impairments to ARE's option to build the North Tower.

48.     On or about November 16, 2016, Hildesley, John Cunningham (then ARE Senior Vice President, NYC Regional Market Director and Strategic Operations), and Jim Kielian of Stantec (ARE's civil engineer) met with Rawlings and two H+H consultants, John Levy (President of Base Tactical Disaster Recovery Inc. ("Base Tactical")) and Hazel Remo (Associate Vice President of Arcadis Design and Consultancy).

49.     During the November 16th meeting, H+H presented a linear design for the FPS, running along the FDR from East 25th to East 30th Street, with a wall height ranging from 15.5 feet to 19 feet as it proceeded north.  At 19 feet, the portion of the floodwall bordering the Option Premises was its highest point.  Although the plans still showed the proposed wall situated outside of the Option Premises, they also showed a problematic amount of stormwater

runoff ponding on the northeast corner of the Option Premises due to the contemplated location and design of the FPS.

50.     Two days later, Cunningham emailed Rawlings to express ARE's serious concerns over the likelihood of significant flooding suggested by the latest design, and the fact that H+H had proposed no drainage plan as part of the FPS, which would saddle ARE and the North Tower design with the burden of managing the excess water.   Cunningham further notified H+H that Stantec (ARE's outside civil engineering firm) would be sending H+H a series of questions, which, if responded to, would allow ARE to "better evaluate the impact, costs, etc. and take whatever steps are necessary to protect its investment" in the ACLS and the Option Premises.

51.     On November 19, 2016, Levy emailed Cunningham a new architectural drawing, which now showed no ponding, claiming that the new drawing "better describes the plan for the 30th Street protection" because it shows that the FPS "moves further up 30th Street than the sketch we used at the meeting [and] as [a] result will provide appropriate protection."

52.     On or about December 12, 2016, Hildesley emailed Rawlings a list of questions prepared by Stantec concerning the FPS design, and requested a meeting to further review the designs.  In addition to requesting clarification on H+H's drainage plans, ARE also sought information about the FPS' specific design metrics, H+H's construction timeline, and H+H's pursuit of FEMA accreditation for the FPS.

53.     On or about March 13, 2017, Rawlings relayed Arcadis' responses to ARE's December 12 questions and attached drawings of the latest FPS design specifications.  Arcadis,

on behalf of H+H, stated that it expected to complete the FPS "by 2023," and that H+H planned to apply for FEMA accreditation through FEMA's Conditional Letter of Map Revision process.[4]

54.      On or about December 22, 2017, Hildesley met with Rawlings to discuss the OCME's plans to vacate the Option Premises, and to obtain an update on H+H's plans for the FPS.  Hildesley conveyed ARE's concerns about H+H's plans to seek FEMA accreditation given FEMA's design requirements and the potential for delays.  Rawlings reiterated H+H's views that ARE should be "fully collaborative" with H+H regarding the FPS and agreed to set up another meeting among ARE, H+H, and their respective design teams.  Surprisingly, Rawlings stated that H+H was still focused on the steps required to obtain approval from FEMA to allow Bellevue to move from the U-shaped floodwall design already approved by FEMA to the new linear design, which, at this point, H+H had been discussing with ARE for over a year.

55.      On or about January 30, 2018, Hildesley and Rawlings met with their respective design teams, including Levy (Base Tactical), Remo (Arcadis), and Gary Guttman (H+H).  At the meeting, Hildesley reiterated that ARE was proceeding towards its design of the North Tower.  In response, Rawlings stated that H+H did not expect ARE to delay its design or construction of the North Tower pending completion of the FPS.

56.      Thereafter, ARE asked Stantec to continue evaluating H+H's current plans, but in parallel, ARE also independently worked with its engineers to develop preliminary designs for the North Tower that would protect the Option Premises from flooding, as required by the NYC building code.  Despite being kept in the dark about H+H's final FPS design plans—and specifically whether the FPS would ultimately extend north to the Option Premises—ARE nevertheless worked to ensure that its design plans were consistent with the latest specifications

---

[4]      *See* https://www.fema.gov/glossary/conditional-letter-map-revision-clomr.

for the FPS it had received from H+H in January 2018, in an effort to mitigate any impairment to the North Tower if the FPS were to materialize.

57.    On June 18, 2018, however, Rawlings informed Hildesley that the FPS had been put on the "backburner" and was no longer a priority.  In direct reliance on Rawlings' representations, ARE shifted its focus from the design of the FPS to negotiations with EDC (lease administrator for H+H) for a contemplated seventh amendment to the Ground Lease[5] and continuing development of design plans for the North Tower.

**V.    ARE and H+H Enter into the 7th Amendment**

58.    On or about October 3, 2018, ARE and H+H formally entered into the Seventh Amendment to the Ground Lease ("7th Amendment"), which set forth all material terms and conditions upon which ARE would be entitled to exercise the Option to ground lease the Option Premises, and develop, construct, and operate the North Tower.

59.    The 7th Amendment, among other things, set June 30, 2019 as the deadline for ARE to exercise its Option, and set July 3, 2020 as the closing date for the Option (the "Closing"), which ARE could extend to July 31, 2021.  Prior to Closing, ARE was required to deliver schematic designs for the North Tower, including site and floor plans; prepare materials required for the completion and approvals of any environmental reviews, assessments, and impact statements; and obtain a final foundation permit and final approval from the Public Design Commission.  Critically, ARE was thus required to both finalize its designs for the North Tower (including the foundation) before Closing and commence construction immediately thereafter.

---

[5]    The first six amendments to the Ground Lease are not germane to this matter, except for the absence of any mention of the FPS, H+H's or the City's consideration of the FPS, or any obligation of ARE with respect thereto.

60.     At no point during any discussions concerning the 7th Amendment did H+H or EDC inform ARE it would be expected to coordinate the North Tower's design with that of the FPS, to fund the FPS design and construction costs without reimbursement, or to delay construction of the North Tower pending the completion of the entire FPS design.  To the contrary, Defendants concealed these materials facts from ARE and made repeated representations stating just the opposite, inducing ARE to continue to incur massive costs.

## VI.    Defendants Improperly Obstruct ARE's Development of the North Tower and Fraudulently Misrepresent Critical Design Criteria

### A.    Relying on H+H's Misrepresentations, ARE Exercises the Option

61.     Following execution of the 7th Amendment, until approximately July 2019, ARE continued to conduct due diligence to finalize its underwriting of the Option in anticipation of Closing.  Defendants knew full well that ARE was moving to exercise the Option because, among other things, over the next seven months, ARE, in conjunction with EDC, submitted its Concept Review application to the NYC Public Design Commission; H+H, in conjunction with EDC, submitted a zoning request letter to Alicia Glen, Deputy Mayor for Housing and Economic Development, describing ARE's development plans for the North Tower; and ARE submitted to the EDC its geotechnical reports for the Option Premises.

62.     Throughout its due diligence process, ARE also regularly followed up with H+H regarding its FPS plans.  For example, on or about January 14, 2019, Hildesley met with Rawlings to discuss the Option Premises, including the FPS.  Rawlings informed Hildesley that the FPS was "definitely delayed,"  and, as in the past, Rawlings expressly reiterated that H+H did not expect ARE to delay its construction of the North Tower pending completion of the FPS.

ARE made clear to H+H that the timing of the FPS, if it were to materialize, was critically important.

63.    On or about July 24, 2019, ARE sent written notice to H+H and EDC that it was exercising the Option and, in accordance with the terms of the 7th Amendment, tendered the security deposit in the amount of $2.25 million.

**B.    Immediately Following ARE's Exercise of the Option, H+H Begins to Pressure ARE to Formally "Cooperate" regarding the FPS**

64.    Based on Rawlings' repeated and consistent representations on behalf of H+H, ARE believed that when it exercised the Option, the FPS would not hinder its ability to develop the North Tower or delay the tower's completion.  And, despite numerous opportunities to come clean prior to ARE's exercise of the Option in late July 2019, Defendants deliberately concealed the truth and failed to correct their prior misrepresentations.  Defendants knew that ARE would be required to delay construction of the North Tower pending FEMA's approval of the FPS design and specifications, and that H+H had no intention of reimbursing ARE for FPS costs, including the structural elements related to the North Tower's foundation, which, under normal circumstances, ARE would not have been required to bear.  Defendants declined to correct their prior misstatements as part of a coordinated campaign to induce ARE to enter into an open-ended "cooperation agreement," which Defendants planned to wield against ARE down the road, forcing ARE to acquiesce to Defendants' FPS demands.

65.    On August 5, 2019, ARE met with Rawlings, Christine Flaherty (Senior Vice President of Capital Design for H+H), and H+H consultants to discuss the FPS.  Hildesley, Richard Suarez (then ARE Senior Director, Real Estate Development and Strategic Planning), and Ken Kraemer (then ARE Assistant Vice President) attended on behalf of ARE.  Rawlings explained that H+H's plans for the FPS had not changed since its last meeting with ARE in

January 2019, and that the purpose of the meeting was to discuss how H+H and ARE could "cooperate" concerning the FPS.  In yet another about-face, Rawlings and Flaherty informed ARE that the FPS was no longer delayed, and that H+H needed "evidence" of ARE's cooperation on the FPS in order to submit H+H's new linear design to FEMA.  Rawlings requested that ARE and H+H meet biweekly with their respective consultants to develop a mutually acceptable design.  None of the representatives from H+H explained the type of "evidence" H+H needed from ARE.

66.     The ARE representatives at the August 5th meeting were surprised by H+H's requests given its prior representations and ARE's demonstrable cooperation with H+H to date. Hildesley made clear that ARE's design of the North Tower's foundation, which would act as the "floodwall" for the property, complied with Department of Buildings ("DOB") flood protection requirements, and that ARE expected to start construction in Q3 2020 and complete construction of the North Tower by Q3 2023, just as H+H required under the 7th Amendment.[6]

67.     Hildesley also explained to H+H that ARE would need time to consider H+H's request for the "evidence" of cooperation and whether to participate in biweekly meetings because ARE never anticipated that its own consultants would engage in substantial design work for the FPS, or that ARE would be required to incur costs for structural floodproofing elements that go beyond DOB requirements.  To the contrary, up until the August 5th meeting, H+H had repeatedly made clear that H+H would be using FEMA funding for the FPS design and construction and that ARE could continue its work on the North Tower without concern or

---

[6]     H+H could not identify a specific date upon which it would complete the design of the FPS.  During the meeting H+H stated that it was targeting completion of the design between "mid-2020 to 2022/2023" and that it anticipated wall construction to take 48 months.  None of the H+H representatives, however, told ARE they expected ARE to delay construction of the North Tower pending the design and completion of the FPS.

involvement.  But beginning with the August 5th meeting, H+H changed tactics and advised

ARE that H+H actually expected ARE to expend significant resources and time to assist in

H+H's FPS design, with no reimbursement mechanism in place, no deadline for submitting

design plans for approval by FEMA, and no clear timeline for the FPS' construction.

68.     Following the August 5th meeting, H+H continued to reiterate its request that

ARE cooperate, and pushed ARE to turn over studies regarding the site conditions of the Option

Premises (which ARE commissioned and paid for).  H+H also requested that ARE agree to a

formal kick-off meeting for the go-forward design of the FPS.  H+H's suggestion that ARE

needed to "document" its cooperation and provide H+H with numerous technical studies

continued to cause ARE significant concern, particularly given H+H's prior representations that

ARE's development of the North Tower would not be impaired by the FPS.  Moreover, pursuant

to the 7th Amendment, H+H was simultaneously requiring that the Closing occur no later than

August 3, 2020, notwithstanding that, under the 7th Amendment, ARE was required to have

obtained permits for the foundation of the North Tower as a condition to Closing.  This would be

impossible to do by August 3, 2020 if the design criteria for the foundation were to change in

order to accommodate the FPS.

69.     H+H's repeated requests were also concerning because, as ARE explained to

H+H, ARE had cooperated with H+H throughout.  ARE was reluctant to execute an open-ended

formal agreement to "cooperate" on a vague and unspecified design plan (which was not

required under the Ground Lease and would constitute a substantial impairment to the value of

the Option), because the underlying parameters of any such Agreement, including technical

requirements, cost structure, and timeline, remained unknown.

70.     In early December 2019, H+H reiterated its request for evidence of ARE's "cooperation," and stated that it intended to seek a remapping of flood insurance maps from FEMA that would result in the removal of the areas protected by the FPS from the FEMA-designated flood zone.  H+H did not, however, state that its plans for remapping would impact ARE's plans for the North Tower's design or construction.

71.     On or around December 3, 2019, ARE, H+H, and EDC met to discuss H+H's request for "cooperation" from ARE.  Flaherty, on behalf of H+H, agreed with ARE that ARE and H+H would work with EDC to negotiate an agreement detailing ARE's rights and obligations in connection with the floodwall, including any expected costs and liabilities for ARE.  In a December 3 email to Jeremy Berman (counsel for H+H), Flaherty requested a meeting with H+H and ARE and their respective counsel to negotiate.

72.     On December 6, 2019, Hildesley emailed Brian Ker (EDC Assistant Vice President, Real Estate Transaction Services), explaining that ARE was concerned about H+H's new plan to submit for a remapping, noting that it could delay the North Tower's design and construction schedule.  Hildesley also told Ker that before ARE could proceed with any further design coordination, ARE and H+H needed to document the parties' FPS-related obligations regarding costs, reimbursements, delays, and liabilities.

73.     Ten days later, on December 13, 2019, H+H, for the first time, presented ARE with two FPS design options: (1) a separate and independent wall that bisected the North Tower from ARE's East and West Towers ("Independent Wall"); and (2) a floodwall that integrated with the North Tower's foundation ("Integrated Wall").  H+H also reiterated its plan to seek a remapping of the flood insurance maps from FEMA, but provided no detailed or specific

information about the remapping process, and failed to disclose how the remapping process would impact the timing of ARE's North Tower construction.

74.     During the December 13th meeting, Cunningham and Hildesley reiterated ARE's concern about the impacts of H+H's plans on the Option Premises.  First, H+H's plans for remapping would significantly delay the North Tower's construction, as the parties would need to delay design and construction pending design criteria that met FEMA's requirements.  At this juncture, however, the 7th Amendment required ARE to close on the Option by no later than August 3, 2020, and ARE planned to complete its construction of the North Tower by Q3 2023. Notwithstanding the fast approaching deadline, H+H refused to identify when it planned to complete the FPS design, let alone construction of the FPS.  The absence of any schedule for H+H's construction was particularly problematic if H+H chose to pursue the Integrated Wall design, by which a portion of the FPS would become part of the North Tower's foundation.  If H+H insisted that ARE comply with FEMA's requirements for remapping, it would be unable to finalize design and begin construction on the North Tower until after H+H confirmed the final design criteria for the portion of the wall that would integrate with the North Tower's foundation.

75.     Second, H+H's Independent Wall design option would fundamentally change the development of the Option Premises.  As H+H knew, ARE designed the North Tower to integrate with the East and West Towers such that the ACLS would be a "commercial life science campus"—exactly as contemplated, and required, in the RFP and RFP response.  The Independent Wall design, however, would render it impossible to achieve an integrated campus, since the wall would bisect the campus, with the East and West Towers to the south of the floodwall, and the North Tower to the north.  If, for example, an employee working in the East Tower needed to visit a lab located in the North Tower, that employee would have to either (i)

24

walk up First Avenue and down East 30th Street to the North Tower's separate entrance, or (ii) climb over a structure between the buildings. The Independent Wall thus not only would derail ARE's design for an integrated campus, but also would (i) require ARE to modify then-existing designs for the North Tower at significant cost to ARE, and (ii) create the serious risk that ARE's future tenants would look elsewhere to lease the integrated space that was conceived and required to be a core attribute of the project. The Independent Wall design also would reduce the size of the Option Parcel (by virtue of a portion being occupied by the Independent Wall), impacting the design of, and construction costs for, the North Tower.

76.    Defendants refused to acknowledge or consider these obvious and critical issues. Instead, H+H began a coordinated campaign with EDC to extort from ARE a "cooperation agreement" with respect to the FPS, including by withholding from ARE critical signatures and H+H approvals for the North Tower's design, which, as Defendants well knew, ARE needed to obtain to meet its predevelopment obligations under the Ground Lease prior to Closing, and which Defendants were required to provide to ARE under the 7th Amendment.

77.    Specifically, in a December 16, 2019 email to Berman (counsel for H+H), Ross Moskowitz (counsel for ARE) requested an update on ARE's application to the DOB in connection with the North Tower's design. Knowing that H+H needed to sign off as the legal owner of the Option Premises, Berman claimed H+H had a "biz" reason to withhold sign-off and "needs reassurance" that ARE would cooperate with H+H on the FPS.

78.    Flaherty also stated that "without coordination we are nowhere," making clear that H+H would continue to withhold its signature until ARE signed a non-disclosure agreement and "coordination" agreement for the FPS. Flaherty further stated that:

> I cannot move forward with my fema [sic] project protecting this whole superblock without us starting to move forward together…[t]he full way to create a solution

25

that is most effective and keeps ARE moving and allows us to eventually build a FEMA compliant floodwall at a date to be determined is by having our technical teams coordinate so vetted technical solutions are found in interest of both sides.

79.    Although Moskowitz informed Berman and Flaherty that H+H's refusal to sign the application would cause a "big issue" for the North Tower's construction schedule, H+H nevertheless continued to withhold its signatures on the critical application, all in order to extract the "cooperation" agreement from ARE.

80.    On December 17, 2019, Cunningham from ARE emailed Ker of EDC asking for his assistance to obtain H+H's signatures on the DOB applications.  As Cunningham explained, ARE needed EDC's help to "marshal issues," to avoid potentially creating "immense delays, costs and liabilities."  Cunningham further stated:

> For 5 years we have been discussing with them the floodwall tying in on the corner of 30th Street and FDR access road, late last week they gave us a new drawing showing it going right through the service level between Phase 1 and Phase 2, which has a long list of challenges based on the existing in-place design, as well as the design and schedule for the North Tower. And they are now threatening to not sign off on our North Tower applications until we "commit to cooperate" which is fine, but we will not agree to a problematic design, increased risk / liability, maintenance and flooding on the north side of the wall in our service level which will result based on this latest design. Needless to say, this presents a lot of issues, delays, costs, etc. We need EDC to mediate.

81.    Ultimately, given ARE's desperate need for the above-referenced application to satisfy the predevelopment obligations that H+H itself imposed under the 7th Amendment, ARE was left with no choice but to affirm in writing that it would continue to cooperate with H+H. On the evening of December 17, 2019, Cunningham emailed Flaherty, Berman, and others at H+H to affirm that ARE was willing to "make its project team available to continue to meet with you and your colleagues on our respective projects to review our collective plans and engineering studies."  H+H signed the DOB application only after Cunningham sent his email to reaffirm ARE's commitment to cooperate.

C.     **After Failing to Provide ARE with Defined Design Criteria for the FPS, H+H Issues Final Criteria in October 2020**

82.    Over the next several months, despite the enormous disruptions caused by the COVID-19 pandemic, ARE, H+H, and their respective consultants, met and exchanged correspondence concerning the FPS design.  The specifics of H+H's FPS designs and plans remained ambiguous, and H+H refused to provide ARE with responses to even basic questions concerning the FPS design, H+H's plans to submit for FEMA accreditation, the remapping process, and how the FPS might impact the North Tower.  As ARE later discovered, at all relevant times, H+H knew that the FPS would significantly delay ARE's development of the North Tower and continued pursuit of and closing on the Option, but H+H misrepresented and failed to disclose material facts about the FPS design and construction timeline, as part of its scheme to induce ARE into a formal "cooperation" agreement.

83.    Between January and February 2020, ARE's and Arcadis' design teams met on various occasions to further discuss the FPS design criteria.  The design teams exchanged numerous drawings and proposals concerning the relocation of utilities and the floodgate which would connect to the north edge of the Option Premises.  During this period, Arcadis explained that H+H would need to resolve any drainage issues on the Option Premises in order for H+H to successfully pursue remapping, but neither Arcadis nor H+H disclosed any plans for a solution or a timeline to resolve the issues.

84.    Given the opacity of H+H's FPS plans, and their potential impact on the Option Premises, ARE was effectively precluded from closing on the Option Premises by August 3, 2020, as the 7th Amendment then required.  On or about February 12, 2020, John Alschuler met with James Patchett (EDC President) to state ARE's concerns with Arcadis' unprecedented requirement that the FPS meet FEMA levee standards.  Alschuler noted that ARE was scheduled

27

to close on the Option on August 3, 2020, and would be forced to issue an unavoidable delay notice given the material burden H+H had imposed on the Option Premises, without any visibility into key FPS design terms.  ARE issued this notice on February 14, 2020, and thereafter continued to work closely with H+H to attempt to assist in finalization of the FPS design criteria.

85.    On or about February 20, 2020, Hildesley, Cunningham, and Alschuler met with EDC, including Patchett, to discuss the misaligned timelines between the FPS and North Tower. ARE explained that H+H's demand that the FPS comply with FEMA levee requirements without articulating design criteria for a building to meet these requirements would prevent ARE from closing in 2020 and constructing the North Tower by Q3 2023 as planned and required by the 7th Amendment.

86.    ARE also reiterated its concern that it was incurring significant expenses in time and money in pursuit of an FPS design—costs it never expected to incur based on H+H's repeated prior representations that FEMA funding would cover design and construction costs. Patchett responded that H+H should agree to a reimbursement mechanism, and suggested that ARE agree to a $3 million cap for FPS-related reimbursements.

87.    By early spring 2020, H+H's FPS plans changed yet again.  In late February 2020, Patchett informed Alschuler that H+H would consider the North Tower an "in place structure" not subject to FEMA's levee requirements, and represented to ARE that it could proceed with the foundation for the North Tower as designed, if it met DOB requirements. Patchett further informed H+H that it would connect the FPS to the North Tower at a later date, and that an operations and maintenance agreement with ARE could be discussed at a later date.

Lastly, Patchett stated that ARE would not need to "solve for drainage" on the Option Premises, which was H+H's responsibility as part of its FEMA remapping application.

88.    Thereafter, in or around April 2020, Arcadis sent ARE a design criteria report that included FEMA design criteria, contrary to Patchett's assurance that the North Tower would not need to follow FEMA's levee requirements. ARE immediately raised its concerns with H+H and Arcadis, but, given the impending closing date and faced with no choice but to advance the North Tower design, ARE and H+H, along with their respective consultants, spent another five months reviewing Arcadis' new report and exchanging comments and questions about the floodwall's design criteria. At ARE's insistence, EDC ultimately agreed to extend the closing date for the Option to February 3, 2021.

89.    Even still, as late as September 2020, H+H had failed to address ARE's concerns over the levee requirements and H+H's remapping plans, which were back on the table per the April 2020 design criteria report. In an email to Elizabeth Arnaiz (EDC, Executive Vice President for Capital), Suarez of ARE outlined ARE's concerns and posed the following specific questions regarding H+H's plans:

> Question 1: Is H+H still seeking a remapping of the FEMA flood map, even though, according to H+H, the remapping is not required for the FEMA grant? If "yes," then Bellevue and Arcadis will need to confirm how some of the levee requirements would apply to the North Tower, which we understand has never been applied to a building . . .
>
> Question 2: What specific operation agreements, easements and other materials are needed by H+H (and by when) in order to submit a Project Worksheet to FEMA and for funds to be released to H+H? And what is the overall targeted project schedule for design, approvals and construction? . . .

Arnaiz stated she would forward ARE's questions to H+H. However, H+H once again ignored ARE's requests for disclosure.

90.     Instead, on October 29, 2020, Flaherty sent Cunningham a design criteria report covering ARE's portion of the FPS ("October 2020 Criteria" or "October 2020 Report").  The October 2020 Report laid out a number of specific FPS criteria for the portion of the wall that H+H desired ARE to integrate into the North Tower's foundation.  Of note, the October 2020 Report did not expressly seek to require that ARE adhere to FEMA's levee design criteria, implement drainage solutions on the Option Premises to assist H+H with its remapping application, or, most importantly, delay construction of the North Tower pending FEMA's review.

91.     Notably, on October 20, 2020, Flaherty had sent Cunningham a draft of the report with a cover letter threatening to "*block the intent* of [ARE's] development" if ARE did not agree to the criteria (the "October 20, 2020 Letter" (emphasis added)).  After receiving a copy of the October 20, 2020 Letter, however, EDC asked Flaherty to revise her cover letter to remove H+H's threats.  Nine days later, when Cunningham received the final draft of the October 2020 Report, the cover letter had been revised to omit its prior threat.

92.     On November 6, 2020, ARE wrote Flaherty seeking answers to "remaining questions" concerning the FPS and the October 2020 Criteria.  In addition to seeking confirmation that H+H would not require compliance with FEMA levee standards, ARE cut to the heart of its concerns, asking: "when in the H+H process will the Community Floodwall design criteria become formally finalized so that we can be confident no further material criteria will be added and that no further material changes will be made?"

93.     H+H responded on December 7, 2020, confirming in writing that the October 2020 Report did indeed reflect near-final criteria subject only to minor modifications:

> **Based on your schedule, when in the H+H process will the Community Flood Wall criteria become formally finalized so that no further material criteria will be added and no further material changes will be made?** The criteria are already

settled and, based on existing information and current conditions, *it should not change*. As stated above an engineer will have to perform appropriate quality checks and calculations to refine the existing preliminary designs to ensure they conform to the criteria. *The necessary refinements are more accurately viewed as fine tuning rather than changing the designs as is typical as one moves through the design process to final construction drawings.*

(italics added).

94.     With respect to ARE's concerns about remapping, Flaherty also stated that:

The Bellevue Community Floodwall will be designed to the 500 year-storm event standards for critical facilities and therefor, remapping may be pursued once the project is completed.  There is no requirement that re-mapping be pursued but, given that it will reduce insurance costs, this may be something ARE will wish to do.  H+H does not maintain insurance and therefor H+H will not directly benefit from re-mapping and will not apply for it.

95.     In light of Flaherty's assurances, ARE regarded the October 2020 Criteria as the final design criteria for the portion of the FPS which H+H desired ARE to integrate into the North Tower, and began to work with H+H and their respective engineers to finalize the minor refinements that were necessary.  Consistent with its representations to ARE concerning the final design criteria, H+H began to publicize its agreement with ARE on the FPS design.

96.     Over the next eight months, ARE worked with H+H and its consultants to demonstrate that ARE's existing foundation design met the October 2020 Criteria—design criteria that, as ARE has now discovered, Defendants knew were not finalized.

**D.     H+H and EDC Fraudulently Induce ARE to Enter into the 10th Amendment to the Ground Lease**

97.     In or around January 2021, counsel for ARE, H+H, and EDC began negotiations on a tenth amendment to the Ground Lease (the "10th Amendment")[7], to further specify certain pre-closing obligations H+H and ARE had to meet, including an extension of the outside date for Closing due to delays caused by the global pandemic.

---

[7]     The eighth and ninth amendments to the Ground Lease are not relevant to this dispute.

98.    H+H again demanded that ARE document its "cooperation" with H+H in connection with the FPS.  This time, however, H+H demanded that ARE agree to include contractual language in the 10th Amendment to formally document ARE's agreement to cooperate.  In a March 2021 email, Berman (counsel for H+H) explained that H+H believed there was a "basis for an agreement" between H+H and ARE concerning the floodwall.  Similar to Flaherty's prior threat, Berman implied that failing to agree to cooperation now could derail ARE's future schedule, stating:

> Putting off the issues will not make them go away and it may put pressure on your schedule later when you cannot afford it . . .
>
> As you can see, we are very optimistic about our ability to mutually settle all the issues in a way that will please everybody – something that cannot be said about many negotiations.  What we worry about is the price of delay and the fears and suspicions that tend to fill the vacuum delay creates.

99.    In response, Cunningham stated that ARE "remain[s] interested and willing to [cooperate with H+H, including by providing drawings] so long as H+H confirms in writing, among other things, that the materials are being provided for non-binding, informational purposes only, and without reliance, obligation or prejudice."

100.    H+H continued to push ARE to agree to "cooperation" language in the 10th Amendment, and even intentionally delayed negotiations to compel ARE to accept such "cooperation" language.  Ultimately, on July 1, 2021, ARE was forced to yield to H+H's demands, and the parties agreed in the 10th Amendment "to cooperate in good faith to attempt to reach mutually agreeable written parameters."  ARE only agreed, however, in full reliance on H+H's representations that the October 2020 Criteria **were final**, and that ARE's timeline for the North Tower **would not** be disrupted, because H+H was no longer considering remapping.  Had ARE known—as Defendants knew full well—that the October 2020 Criteria were not final, that

ARE's timeline for the North Tower would never be possible to meet, and that ARE's FPS costs would never be properly reimbursed, ARE would not have agreed to the "cooperation" language contained in the 10th Amendment.

101.    As part of the 10th Amendment, the parties agreed to extend the Closing for the Option until November 3, 2022, and agreed that ARE would have the option to further extend this date to November 3, 2024 in exchange for a $5 million extension fee.

102.    At no point prior to the party's execution of the 10th Amendment, including during its negotiation, did Defendants disclose that the October 2020 Criteria were not final, that they would be subject to substantial, unilaterally-imposed modifications, or that remapping would necessarily saddle the project with significant delays.  To the contrary, the 10th Amendment specifically contemplated that the final design for the North Tower's foundation would be based on the October 2020 Criteria, and even attached ARE's draft FPS plans and analysis for the North Tower's foundation design, as of the date of the 10th Amendment.

103.    Despite being acutely aware that the October 2020 Report did not reflect final criteria for the FPS, H+H stated just the opposite to ARE.  As part of its fraudulent scheme, H+H assured ARE that the October 2020 Criteria were indeed final, and subject to only minor changes.  H+H knew this representation to be false when made because, among other things, H+H had not even formally designed the FPS, or resolved the drainage issues on and around the Option Parcel that would affect the design of the North Tower.  Had Defendants disclosed these facts, ARE would have known that the October 2020 Criteria were still subject to substantial modifications, which, in turn, would substantially delay design and development of the North Tower.  Defendants engaged in this affirmative misrepresentation and fraudulent omission to

induce ARE to contractually agree to cooperate with respect to the FPS—a primary objective for H+H since ARE decided to exercise the Option.

     **E.    H+H and EDC Fraudulently Induce ARE to Enter into the 11th Amendment to the Ground Lease**

104.    For approximately the next sixteen months, ARE, H+H, and their respective consultants continued work to confirm that the North Tower's foundation satisfied the supposedly final October 2020 Criteria.  Drawings and presentations were exchanged documenting, among other things, how ARE's design met the October 2020 Criteria, as well as minor, immaterial design modifications by both parties.

105.    During this period, H+H never disclosed that it planned to substantially change the FPS design requirements and materially overhaul the October 2020 Criteria, which, as Defendants well knew, would dramatically delay ARE's North Tower approvals, permitting, and construction, resulting in vastly greater expense to ARE.  As a result of Defendants' fraudulent concealment, ARE continued to rely on Flaherty's December 2020 representation that the October 2020 Criteria reflected H+H's final design criteria, and therefore proceeded with its design and construction plans for the North Tower.

106.    As the Option Closing Date approached, the parties began negotiating the 11th Amendment to the Ground Lease (the "11th Amendment"), which was executed on November 3, 2022.  Among other things, the 11th Amendment codified all prior negotiations related to the North Tower in connection with ARE's exercise of the extension of the Option.  In reliance on Defendants' representations regarding the FPS and that the October 2020 Criteria Report reflected H+H's final design, ARE also agreed to pay $5 million to H+H to extend the closing date for the Option to November 2024.

107.    ARE also requested that the parties incorporate the October 2020 Criteria into the 11th Amendment, given Defendants' repeated representations—including during in-person negotiations at EDC's office on October 12, 2022—that they were final.  In response, Defendants did not so much as hint that H+H planned to materially alter the October 2020 Criteria.   Instead, in a deliberate attempt to mislead ARE, EDC indicated to ARE's counsel that the October 2020 Criteria could not be incorporated into the 11th Amendment merely because the person responsible for signing off on this request was unavailable.

108.    Facing a November 3, 2022 deadline to extend the Closing, ARE ultimately agreed to proceed with the 11th Amendment without formal incorporation of the October 2020 Criteria.  It is now clear, however, that Defendants knowingly misled ARE, which later learned (as detailed below), that Defendants indisputably knew the October 2020 Criteria were not final when the 11th Amendment was executed, and that they would in fact be materially altered in a manner that would preclude ARE from completing its North Tower design by even the extended Closing Date contemplated in the 11th Amendment.

109.    In fact, as late as September 2022—*while* it assured ARE that the design criteria had been definitively finalized—H+H knew it had only recently engaged Arcadis to perform "Preliminary and Final Design Services" for the FPS, contrary to its representations that Arcadis had long been H+H's FPS design engineer and that Arcadis had finalized the design criteria as reflected in the October 2020 Report.

110.    Had Defendants disclosed the true state of facts as they then well knew and understood, ARE would not have entered into either the 10th or the 11th Amendment as written, much less paid $5 million in extension fees.

**VII.    H+H and EDC Reverse Course and Change the FPS' Design Criteria**

111.    Following the parties' execution of the 11th Amendment on September 3, 2022, ARE continued to work closely with EDC and H+H to pursue the North Tower.  In a September 12, 2022 press release, Alexandria reiterated its intention to pursue the North Tower, highlighting its two-decade commitment to nurture, accelerate, and grow a vibrant commercial life science cluster in NYC.  As described herein and in the annexed press release[8], Alexandria has meaningfully grown the NYC commercial life science ecosystem through investment and infrastructure, including by:

- Developing the first and only commercial life science campus: the ACLS;
- Driving growth of early- and growth-stage companies through Alexandria Venture Investments (AVI), the most active early-stage life science venture investor in NYC;
- Catalyzing and growing NYC life science startups through Alexandria LaunchLabs, the premier, high touch early-stage company acceleration platform; and
- Convening the NYC life science community through thought leadership and strategic programming.

No other public or private entity has made or endeavored to make this dramatic cluster-creating impact.

112.    For its part, the EDC continued to tout the ACLS to evince NYC's investment into the life science industry and described the campus as a "state-of-the-art research and development campus that serves as the flagship location for [NYC's] expanding life sciences sector."[9]  The EDC further continued to contemplate the North Tower's completion.[10]

113.    EDC and H+H's tactics and position on the North Tower's completion changed in the months following the 11th Amendment.  Beginning in or around late 2022 and early 2023,

---

[8]    *See* Exhibit 3.
[9]    *See The Alexandria Center for Life Science – NYC*, EDC, available at https://edc.nyc/program/alexandria-center-life-science-nyc (last accessed July 22, 2024).
[10]    *Id.*

ARE and H+H began discussions concerning a potential 13th Amendment to the Ground Lease (the "13th Amendment"). After the parties began these negotiations, H+H reversed course and advised for the first time that it planned to materially alter the design criteria for the portion of the FPS that would be integrated into the North Tower, despite its prior representations.

114. Specifically, on or around February 15, 2023, H+H informed Cunningham that Arcadis and the Department of Design and Construction ("DDC") may be changing the FPS' design criteria, and that ARE could expect new criteria in June 2023. Given that this about-face upended ARE's schedule, economics, and rationale for exercising the Option and entering into the 10th and 11th Amendments, ARES immediately pushed back, reminding H+H of its prior assurances that the FPS design criteria as reflected in the October 2020 Report were final, and subject to only minor modifications.

115. In a May 22, 2023 email to Cunningham, Gbenga Dawodu, SVP, Real Estate Transaction Services for EDC, rejected ARE's assertion, claiming without explanation that the "DDC clarified its floodwall requirements." Prior to this email, however, neither EDC nor H+H had ever disclosed to ARE that H+H's October 2020 Criteria were even subject to DDC review, much less approval. Nor had EDC or H+H provided ARE with any other design criteria for the FPS following the October 2020 Report. To the contrary, over the prior two years, ARE expended significant time and resources working with H+H and its engineer, Arcadis, to ensure that ARE's development plans for the North Tower met the October 2020 Criteria, based on H+H's repeated assurances that those criteria were final. Had ARE known that the October 2020 Criteria were in fact not final, and would be subject to the review and approval of DDC—an entirely distinct City agency—ARE would not have agreed to enter into the 10th Amendment

and 11th Amendments without receiving concessions from H+H to account for the substantial delays and costs resulting from this additional layer of review.

116.    As has since become clear, however, Defendants knew at the time ARE agreed to enter into the 10th and 11th Amendments, that DDC review and sign off were required, that further design work on the remainder of the FPS was required (and would materially impact the North Tower's design and construction), and that ARE would not be able to close on the Option in November 2024.  Defendants deliberately failed to disclose any of this critical information to ARE, all in order to induce ARE into entering into the 10th and 11th Amendments.  Defendants also falsely assured ARE that the October 2020 Criteria were final (and that any modifications would be immaterial "refinements"), inducing ARE to pay millions in extension fees and incur significant costs designing the North Tower to criteria Defendants knew were not final and were in fact subject to considerable change.

117.    On October 23, 2023, Defendants for the first time demanded that ARE use new design criteria.  In a draft of the 13th Amendment sent to ARE's counsel, EDC included language requiring ARE to (i) cooperate with H+H on the FPS pursuant to design requirements set forth in an entirely new design report, *which was not even provided to ARE*, and (ii) agree to implement *any* additional design changes that H+H might seek to impose in the future.

118.    After receiving this draft, it became clear to ARE that the FPS design criteria were an indecipherable moving target, and that negotiations over the 13th Amendment had failed.  It was also apparent that Defendants' refusal to commit to final design criteria, and endless waffling and dithering on vital design requirements would preclude ARE from meeting its design obligations prior to the November 2024 Closing.  Significantly, ARE's design for the North Tower's foundation was based entirely on the October 2020 Criteria.  ARE would now

have less than twelve months to evaluate H+H's new design criteria, raise appropriate questions and concerns, obtain H+H's answers and clarifications, and negotiate over discrepancies and points of disagreement—an elaborate, time-consuming process that had already taken years after H+H misled ARE concerning the finality of design criteria set forth in the October 2020 Report.

119.    Proceeding with construction drawings (which follow design development drawings) in the face of such uncertainty was untenable for ARE because the forthcoming and unknown design criteria would impact the North Tower's foundation and ARE would have to reevaluate and redesign parts of the North Tower.  The time it would take for ARE to seek new approvals from various City agencies (including negotiation of inevitable points of variance and disagreement) would most likely cause ARE to miss the Closing Date deadline.  It was—and remains—impossible for ARE to know when construction might start in the face of uncertainties surrounding H+H's timeline to finalize design criteria, the extent of updates and modifications to those design criteria, the extent of any consequent redesign required for the North Tower, and the impact on permitting and approvals for construction of the North Tower.  As EDC's and H+H's misconduct has rendered it impossible for ARE to proceed with the North Tower at this time, ARE sent EDC and H+H a second Unavoidable Delay Notice relating to the FPS on January 11, 2024.

120.    To this day, less than four months before ARE is required to close on the Option, Defendants have continued to reveal new FPS information, confirming that it is impossible for ARE to even estimate when the North Tower design might be finalized.

121.    On March 20, 2024, Defendants informed ARE of yet another entirely new requirement not provided for in the Ground Lease, demanding for the first time that ARE also build a seepage cut-off wall into the North Tower, separate and apart from the FPS.  This

requirement was never discussed with ARE prior to March 2024.  Not only did Defendants conceal this requirement from ARE for years, but, as with the FPS, Defendants' purported "requirements" for the seepage wall are as yet effectively undefined, including with respect to basic technical details such as dimensions and placement.  As a result, ARE cannot even begin the design of such a wall, much less integrate it into the North Tower.

122.    On April 15, 2024, Defendants provided ARE with yet another report from Arcadis containing new but incomplete information that will impact the design of the North Tower.  Among other things, the new Arcadis report demonstrates that the FPS is expected to include infrastructure within the roadway of East 30th Street that will directly conflict with ARE's ability to deliver electric feeders to the North Tower, making it impossible to power the North Tower.  The new report also admits that its assumptions—the entire basis for the design of the FPS—do not even contemplate development of the North Tower.  Defendants' introduction of these new and critical design elements that impact the North Tower underscore the manner in which ARE has been prevented from finalizing the North Tower's design until the FPS design and design criteria have been finalized.  Significantly, the report also admits that Acardis was only in the "planning stage" in 2020 and, therefore, the criteria in the October 2020 Report were never "final," despite Defendants' repeated representations to the contrary.

123.    In short, H+H's continuing last-minute changes would not only require ARE to spend additional sums to evaluate new sets of design criteria and modify its design, but would also render ARE unable to close by November 2024 (the deadline imposed by H+H under the 11th Amendment), after which ARE would no longer be permitted to develop the Option at all.

## VIII.    H+H's and EDC's Fraudulent and Bad Faith Conduct Causes ARE to Incur Substantial Damages

124.    After nearly 20 years of working with Defendants to develop a three-building life science campus and spending more than $1.5 billion to develop that campus and the market for commercial life science buildings in NYC, ARE is now left with an unfinished campus and a profoundly impaired contractual option.

125.    EDC and H+H's fraudulent efforts to offload the design burden and construction costs of their proposed FPS onto ARE has caused ARE to incur significant expenses and lost opportunity costs.  Among other things, EDC and H+H prevented Alexandria from delivering a much-needed North Tower on the ACLS, which is already more than 95% occupied across its two existing towers.  The delays caused by H+H and EDC also caused Alexandria to miss the life science bull market that occurred while Alexandria was seeking to exercise its option, but which has now substantially softened nationally.  At the same time, the EDC also encouraged and induced other developers to build life science projects in NYC, based on erroneous and exaggerated information about demand and anticipated market growth, which has led to a material overbuilding of life science space in NYC.

126.    As a result of Defendants' fraudulent misrepresentations and breaches of the covenant of good faith and fair dealing, ARE has suffered significant damages, including, among other things, compensatory damages related to the North Tower's design and construction costs, as well as lost profits related to the North Tower's construction delays.

127.    H+H and EDC's misconduct also resulted in significant delays in delivering NYC's desired flood wall itself, which is supposed to safeguard Bellevue Hospital and the wider Kips Bay neighborhood, both of which are at continued risk of flooding.  Moreover, H+H and EDC's misconduct has caused irreparable damage not only to ARE, but also to the ACLS itself,

the ACLS's tenants, and the nascent life science industry that Alexandria has painstakingly created in NYC.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**(Fraudulent Inducement – 10th Amendment)**

128.    ARE repeats, realleges, and incorporates by reference all of the preceding paragraphs as if fully set forth herein.

129.    During their negotiations with ARE in 2020 and 2021, Defendants made repeated material misrepresentations, and engaged in repeated omissions of material facts, concerning the FPS design criteria.

130.    Defendants knew their misrepresentations to be false and misleading when made, and further knew that their material omissions would deceive ARE into having a false and incorrect understanding of material facts concerning the FPS design requirements.

131.    Defendants made these misrepresentations and engaged in these omissions with the intent and for the purpose that ARE rely on them to its detriment, to induce ARE into entering into the 10th Amendment.

132.    ARE did rely on Defendants' misrepresentations and omissions, in good faith, when ARE entered into the 10th Amendment, and, as a result, thereafter incurred massive costs related to the design and coordination of the FPS and the North Tower, including by paying H+H millions of dollars to extend its time to close on the Option Premises.  Defendants also failed to disclose material FPS-related facts, and indeed concealed such facts, that were uniquely within their possession.  Defendants had a duty to disclose such facts, which would have alerted ARE to the falsity of Defendants' prior representations, but did not disclose such facts.

133.    Specifically, among other things, the October 2020 Report set forth highly specific FPS technical design criteria.  For example, the October 2020 Criteria did not require that ARE comply with FEMA's levee standards, or that ARE bear responsibility for implementing drainage solutions on and around the Option Premises to assist H+H with its remapping application.

134.    When ARE expressly sought confirmation that the October 2020 Criteria were in fact final, Defendants doubled down on their prior false assurances, confirming in writing that the criteria were indeed final, subject to certain minor and immaterial modifications.

135.    At the time Defendants made these representations and provided these assurances, they knew, believed, and understood them to be false, and knew that the October 2020 Criteria were not final, but would instead be subject to significant and material changes, directly impacting ARE's North Tower design, construction costs and schedule, and even its ability to build the North Tower at all.

136.    Defendants further knew, but failed to disclose, that Arcadis, the engineering firm responsible for creating the October 2020 Criteria, had not even been selected by Defendants to design the FPS, and that H+H would require ARE to delay its construction of the North Tower until FEMA approved Arcadis as well as the FPS design and criteria.  Even though Defendants represented that the October 2020 Criteria were final, they knew the October 2020 Criteria were necessarily subject to material changes that would certainly impact the North Tower's construction timeline.  Defendants deliberately and knowingly withheld this information from ARE.

137.    Underscoring the extent of Defendants' misconduct, at the time they falsely claimed the October 2020 Criteria to be final, and failed to disclose the various reasons they

knew the criteria would certainly be subject to material change, Defendants' engineers and consultants were actively working to develop *new*, materially different FPS design criteria. Defendants deliberately failed to disclose such ongoing design work, or that it would give rise to design criteria modifications incompatible with the October 2020 Criteria, even as they assured ARE that the October 2020 Criteria were final and that any modifications would be refinements and minor.

138.    Defendants made such misrepresentations and engaged in such omissions to fraudulently induce ARE into executing the 10th Amendment.  Defendants were well aware that their timeline for the FPS project did not and could not align with ARE's construction timeline for the North Tower, and were likewise aware that this misalignment would require ARE to incur substantial additional costs, and impact its ability to even start, much less successfully complete, the North Tower project.  Defendants misrepresented and failed to disclose the true state of affairs to ARE to deceive it into believing that the FPS criteria would not impact its development, construction, ownership, or operation of the North Tower.

139.    Defendants also knew and understood that additional extensions of ARE's option period—which Defendants knew but failed to disclose would be necessary to accommodate further delays in the FPS design—would provide Defendants with the opportunity to extort additional extension fee payments from ARE.  Defendants failed to disclose that they would not permit ARE to close and commence construction while the FPS design was incomplete and the design criteria subject to further, substantial modifications.  Defendants concealed the truth from ARE to enrich themselves, at ARE's expense, obtaining millions of dollars from ARE by ensuring that extensions of the option period would be necessary, and making it impossible for ARE to complete its design of the North Tower by Closing.

140.     ARE relied in good faith on Defendants' false and misleading statements and omissions when it agreed to enter into the 10th Amendment (including its agreement to formally "cooperate" with H+H concerning the floodwall).  Had ARE known the truth, it would have developed an independent flood protection system, designed independently as part of the North Tower's overall design.  Had ARE not been prevented from pursuing this independent design as a result of Defendants' fraud, it would have been able to complete its construction of the North Tower as originally contemplated.

141.     Moreover, ARE's reliance on Defendants' representations about the October 2020 Criteria was entirely justified.  After an extended period of uncertainty and ambiguity concerning the FPS design criteria, the October 2020 Report provided precisely the sort of technical specificity and comprehensiveness that ARE had been seeking from Defendants for many months, along with express assurances that the design criteria had been finalized.

142.     The October 2020 Criteria also expressly and directly addressed ARE's concerns over Defendants' prior FPS designs by, among other things, eliminating any requirements related to FEMA levee standards or ARE's responsibility for implementing drainage solutions on the Option Premises.

143.     ARE also relied on Defendants' December 7, 2020 *express confirmation* that the design criteria were final, which was made in response to ARE's *direct inquiries*.  H+H also doubled down on that confirmation in the 10th Amendment, which expressly called for ARE's cooperation with H+H to design the North Tower based on the October 2020 Criteria.

144.     ARE had no reason to believe Defendants misrepresentations and omissions were false, and could not have discovered through the exercise of ordinary diligence that Defendants' misrepresentations and omissions were false.

145.    In reliance on Defendants' false and misleading misrepresentations and omissions, ARE entered into the 10th Amendment to the Ground Lease on or about July 1, 2021.

146.    As a direct and proximate result of Defendants' false and fraudulent misrepresentations and omissions, ARE has been damaged in an amount to be determined at trial, but in no event less than $50 million.

**SECOND CAUSE OF ACTION**
**(Fraudulent Inducement – 11th Amendment)**

147.    ARE repeats, realleges, and incorporates by reference all of the preceding paragraphs as if fully set forth herein.

148.    During their negotiations with ARE in 2020 through 2022, Defendants made repeated material misrepresentations, and engaged in repeated omissions of material facts, concerning the FPS design criteria.

149.    Defendants knew their misrepresentations to be false when made, and further knew that their material omissions provided ARE with, and deceived ARE into having, a false and incorrect understanding of material facts concerning the FPS design criteria.

150.    Defendants made these misrepresentations and engaged in these omissions with the intent that ARE would rely on them, and for the purpose of inducing ARE into entering the 11th Amendment.

151.    ARE did in fact rely in good faith on Defendants' misrepresentations and omissions when it entered into the 11th Amendment, incurring massive costs related to the design of the FPS and the North Tower, and paying H+H millions of dollars to extend its time to close on the Option Premises.  Defendants failed to disclose, and took steps to actively conceal, material, FPS-related facts that were uniquely within their possession.  Defendants had a legal

duty to disclose such facts but chose not to do so, and instead deliberately concealed them from ARE.

152.    The October 2020 Report set forth highly specific FPS technical design criteria. For example, the October 2020 Criteria did not require that ARE comply with FEMA's levee standards, or that ARE bear responsibility for implementing drainage solutions on the Option Premises to assist H+H with its remapping application.

153.    When ARE expressly sought confirmation that the October 2020 Criteria were in fact final, Defendants doubled down on their prior assurances, confirming in writing that the criteria were indeed final, subject to certain minor and immaterial modifications.

154.    At the time Defendants made these representations and provided these assurances, they knew, believed, and understood them to be false, and knew that the October 2020 Criteria were not final, but would instead be subject to significant and material changes, directly impacting ARE's North Tower design, construction costs, and schedule, and even its ability to build the North Tower at all.

155.    Defendants further knew but failed to disclose that Arcadis, the engineering firm responsible for creating the October 2020 Criteria, had not even been selected by Defendants to design the FPS, and that H+H would require ARE to delay its construction of the North Tower until FEMA approved Arcadis as well as the FPS design and criteria.  Even though Defendants represented that the October 2020 Criteria were final, they knew the October 2020 Criteria were necessarily subject to material changes that would certainly impact the North Tower's construction timeline.  Defendants deliberately and knowingly withheld this information from ARE.

156.    Underscoring the extent of Defendants' misconduct, at the time they falsely claimed the October 2020 Criteria to be final, and failed to disclose the various reasons they knew the criteria would certainly be subject to material change, Defendants' engineers and consultants were actively working to develop *new*, materially different FPS design criteria. Defendants deliberately failed to disclose such ongoing design work, or that it would give rise to design criteria modifications incompatible with the October 2020 Criteria, even as they assured ARE that the October 2020 Criteria were final and that any modifications would be mere refinements and minor.

157.    Defendants made such misrepresentations and engaged in such omissions to fraudulently induce ARE into executing the 11th Amendment.  Defendants were well aware that their timeline for the FPS project did not and could not align with ARE's construction timeline for the North Tower, and were likewise aware that this misalignment would require ARE to incur substantial additional costs, and impact its ability to even start, much less successfully complete, the North Tower project.  Defendants misrepresented and failed to disclose the true state of affairs to ARE, to deceive it into believing that the FPS criteria would not impact its development, construction, ownership, or operation of the North Tower.

158.    Defendants also knew and understood that additional extensions of ARE's option period—which Defendants knew but failed to disclose would be necessary to accommodate further delays in the FPS design—would provide Defendants with the opportunity to extort additional extension fee payments from ARE.  Defendants failed to disclose that they would not permit ARE to close and commence construction while the FPS design was incomplete and the design criteria were subject to further, substantial modifications.  Defendants concealed the truth from ARE to enrich themselves at ARE's expense, and thereby obtained millions of dollars from

ARE by ensuring that extensions of the option period would be necessary, and making it impossible for ARE to complete its design of the North Tower by Closing.

159.    ARE relied in good faith on Defendants' false and misleading statements and omissions when it agreed to enter into the 11th Amendment (including its agreement to formally "cooperate" with H+H concerning the floodwall).  Had ARE known the truth, it would have developed an independent flood protection system, designed independently as part of the North Tower's overall design.  Had ARE not been prevented from pursing this independent design as a result of Defendants' fraud, it would have been able to complete its construction of the North Tower as originally contemplated.

160.    ARE's reliance on Defendants' representations about the October 2020 Criteria was entirely justified.  After an extended period of uncertainty and ambiguity concerning the FPS design criteria, the October 2020 Report provided precisely the sort of technical specificity and comprehensiveness that ARE had been seeking from Defendants for many months, along with express assurances that the design criteria had been finalized.

161.    The October 2020 Criteria also expressly and directly addressed ARE's concerns over Defendants' prior FPS designs by, among other things, eliminating any requirements related to FEMA levee standards or ARE's responsibility for implementing drainage solutions on the Option Premises.

162.    ARE also relied on Defendants' December 7, 2020 *express confirmation* that the design criteria were final, which was made in response to ARE's *direct inquiries*.  H+H also doubled down on that confirmation in the 11th Amendment, which expressly called for ARE's cooperation with H+H to design the North Tower based on the October 2020 Criteria.

163.    ARE had no reason to believe Defendants' misrepresentations and omissions were false, and could not have discovered through the exercise of ordinary diligence that Defendants' misrepresentations and omissions were false.

164.    For more than a year after ARE executed the 10th Amendment in reliance on Defendants' fraudulent representations and omissions concerning the October 2020 Criteria, ARE, H+H, and their respective consultants worked toward finalizing a FPS design based on the October 2020 Criteria.  The parties exchanged extensive technical drawings and presentations that were based on and complied with the October 2020 Criteria.

165.    At no point between the parties' execution of the 10th Amendment and the negotiations of the 11th Amendment did Defendants disclose to ARE, as required, that H+H planned to make changes to the FPS design requirements materially different from the October 2020 Criteria.

166.    To the contrary, H+H doubled down on its representations that the October 2020 Criteria were final in 2022 as the parties negotiated the 11th Amendment to extend the Closing Date for the Option.  Even when ARE requested that the October 2020 Criteria be expressly incorporated into the 11th Amendment, Defendants failed to disclose and continued to conceal that, in truth and fact, as H+H then well knew and believed, H+H intended to materially modify the FPS design.  Instead, H+H expressly reaffirmed that the October 2020 Criteria were final, and falsely claimed that they would be incorporated into the 11th Amendment, but for the purported unavailability of the person authorized to sign-off on such inclusion.

167.    H+H's claims regarding the unavailability of its personnel were purely pretextual, fabricated in full knowledge that the deadline for ARE to extend the Closing Date was fast approaching.  As ARE later learned, H+H knew but concealed that the October 2020 Criteria

were not final and would be subject to significant and material changes, directly impacting ARE's ability to construct the North Tower.

168.    ARE was thus fully justified in relying on Defendants' misrepresentations and omissions, had no reason to believe that such misrepresentations and omissions were false, and could not have discovered through the exercise of ordinary diligence that Defendants' misrepresentations and omissions were false.

169.    In reliance on Defendants' false and misleading misrepresentations and omissions, ARE entered into the 11th Amendment to the Ground Lease on or about November 3, 2022.

170.    As a direct and proximate result of Defendants' false and fraudulent misrepresentations and omissions, ARE has been damaged in an amount to be determined at trial, but in no event less than $50 million.

### THIRD CAUSE OF ACTION
**(In the alternative, Breach of Contract – Implied Covenant of Good Faith And Fair Dealing)**

171.    ARE repeats, realleges, and incorporates by reference all of the preceding paragraphs as if fully set forth herein.

172.    The Ground Lease and related amendments (collectively, the "Agreement") constitute a valid and binding contract between ARE and H+H.

173.    Among other things, the Agreement provides ARE with the right to develop the Option Premises and construct the North Tower.  ARE has fully complied with its obligations under the Agreement, and paid H+H millions of dollars to exercise the Option and extend its date to close on the Option.

174.    The Agreement, like all contracts in New York, includes an implied covenant of good faith and fair dealing.  Among other things, the implied covenant of good faith and fair dealing required H+H to refrain from taking any action to obstruct or interfere with ARE's exercise of and closing on the Option and development of the North Tower.

175.    Since at least February 2018, H+H has breached the implied covenant of good faith and fair dealing by preventing ARE from closing on its Option and developing the North Tower.  Among other things and as detailed above, H+H repeatedly refused to provide ARE with specific and final criteria which ARE could use to integrate a portion of the FPS into the North Tower's foundation.

176.    After nearly five years of repeated delays and changes in the design of the FPS, H+H finally provided ARE with the October 2020 Criteria, which H+H represented reflected the final design criteria for the FPS.  ARE worked with H+H and H+H's consultants over the next three years to modify the design of the North Tower and prepare technical drawings and documents to demonstrate that the North Tower complies with the October 2020 Criteria and spent millions of dollars to work to demonstrate to H+H that it was ready to proceed with the construction of the FPS and the North Tower.  ARE also paid H+H millions of dollars to extend the Option's Closing Date as it continued to work to comply with the October 2020 Criteria.

177.    Then, in November 2023, H+H changed the design criteria for the floodwall again and demanded that ARE agree to (i) abide by a new set of incomplete design criteria and (ii) *any* criteria that H+H may develop in the future.  H+H's new demands and new criteria would require ARE to spend additional sums to evaluate a new set of design criteria, coordinate points of disagreement, and wait for H+H to finalize its FPS criteria and design; the demands from H+H that ARE abide by incomplete and unknown future criteria have made it impossible for

ARE to perform and close on the Option by November 2024 as required by the 11th Amendment.

178.    H+H's acts and omissions thus adversely impacted ARE's ability to develop the Option Premises and frustrated the purpose of the Agreement, depriving ARE of the benefit of its bargain.  H+H therefore breached its duty of good faith and fair dealing.

179.    As a direct and proximate result of the foregoing, ARE has been damaged and is entitled to recover compensatory damages in an amount to be determined at trial, but in no event less than $50 million.

## JURY DEMAND

Plaintiffs demand a trial by jury on all claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, ARE respectfully requests that this Court enter judgment against Defendants and provide the following relief:

(a)    Actual and compensatory damages in an amount to be determined at trial, but in no event less than $50 million;

(b)    Indirect and consequential damages;

(c)    Reformation of the Ground Lease and its related amendments;

(d)    Pre- and post-judgment interest at the maximum rate allowed by law;

(e)    All costs of suit; and

(f)    All such further relief, both general and special, at law or in equity, to which ARE may show itself justly to be entitled or as this Court may deem appropriate.

Dated:  August 6, 2024
        New York, New York

KASOWITZ BENSON TORRES LLP


By:  _/s/Paul M. O'Connor_____
     Paul M. O'Connor
     Mark P. Ressler
     A. Macdonald Caputo, Jr.
     Melissa A. Barahona

1633 Broadway
New York, New York 10019
Tel.: (212) 506-1700
Fax: (212) 506-1800
poconnor@kasowitz.com
mressler@kasowitz.com
acaputo@kasowitz.com
mbarahona@kasowitz.com


*Attorneys for ARE-East River Science Park, LLC*