UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ARE-EAST RIVER SCIENCE PARK, LLC,

                Plaintiff,

     v.

NEW YORK CITY HEALTH AND
HOSPITALS CORPORATION AND NEW
YORK CITY ECONOMIC
DEVELOPMENT CORPORATION,

                Defendants.

Civil Action No.: 1-24-cv-05956 (NRB)

---

## **PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL DISMISSAL OF THE FIRST AMENDED COMPLAINT**

LOEB & LOEB LLP
Paul M. O'Connor III
Mark P. Ressler
Melissa A. Barahona
345 Park Avenue
New York, New York 10154
Tel.: (212) 407-4000
poconnor@loeb.com
mressler@loeb.com
mbarahona@loeb.com

*Attorneys for Plaintiff ARE-East River
Science Park, LLC*

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF FACTS ....................................................................................4

    A.    Background ........................................................................................4

    B.    ARE Works with Defendants to Design a Floodwall ...............................4

    C.    Defendants Make Material Misrepresentations and Omit Material Facts
        to Induce Plaintiff to Enter into the Amendments ....................................6

    D.    Defendants Demand That ARE Adhere to New FPS Design Criteria.................10

ARGUMENT ....................................................................................................11

I.    Legal Standard .............................................................................................11

II.    Plaintiff Properly and Adequately Pled Fraudulent Inducement .......................................12

    A.    The Amended Complaint Specifically Alleges that Defendants Made
        Repeated Misrepresentations Regarding the October 2020 Report....................12

    B.    Plaintiff Adequately Alleges That Defendants Made Actionable
        Omissions and Misrepresentations ........................................................15

    C.    Plaintiff Adequately Pled Reasonable Reliance ......................................18

    D.    The Amendments' Merger Clauses Do Not Bar Plaintiff's Claims ....................20

III.    Plaintiff Properly Pled Good Faith and Fair Dealing Claims ...........................................23

CONCLUSION...................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adler v. Berg Harmon Assoc.*,
    816 F. Supp. 919 (S.D.N.Y. 1993)..........................................................................13

*Aero Media LLC v. World Healing Ctr. Church, Inc.*,
    2013 U.S. Dist. LEXIS 83891 (S.D.N.Y. June 11, 2013) ......................................20

*Amuze v. Better Bus Bureau*,
    2023 N.Y. Misc. LEXIS 958 (Sup. Ct., N.Y. Cty. March 3, 2023)........................16

*Anderson News, L.L.C. v. Am. Media, Inc.*,
    680 F.3d 162 (2d Cir. 2012)...................................................................................23

*Anschutz Corp. v. Merrill Lynch & Co.*,
    690 F. 3d 98 (2d Cir. 2012)....................................................................................15

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)................................................................................................11

*Bell v. Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)................................................................................................11

*Bridgestone/Firestone v. Recovery Credit Servs.*,
    98 F.3d 13 (S.D.N.Y. 1996)....................................................................................21

*Brock Cap. Grp. LLC v. Siddiqui*,
    2022 U.S. Dist. LEXIS 101738 (S.D.N.Y. June 7, 2020).......................................18

*Campaniello Imps., Ltd. v. Saporiti Italia S.p.A.*,
    117 F.3d 655 (2d Cir. 1997)...................................................................................13

*Cereus Prod. Dev., Inc. v. Boom LLC*,
    2015 U.S. Dist. LEXIS 73503 (S.D.N.Y. June 5, 2015) ........................................14

*Chambers v. Time Warner, Inc.*,
    282 F.3d 147 (2d Cir. 2002)...................................................................................11

*Deutsche Bank Natl. Trust Co. v Sinclair*,
    68 A.D.3d 914 (2d Dep't 2009) ..............................................................................16

*DM Manager LLC v. Fid. Nat'l Info. Servs.*,
    2024 U.S. Dist. LEXIS 59835 (S.D.N.Y. Mar. 29, 2024) ......................................21

*DynCorp v. GTE Corp.*,
  215 F. Supp. 2d 308 (S.D.N.Y. 2002)......................................................................22

*In re Enron Corp.*,
  2005 U.S. Dist. LEXIS 2134 (S.D.N.Y. Feb. 14, 2005)...........................................22

*Fisher Sci. Co. L.L.C. v. Ortho-Clinical Diagnostics, Inc.*,
  2019 U.S. Dist. LEXIS 54316 (S.D.N.Y. March 29, 2019) ......................................25

*Four Finger Art Factory, Inc. v. DiNicola*,
  2000 U.S. Dist. LEXIS 1221 (S.D.N.Y. Feb. 9, 2000)..............................................22

*Hatteras Enters. v. Forsythe Cosmetic Grp. Ltd.*,
  2018 U.S. Dist. LEXIS 68792 (E.D.N.Y. April 23, 2018) ........................................15

*Hollander v. Cayton*,
  145 A.D.2d 605 (2d Dep't 1988) ...............................................................................16

*Int'l Fin. Corp. v Carrera Holdings Inc.*,
  82 A.D.3d 641 (1st Dep't 2011) ................................................................................16

*Johnson v. Nextel Commc'ns, Inc.*,
  660 F.3d 131 (2d Cir. 2011)......................................................................................12

*Koch Indus. v. Hoechst Aktiengesellschaft*,
  727 F. Supp. 2d 199 (S.D.N.Y. 2010).......................................................................21

*Kraus USA Inc. v. Magarik*,
  2020 U.S. Dist. LEXIS 83481 (S.D.N.Y. May 12, 2020) .........................................15

*Kriegel v. Donelli*,
  2014 U.S. Dist. LEXIS 90086 (S.D.N.Y. June 30, 2014) .........................................22

*Lam v. Am. Express Co.*,
  265 F. Supp. 2d 225 (S.D.N.Y. 2003).......................................................................22

*Lam v. Am. Express Co.*,
  265 F. Supp. 2d 225 (S.D.N.Y. 2003).......................................................................22

*Langhamer v. Johnson*,
  2023 U.S. Dist. LEXIS 183960 (S.D.N.Y. Oct. 12, 2023) .......................................20

*Leukemia & Lymphoma Soc'y, Inc. v. Walter & Eliza Hall Inst of Medical Rsch.*,
  2024 U.S. Dist. LEXIS 150883 (S.D.N.Y. Aug. 20, 2024).......................................25

*Malmsteem v. Berdon, LLP*,
  477 F. Supp. 2d 655 (S.D.N.Y. 2007).......................................................................15

*Maloul v. Berkowitz*,
　2008 U.S. Dist. LEXIS 56314 (S.D.N.Y. July 22, 2008) .......................................................20

*Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*,
　500 F.3d 171 (2d Cir. 2007)...........................................................................................12

*Minnie Rose LLC v. Yu*,
　169 F. Supp. 3d 504 (S.D.N.Y. 2016)................................................................................21

*MVP Health Plan, Inc. v. Cotiviti, Inc.*,
　2019 U.S. Dist. LEXIS 190440 (N.D.N.Y. Nov. 1, 2019) ....................................................15

*NCR Corp. v. B.A.T. Indus. P.L.C.*,
　2024 U.S. Dist. LEXIS 165786 (S.D.N.Y. Sept. 14, 2024)...................................................18

*Nielsen Co. (US), LLC v. Success Sys., Inc.*,
　2013 WL 1197857 (S.D.N.Y. Mar. 19, 2013) .......................................................................20

*P.T. Bank Cent. Asia v. ABN AMRO Bank N.V.*,
　301 A.D.2d 373 (1st Dep't 2003) .......................................................................................18

*Pentacon BV v. Vanderhaegen*,
　725 F. Supp. 3d 350 (S.D.N.Y. 2024).............................................................................14, 20

*Permanens Capital L.P. v. Bruce*,
　2022 U.S. Dist. LEXIS 131926 (S.D.N.Y. July 22, 2022) .....................................................23

*President Container Grp. 11, LLC v. Systec Corp.*,
　467 F. Supp. 3d 158 (S.D.N.Y. 2020)................................................................................16

*Rachman Bag Co. v. Liberty Mut. Ins. Co.*,
　46 F.3d 230 (2d Cir. 1995)..............................................................................................12

*Remuda Jet Five LLC v. Empressa Brasileira De Aeronautica, S.A.*,
　2012 U.S. Dist. LEXIS 48736 (S.D.N.Y. March 27, 2002) ...................................................16

*S. Telecom Inc. v. ThreeSixty Brands Grp., LLC*,
　520 F. Supp. 3d 497 (S.D.N.Y. 2021)................................................................................25

*Sehera Food Servs. Inc. v. Empire State Bldg. Co. L.L.C.*,
　74 A.D.3d 542 (1st Dep't 2010) .......................................................................................13

*Sequoia Healthcare Servs., LLC v. Essex Capital Corp.*,
　2018 U.S. Dist. LEXIS 116265 (S.D.N.Y. July 11, 2018) ..............................................21, 22

*Weaver v. Chrysler Corp.*,
　172 F.R.D. 96 (S.D.N.Y. 1997) ........................................................................................13

*Wild Bunch, SA v. Vendian Entertainment, LLC*,
    256 F. Supp.3d 497 (S.D.N.Y. 2017)...........................................................................18, 19, 20

*Yusin Brake Corp. v. Motorcar Parts of Am., Inc.*,
    2014 U.S. Dist. LEXIS 77472 (S.D.N.Y. June 6, 2014) ................................................... 16-17

**Other Authorities**

Fed. R. Civ. P. 9(b) .................................................................................................................11, 12, 14

Fed. R. Civ. P. 15 ...........................................................................................................................12, 25

Fed. R. Civ. P. 12(b)(6)...................................................................................................................11, 23

Plaintiff ARE-East River Science Park, LLC ("Plaintiff" or "ARE") respectfully submits this memorandum of law in opposition to the Motion for Partial Dismissal of the First Amended Complaint (the "Motion") filed by defendants New York City Health and Hospitals Corporation ("H+H") and New York City Economic Development Corporation ("EDC," and together with H+H, "Defendants" or the "City").[1]

## PRELIMINARY STATEMENT

Remarkably, the City makes this partial dismissal motion on the same grounds that drew skepticism from the Court at the October 31, 2024 pre-motion conference, when Your Honor noted that the City's motion would not prevail, encouraged it to file an answer rather than a motion, and urged the parties to proceed with discovery. The City did not listen. Instead, the City has refused to start discovery and clings primarily to the demonstrably flawed argument that the Amended Complaint lacks specificity as to some (but not all) claims.[2]

To the contrary, the Amended Complaint alleges in 196 detailed paragraphs that Defendants repeatedly made fraudulent misrepresentations to ARE and intentionally omitted material facts regarding the design criteria for a floodwall, or Flood Protection System ("FPS"), the City purportedly plans to erect along the FDR Drive. After ARE exercised its contractual option to build a third tower (North Tower) for the Alexandria Center for Life Science-New York City ("ACLS"), Defendants told ARE it either had to incorporate that FPS into the foundation of the North Tower or Defendants would build the FPS through the middle of the ACLS campus.

---

[1] Capitalized terms not defined herein shall have the same meaning as ascribed to them in the First Amended Complaint filed in this action on January 24, 2025 (the "Amended Complaint"). (ECF No. 33.) Citations to specific paragraphs of the Amended Complaint are denoted herein as "Am. Compl. ¶__." Citations to Defendants' Memorandum of Law in Support of the Motion (ECF No. 39) are denoted herein as "Mot. __."

[2] The City has only agreed to engage in discovery relating to ARE's declaratory judgment claim, which is not the subject of this Motion.

Defendants have for at least ten years dissembled about the FPS design criteria and delayed and obstructed ARE's efforts to proceed with developing the North Tower.  The City's misconduct has inflicted massive damages on ARE and denied ARE the benefits of its bargain.  Defendants' Motion should be denied for at least four reasons.

*First*, ARE has adequately pled that Defendants made actionable and material misrepresentations and omissions.  The Amended Complaint specifically identifies the date, speaker, and substance of the alleged misrepresentations and the facts Defendants failed to disclose to ARE at the time Defendants made the statements.  Each of the representations are misrepresentations of existing fact.  The Flaherty Letter states definitively that the FPS design criteria "*should not change,*" an assurance that comports fully with Defendants' similar assurances that the FPS design criteria were "already settled" but for any "fine tuning" (which would not materially impact ARE's ability to close on the Option).  The Court should not take up Defendants' invitation to read "should not change" in a vacuum, and instead must consider that phrase in the context of the detailed facts alleged.  Those facts demonstrate that Defendants knew, and failed to disclose, that the criteria were not settled to induce ARE to enter into the 10th and 11th Amendments ("Amendments") to the Ground Lease.

*Second*, ARE has adequately pled that Defendants violated the implied covenant of good faith and fair dealing.  Defendants' argument that the parties' 2023 negotiations cannot sustain ARE's good faith and fair dealing claim ignores the well-pled facts demonstrating that Defendants frustrated ARE's ability to close on the Option.  Since at least the fall of 2019, Defendants' misconduct included, among other things, delaying and preventing ARE from obtaining information and documents necessary to proceed with its predevelopment obligations prior to closing on the Option.  By way of example only, as alleged, Defendants intentionally

delayed their responses to ARE's questions concerning the FPS prior to the fall of 2020; withheld a critical signature on a building application until ARE sent an email agreeing to make ARE's team available to meet with Defendants regarding the FPS; and frustrated ARE's ability to complete the predevelopment obligations by demanding that ARE unilaterally accept new and incomplete design criteria in 2023 and 2024. Defendants' antics denied ARE its benefit of the bargain under the Ground Lease and prevented ARE from developing the North Tower.

*Third*, Defendants' argument that the cooperation clause in the 10th Amendment ("Cooperation Clause") bars ARE's claims ignores ARE's allegations and rests on the false premise that the Cooperation Clause somehow indicates the design criteria were not settled. The Cooperation Clause does no such thing. As alleged, ARE for years resisted entering into a contractual agreement to "cooperate" with Defendants concerning the FPS because Defendants could not specify the FPS design criteria. ARE, of course, was unwilling to make a contractual commitment until it understood the specific FPS design criteria that applied to the North Tower because the floodwall would tie into the North Tower's foundation. After years of discussions, Defendants finally provided ARE with assurances that, but for minor refinements, the design criteria in an October 2020 Report reflected the "settled" FPS design criteria.

ARE relied on those assurances in agreeing to the Cooperation Clause and in continuing to work with Defendants, assuming that, based on Defendants' representations, the design plans attached to the 10th Amendment complied with the October 2020 Report. But that was not so, as the FPS design criteria were far from finalized. Had ARE known the FPS design criteria were in flux and not settled, ARE would not have agreed to enter into the Amendments. And, to the extent Defendants disagree with ARE's interpretation of the Cooperation Clause and

understanding of Defendants' representations concerning the FPS, that is an issue that cannot be resolved on a motion to dismiss.

**_Finally_**, it is black letter law that the merger clause contained in the Ground Lease cannot bar ARE's claims, as ARE has specifically alleged material misrepresentations and fraudulent omissions collateral to the contract.

Defendants' Motion should be denied in its entirety.

## STATEMENT OF FACTS

### A.    Background

ARE, an indirect subsidiary of Alexandria Real Estate Equities ("Alexandria"), entered into a Ground Lease with H+H, as the Landlord, and the EDC, as the Lease Administrator, to develop a commercial life science campus on the East Side of Manhattan along First Avenue. (Am. Compl. at ¶¶ 26-27, 32.)  The campus, known as the Alexandria Center for Life Science - New York City currently consists of two buildings, the East and West Towers.  The lab space in each tower is fully subleased to commercial life science companies, including Intra-Cellular Therapeutics (acquired by Johnson and Johnson), Immunai, Prevail (acquired by Eli Lilly), and dozens of early-stage commercial life sciences companies Alexandria recruited and invested in to help grow New York City's commercial life science industry.  (_Id._ at ¶¶ 33, 39.)

ARE also holds the Option to build the North Tower on the parcel immediately to the north of the ACLS campus.  (_Id._ at ¶ 34.)  Notwithstanding years of back-and-forth with Defendants over the Option, and the massive costs ARE has incurred, the North Tower was not built as a result of Defendants' misconduct.

### B.    ARE Works with Defendants to Design a Floodwall

In the wake of Hurricane Sandy, FEMA allocated approximately $376 million to H+H to help fund the construction of a floodwall for Bellevue Hospital.  (_Id._ at ¶¶ 40, 42.)  In or around

4

October 2015, H+H notified ARE that H+H planned to use the FEMA funds to build a linear floodwall up to (and past) the Option Premises, beginning near East 26th Street and extending north as far as East 34th Street.  (*Id.* at ¶ 43.)  ARE and Defendants continued to discuss H+H's plans for the FPS sporadically over the next three years.  (*Id.* at ¶¶ 44-57.)  By June 2018, H+H informed ARE that H+H's plans for the FPS were on a "backburner."  (*Id.* at ¶ 57.)  Around the same time, the parties began to negotiate the 7th Amendment to the Ground Lease to set forth the framework for ARE to exercise the Option to close on the Option Premises.  (*Id.*)

The parties executed the 7th Amendment on or about October 3, 2018.  (*Id.* at ¶ 58.)  Prior to closing on the Option, the 7th Amendment required ARE to "deliver schematic designs for the North Tower, including site [] plans; prepare materials required for the completion and approvals of any environmental reviews, assessments, and impact statements; and obtain a final foundation permit and final approval from the Public Design Commission."  (*Id.* at ¶ 59.)  ARE was thus required to both finalize its designs for the North Tower before closing on the Option and commence construction immediately thereafter.  (*Id.*)

On July 24, 2019, ARE sent written notice to Defendants exercising the Option and tendered a $2.5 million security deposit to Defendants.  (*Id.* at ¶ 63.)  Within a week of ARE's exercise of the Option, H+H notified ARE that H+H intended to move forward with its plans for the FPS and that H+H needed "evidence" of ARE's cooperation for H+H's submission to FEMA.  (*Id.* at ¶ 65.)

Between August and December 2019, Defendants repeatedly pressured ARE to enter into a formal agreement to "cooperate" with Defendants concerning the FPS.  (*Id.* at ¶¶ 65-70.)  Because Defendants could never present ARE with settled FPS design criteria—a portion of which would integrate with the foundation of the North Tower—ARE rejected any possibility of

entering into a contractual agreement to cooperate.  In December 2019, Defendants escalated their demands by threatening to pursue an "independent" floodwall strategy, the construction of which would run through the middle of the ACLS campus, bisecting the North Tower from the East and West Towers and destroying the shared goal of a unified life science campus.  (*Id.* at ¶ 73-75.)  Even still, ARE continued to refuse to enter into an agreement to cooperate, so Defendants further escalated their demands by intentionally withholding their signatures to key permit applications that were fundamental to ARE's predevelopment obligations under the 7th Amendment.  (*Id.* at ¶¶ 76-80.)  Only after ARE partially yielded (by sending an email to Defendants agreeing to make ARE's project team available to continue to meet with Defendants regarding the FPS) did Defendants agree to provide the signatures.  (*Id.* at ¶81.)

### C.    Defendants Make Material Misrepresentations and Omit Material Facts to Induce Plaintiff to Enter into the Amendments

Beginning in the fall of 2020, after years of back-and-forth discussions concerning the FPS and Defendants' failed efforts to obtain a formal cooperation agreement from ARE, Defendants made a series of misrepresentations to ARE concerning the FPS design criteria to induce ARE to cooperate.

On October 29, 2020, H+H's Christine Flaherty sent ARE a letter stating that for the "North Tower to be a part of the Community Floodwall, [the North Tower] needs to comply" with the October 2020 Report, which H+H attached to the letter.  (Am. Compl. at ¶ 90.) Significantly, the October 2020 Report "redacted" an April 2020 Report to set forth only those requirements that, according to H+H, were the "basis for establishing ARE's responsibility for the continuation of the Floodwall[.]"  (*Id.* at ¶ 90, Ex. 3.)  The October 2020 Report also omitted any requirement that ARE (i) implement drainage solutions on the Option Premises to assist

H+H with its remapping application, or (ii) delay construction of the North Tower pending

FEMA's review.  (*Id.* at ¶ 91.)

  Given that the FPS design criteria would need to be finalized before ARE could proceed

with its design of the North Tower, ARE wrote to Flaherty on November, 6, 2020 asking H+H to

clarify "when in the H+H process will the Community Floodwall design criteria become

formally finalized so that we can be confident no further material criteria will be added and that

no further material changes will be made?"  (*Id.* at ¶ 93.)  Then, on December 10, 2020, in

response to ARE's questions concerning the FPS design criteria, Defendants sent ARE a letter,

signed by Flaherty ("Flaherty Letter"), which represented that the FPS design criteria were

"settled" and "should not change," subject to minor refinements.  (*Id.* at ¶¶ 93-94.)  Specifically,

Flaherty, on behalf of the "City side," wrote:

> [ARE question] Based on your schedule, when in the H+H process will the
> Community Flood Wall criteria become formally finalized so that no further
> material criteria will be added and no further material changes will be made?
>
> [City Response]: **The criteria are already settled and, based on existing
> information and current conditions, it should not change.** As stated above an
> engineer will have to perform appropriate quality checks and calculations to
> refine the existing preliminary designs to ensure they conform to the criteria.  **The
> necessary refinements are more accurately viewed as fine tuning rather than
> changing the designs as is typical as one moves through the design process to
> final construction drawings.**

(*Id.* at ¶¶ 93-94 (emphasis added).)  Flaherty also confirmed that ARE would not be (i) required

to submit for re-mapping for FEMA and that H+H had no plans to submit the project for re-

mapping; and (ii) H+H planned to submit the project for final approval to FEMA and that their

submission was only "contingent on ARE and H+H finalizing" an agreement that they could

submit to FEMA.  (*Id.* at ¶ 95, Ex. 4.)  At the end of the letter, Flaherty reiterated that the FPS

designs were final subject to minor modifications, stating:

> If ARE's question is when the design of the wall will be final, the answer is that the current designs are final in that they are not expected to be changed except to be refined and modestly adjusted to meet the criteria set out in Question 3.

(*Id.*)  Relying on Defendants' assurances about the October 2020 Report, ARE finally agreed to enter into a formal cooperation agreement with Defendants, and the parties commenced negotiations concerning the 10th Amendment.  (*Id.* at ¶ 104.)

In the months leading up to ARE's execution of the 10th Amendment, Defendants continued to reiterate that the design criteria in the October 2020 Report were "settled" and "final," subject to minor refinements, and that the North Tower need only comply with the criteria in the October 2020 Report, not the April 2020 Report.  For example, on April 26, 2021, Deborah Bindler, EDC's counsel, reiterated in a comment back to ARE on the draft 10th Amendment that the design criteria applicable to ARE's portion of the FPS were set forth in the October 2020 Report.  (*Id.* at ¶ 106.)

On or about July 1, 2021, ARE entered into the 10th Amendment.  (*Id.* at ¶ 103.)  Among other things, the 10th Amendment attached ARE's "Draft Specified Project Drawings and Analysis for the North Tower" (the "TT Memorandum"), which ARE sent to Defendants two months before execution of the 10th Amendment.  (*Id.* at ¶¶ 107-108.)  In reliance on Defendants' prior representations concerning the FPS design criteria, the TT Memorandum expressly stated that the design and calculations were based on the October 2020 Report.  (*Id.*)  Consistent with Defendants' representations that the criteria in the October 2020 Report would need to be "fine tun[ed]" "as is typical," ARE also agreed to cooperate with Defendants to develop mutually agreeable FPS parameters.  (*Id.* at ¶¶ 95, 103.)  ARE only agreed to "cooperate" with Defendants because Defendants represented that the FPS design criteria were final.  (*Id.* at ¶¶ 103-105.)

Over the next sixteen months, ARE and Defendants exchanged draft designs and plans to determine whether ARE's design for the North Tower met the design criteria set forth in the October 2020 Report.  (*Id.* at ¶ 110.)  As the parties continued to work through the design process for the North Tower, the parties agreed to extend the Closing Date for the Option and entered into the 11th Amendment to the Ground Lease.  (*Id.* at ¶¶ 110-112.)  In the days leading up to the execution of the 11th Amendment, at an in-person meeting at EDC's offices, Gbenga Dawodu (EDC SVP) and Melissa Burch (EDC COO) again reiterated that the design criteria in the October 2020 Report were "final."  (*Id.* at ¶ 113.)  ARE executed the 11th Amendment on November 3, 2022 (and paid $5 million to Defendants to extend the Closing Date) in reliance on those representations.  (*Id.* at ¶¶ 104, 114.)

As ARE later discovered, at the time Defendants made each of these representations regarding the October 2020 Report, Defendants knew the design criteria for the FPS were not settled.  Defendants knew the design criteria were not settled because, as ARE later discovered, (i) H+H only engaged its engineer, Arcadis, to provide ***preliminary*** design services and thus the FPS design criteria could not have been "settled"; (ii) there had not been a resolution of the Option Parcel drainage issues, which would necessarily impact the North Tower's construction; and (iii) Defendants had failed to coordinate and obtain approval from the NYC Department of Design and Construction ("DDC"), who, as ARE would later learn, would ultimately be responsible for overseeing the construction of the FPS.  (*See e.g., id.* at ¶¶ 109, 115, 122.)  Defendants also knew that, contrary to their assurances, ARE would be required to comply with the design criteria in the April 2020 Report rather than the design criteria in the October 2020 Report.  (*Compare, id.* at ¶ 107 (alleging that the TT Memorandum expressly stated it was relying on the October 2020 Report); ¶ 113 (in declining ARE's request to attach the October

2020 Report to the 11th Amendment, EDC's counsel stated that the appropriate person was not available at that time to sign off on the request, not that it was the wrong report)) *with id.* at ¶ 128 (alleging that Arcadis told ARE in 2024 that it should have followed the April 2020 Report).

Rather than disclose any of these omitted facts to ARE, Defendants remained silent, wanting ARE to believe—and knowing ARE did believe—their representations that the design criteria in the October 2020 Report were settled.  Had ARE known the truth—namely, that the design criteria were not final, and that Defendants had sought to induce ARE into an impossible and extortionary commitment to meet all of Defendants' FPS-related demands, no matter how arbitrary, and without regard for cost, delays, or impact on the North Tower's development or construction—ARE would have never entered into the Amendments, much less expended significant resources related to the FPS.  (*Id.* at ¶¶ 109, 114-116, 124-125.)

### D.    Defendants Demand That ARE Adhere to New FPS Design Criteria

In the fall of 2023, one year prior to the Closing Date on the Option, Defendants demanded ARE agree to an entirely new set of FPS design criteria.  (*Id.* at ¶¶ 16, 123-125.) Then, in March 2024, H+H demanded that ARE include a seepage wall in the North Tower's foundation, again failing to provide even basic details regarding the seepage wall's depth, dimensions and placement.  (*Id.* at ¶ 127.)  In April 2024, Defendants changed course again and provided ARE with a new report indicating that the FPS will include infrastructure within the roadway of East 30th Street that will directly conflict with ARE's ability to run power lines to the North Tower.  (*Id.* at ¶ 128.)  Significantly, Defendants' April 2024 Report admits that the City's assumptions for the FPS do not even contemplate the North Tower's existence.  (*Id.*)  The City's belated demands and changes to the FPS design criteria less than twelve months prior to the Closing Date for the Option rendered it impossible for ARE to comply with its numerous predevelopment obligations under the 7th Amendment.  (*Id.* at ¶¶ 123-124.)  ARE would now

have less than twelve months to evaluate H+H's new design criteria, raise appropriate questions and concerns, obtain H+H's answers, and negotiate over points of disagreement.  (*Id.*)

Now, nearly seven years after ARE first exercised the Option, the North Tower is still not built and ARE cannot proceed with its development until the FPS design criteria are finalized and approved by FEMA.  As a result of Defendants' fraud and bad faith, ARE has sustained tens of millions of dollars in damages, including costs associated with the design of the floodwall and North Tower, and millions of dollars in lost profits resulting from ARE's inability to complete and sublease the North Tower as originally contemplated.[3]  ARE also has suffered substantial delays and has been denied the benefits of its contractual Option.  (*Id.* at ¶¶ 129-131.)

## ARGUMENT

### I.    Legal Standard

On a motion to dismiss pursuant to Rule 12(b)(6), the standard is whether the plaintiff has pled, not proven, its claims.  A "court must accept as true all allegations contained in a complaint."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The court must construe the complaint "liberally" and draw "all reasonable inferences in plaintiff's favor."  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  A motion to dismiss should be denied where the complaint pleads "enough facts to state a claim to relief that is plausible on its face."  *Bell v. Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  In addition, Rule 9(b) requires a plaintiff alleging fraud to "state with particularity the circumstances constituting [the] fraud."  A claim for

---

[3] The City's statement that ARE's allegations and public statements about the state of the life science market in New York City reflect ARE's position that it "no longer wishes to proceed on the terms negotiated" is a gross mischaracterization of the facts.  (Mot. at n. 3.)  ARE has never informed the City that it is no longer interested in the Option.  ARE commenced this litigation because the City delayed and obstructed ARE's ability to close on the Option as originally contemplated by the parties and it seeks to recover, among other things, the damages caused by such delays, including the loss profits ARE suffered by missing the life science bull market that occurred while ARE sought to develop the Option, which now has substantially softened.  *See, e.g.*, Cushman & Wakefield Insights, https://www.cushmanwakefield.com/en/united-states/insights/life-science-report (last accessed, April 26, 2025) (reporting that NYC has the highest vacancy rate for life-science space in the United States).

fraudulent inducement by misrepresentation is adequately pled with the specificity that Rule 9(b) requires where the complaint, as here, "(1) specif[ies] the statements that the plaintiff contends were fraudulent, (2) identif[ies] the speaker, (3) state[s] where and when the statements were made, and (4) explain[s] why the statements were fraudulent." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006). As demonstrated below, the Amended Complaint satisfies these standards, mandating the denial of Defendants' Motion.[4]

## II.  Plaintiff Properly and Adequately Pled Fraudulent Inducement

To state a claim for fraud in the inducement, a party must allege: "(i) a material misrepresentation of a presently existing or past fact; (ii) an intent to deceive; (iii) reasonable reliance on the misrepresentation by [ARE]; and (iv) resulting damages." *Johnson v. Nextel Commc'ns, Inc*., 660 F.3d 131, 143 (2d Cir. 2011) (citation omitted). Where a party asserts fraudulent inducement based on omission, it must also plead a duty to disclose the omitted information. *See Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc*., 500 F.3d 171, 181 (2d Cir. 2007). Plaintiff's fraud claims easily satisfy these pleading requirements.

### A.  The Amended Complaint Specifically Alleges that Defendants Made Repeated Misrepresentations Regarding the October 2020 Report

Defendants first challenge Plaintiff's fraud claims by mischaracterizing the Amended Complaint's allegations regarding the October 2020 Report. That document is at the heart of the numerous material misrepresentations the City made to ARE and on which ARE relied to its significant detriment in agreeing to enter into the Amendments. Contrary to Defendants' assertions, the Flaherty Letter is not the sole misrepresentation on which Plaintiff relies. (Mot. at

---

[4] Although, as detailed herein, there is no basis to dismiss the Amended Complaint as a matter of law, if this Court were to find that ARE's claims have not been sufficiently pled, ARE respectfully requests leave to amend. *See* Fed. R. Civ. P. 15(a); *see also Rachman Bag Co. v. Liberty Mut. Ins. Co.*, 46 F.3d 230, 234 (2d Cir. 1995) (leave to amend shall be freely given when justice so requires and "refusal to grant leave without justification is inconsistent with the spirit of the Federal Rules.").

10-12.)  Rather, the Amended Complaint specifically identifies multiple misrepresentations

Defendants made regarding the October 2020 Report.[5]

As the Amended Complaint alleges, Defendants represented (we now know falsely) on at

least four separate occasions that the October 2020 Report reflected the design criteria that

applied to the portion of the FPS that Defendants demanded ARE integrate into the North Tower.

(*See* Am. Compl. at ¶ 90, Ex. 3 (alleging that on October 29, 2020 H+H's Flaherty sent ARE a

letter stating that the North Tower needed to comply with the attached October 2020 Report,

which Flaherty represented was the "basis for establishing ARE's responsibility for the

continuation of the Floodwall"); ¶¶ 93-94 (alleging that on December 10, 2020, in response to

ARE's requests for clarification, Defendants referred ARE back to the October 2020 Report and

represented that the material design criteria for the FPS were "settled" and "should not change"

except for any "necessary refinements" that were "more accurately viewed as fine tuning rather

than changing the designs as is typical as one moves through the design process to final

construction designs."); ¶ 106 (alleging that on April 26, 2021, Bindler, EDC's counsel,

reiterated Defendants' prior representations that the design criteria for the FPS were reflected in

the October 2020 Report); ¶ 113 (alleging that on October 12, 2022, EDC's Dawodu and Burch

---

[5] As discussed below (*see* pp. 15-18, *infra*), the Amended Complaint also alleges actionable omissions.  In contrast to the cases cited by Defendants, ARE alleged specific facts showing that Defendants concealed information that would have demonstrated that their statements were false or, at a minimum, misleading.  *See Campaniello Imps., Ltd. v. Saporiti Italia S.p.A.*, 117 F.3d 655, 664 (2d Cir. 1997) (allegations "upon information and belief" regarding defendant's alleged failure to disclose were insufficient to state a fraud claim); *Adler v. Berg Harmon Assoc.*, 816 F. Supp. 919, 924 (S.D.N.Y. 1993) (alleged omissions were insufficiently pled where plaintiff identified a single agent representing only "10-15%" of the plaintiffs that allegedly failed to disclose the relevant facts; *Weaver v. Chrysler Corp.*, 172 F.R.D. 96, 101 (S.D.N.Y. 1997) (alleged omissions were insufficiently pled where plaintiff failed to identify the specific representation that omitted the alleged material fact regarding the child seat and how it misled him).  Moreover, ARE also alleged facts to demonstrate Defendants had a duty to disclose under the "special facts" doctrine.  (*See* pp. 16-18, *infra*.)  Such allegations adequately allege that Defendants had a duty to disclose.  *Cf. Sehera Food Servs. Inc. v. Empire State Bldg. Co. L.L.C.*, 74 A.D.3d 542, 543 (1st Dep't 2010) (finding arm's length transaction could not support fraudulent omission absent a duty to disclose).

represented during an in person meeting at EDC's offices that the criteria set forth in the October 2020 Report were final).

The Amended Complaint further alleges specific facts explaining that Defendants knew such representations were false at the time they made them. (*See, e.g.*, *id.* at ¶ 109 (alleging Defendants knew, when they made the representations, that the October 2020 Report could not reflect "settled" design criteria because "H+H had not formally designed the FPS or resolved the drainage issues on the Option Parcel that would affect the design of the North Tower"); ¶¶ 114-115, 128 (alleging Defendants knew material changes would be made to the October 2020 Report because Arcadis, H+H's engineer, had only been engaged to perform preliminary designs for the FPS).[6]

Such allegations plainly satisfy Rule 9(b)'s requirement to plead the "who, what, when and how" of the alleged fraud.[7] *Cf. Cereus Prod. Dev., Inc. v. Boom LLC*, 2015 U.S. Dist. LEXIS 73503, *17 (S.D.N.Y. June 5, 2015) (denying motion to dismiss where complaint "clearly conveys what the alleged fraudulent statements are, provides details regarding the context of the statement, clearly explains why the statements were fraudulent, and provides allegations leading to the inference that the misstatements were knowingly made"); *Pentacon BV v. Vanderhaegen*, 725 F. Supp. 3d 350, 371, 375-76 (S.D.N.Y. 2024) (holding that "[p]laintiffs' fraudulent inducement claim [] surmounted both the plausibility and particularity bars" where [the] complaint alleged defendants "deliberately withheld critical information and intentionally misrepresented material facts to [p]laintiffs" with the intent to induce [p]laintiffs into entering

---

[6] Remarkably, Defendants' Motion appears to acknowledge that the City always understood the FPS design criteria would change and that ARE was expected to comply with the April 2020 Report and faults ARE for "misinterpret[ing]" the Flaherty Letter. (*See* Mot. at 15, 18 n. 5.)

[7] Defendants' suggestion that the Amended Complaint should be dismissed because it is too particularized is also unavailing. (Mot. at 11 n. 6.) The Amended Complaint is detailed because the history between the parties dates back to 2006, and ARE appropriately identifies the facts and history relevant to each of its claims.

into the agreement); *MVP Health Plan, Inc. v. Cotiviti, Inc.*, 2019 U.S. Dist. LEXIS 190440, at

*12 (N.D.N.Y. Nov. 1, 2019) (finding plaintiff adequately alleged fraudulent inducement where

complaint alleged that "[d]efendant knew about the flaws" in its operations, "made false

representations …[regarding] the functionality," and "proffered false reasons to plaintiff to

negotiate an [amended] agreement.").[8]

### B.    Plaintiff Adequately Alleges That Defendants Made Actionable Omissions and Misrepresentations

Defendants' argument that the Amended Complaint only identifies non-actionable

statements of "future predictions" rather than actionable statements of existing fact likewise fails.

(Mot. at 16-18.)  All of Defendants' statements were unambiguous misrepresentations of existing

fact, not mere "future predictions" or "expectations" regarding the FPS design criteria.

Defendants try to isolate the phrase "should not change" in the Flaherty Letter and

divorce it from that letter's other representations and context, along with the rest of the Amended

Complaint's allegations as a whole.  (*Id.*)  The Amended Complaint alleges that Defendants

represented in the Flaherty Letter that the ***material*** design criteria in the October 2020 Report

were "settled" and "should not change" except as may be necessary for the "***fine tuning rather***

***than changing the designs as is typical as one moves through the design process to final***

***construction drawings***."  (Am. Compl. at ¶ 94 (emphasis added).)  Defendants also ignore

---

[8]  The undescribed litany of cases cited by Defendants in support of their flawed position that the misrepresentations alleged in the Amended Complaint lack particularity are inapposite.  In each case, the complaint at issue either failed to plead specific facts regarding the alleged misrepresentations or failed to demonstrate why the statements were false given public disclosures.  *See Malmsteem v. Berdon, LLP*, 477 F. Supp. 2d 655, 664 (S.D.N.Y. 2007) (failing to identify the specific contents of the alleged misrepresentation, date of the misrepresentation, or which defendant allegedly made the misrepresentation); *Kraus USA Inc. v. Magarik*, 2020 U.S. Dist. LEXIS 83481, at *44 (S.D.N.Y. May 12, 2020) (finding allegations that misrepresentations occurred at some point within two year time period were insufficient); *Hatteras Enters. v. Forsythe Cosmetic Grp. Ltd.*, 2018 U.S. Dist. LEXIS 68792, at *32-33 (E.D.N.Y. April 23, 2018) (finding allegations that misrepresentations occurred within a 6-month window insufficient); *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F. 3d 98, 108 (2d Cir. 2012) (complaint failed to state claim for securities fraud where prior SEC Order and defendant's public disclosures were sufficient to apprise plaintiff of defendant's bidding practices).

ARE's allegations that Defendants repeatedly represented to ARE, outside of the Flaherty Letter, that the design criteria in the October 2020 Report reflected the criteria ARE needed to use for the North Tower and that such criteria were "final." (*See* pp. 8-9, *supra*.)

All of these statements were intentional misrepresentations of existing fact.[9] At the time Defendants made these representations, Defendants knew the material design criteria for the FPS were not settled because, among other things, their engineer was only engaged for "preliminary" designs, they failed to coordinate and obtain approval from the DDC, and Defendants had not resolved FPS-related drainage issues, which would necessarily materially impact the North Tower's design and construction timeline. (*Id.* at ¶¶ 109, 115, 122.)

In addition to their affirmative misrepresentations, Defendants' failure to disclose material facts concerning the FPS and its development likewise supports ARE's fraudulent inducement claims. A party's failure to disclose material facts is actionable (1) where, as here, "the party has made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth;" (2) "when[, as here,] the parties stand in a fiduciary or confidential relationship with each other;" and (3) under the special facts doctrine, which is "where[, as here,] one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." *Yusin Brake Corp. v. Motorcar Parts of Am., Inc.*, 2014 U.S. Dist. LEXIS

---

[9] Defendants' statements were neither ambiguous nor promises of future intent but specific representations regarding the finality of the FPS design criteria. *Cf. Remuda Jet Five LLC v. Empressa Brasileira De Aeronautica, S.A.*, 2012 U.S. Dist. LEXIS 48736, *51 (S.D.N.Y. March 27, 2002) (future performance guarantees for jet that defendant would deliver to plaintiff failed to state a fraud claim); *Deutsche Bank Natl. Trust Co. v Sinclair*, 68 A.D.3d 914, 916 (2d Dep't 2009) (alleged statements regarding benefits of refinancing could not support a fraud claim); *President Container Grp. 11, LLC v. Systec Corp.*, 467 F. Supp. 3d 158, 166 (S.D.N.Y. 2020) (vague allegations regarding the future performance of conveyor system could not support a fraud claim); *Int'l Fin. Corp. v Carrera Holdings Inc.*, 82 A.D.3d 641, 641 (1st Dep't 2011) (expressions of hope concerning stable government relations were non-actionable); *Hollander v. Cayton*, 145 A.D.2d 605, 606 (2d Dep't 1988) (opinion that plaintiff was "immoral" and "unethical" "constituted [a] nonactionable opinion); *Amuze v. Better Bus. Bureau*, 2023 N.Y. Misc. LEXIS 958 (Sup. Ct., N.Y. Cty. March 3, 2023) (similar).

77472, at \*24-26 (S.D.N.Y. June 6, 2014) (quoting *Brass v. Am. Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)).  ARE has alleged sufficient facts demonstrating that Defendants had a duty to disclose because of their superior knowledge and their decision to make knowingly incomplete statements regarding the FPS.

Even assuming Defendants did not intentionally misrepresent the finality of the October 2020 Report (which they did), the Amended Complaint alleges facts demonstrating Defendants were uniquely aware they "had not even formally designed the FPS, or resolved the drainage issues," that "FEMA had not signed off on either the October 2020 Report, or even H&H's retention of Arcadis," and "that DDC review and sign off were required."[10]  (Mot. at 18; *see* Am. Compl. at ¶¶ 104, 115, 122.)  Each of these facts would have ***materially*** altered the design criteria in the October 2020 Report because, at a minimum, each would have delayed further design and construction until these issues were resolved.  (*Id*.)  Defendants were also aware that ARE believed it should rely on the October 2020 Report, rather than the April 2020 Report, to develop its North Tower designs.  (*Id.* at ¶¶ 106-07, 113.)  Rather than correcting their prior misrepresentations concerning the October 2020 Report, Defendants remained silent and continued to reiterate that the FPS design criteria were final.  Had Defendants disclosed the true facts, ARE would have known that the design criteria in the October 2020 Report were not "settled," and would not have entered into the Amendments.

Taken as a whole, these allegations plausibly give rise to the inference that Defendants had a duty to disclose the omitted facts to ARE to correct Defendants' prior representations or

---

[10]  Defendants' focus on the Amended Complaint's alleged failure to demonstrate how the design criteria changed is an inappropriate inquiry on a motion to dismiss.  In any event, the Amended Complaint specifically alleges that Defendants, through their consultants, notified ARE it always needed to comply with the April 2020 Report, directly contradicting their earlier representation that the October 2020 Report, rather than the April 2020 Report, reflected the "basis" for ARE's portion of the FPS.  (Am. Compl. at  ¶ 128.)

render them not misleading.  *See NCR Corp. v. B.A.T. Indus. P.L.C.*, 2024 U.S. Dist. LEXIS 165786, at *33 (S.D.N.Y. Sept. 14, 2024) (complaint's allegations allow for, at a minimum, the plausible inferences that [defendant] had "superior knowledge of certain information" . . .  and that [defendant] knew that [plaintiff] was "acting on the basis of mistaken knowledge" when it signed the agreement); *Wild Bunch, SA v. Vendian Entertainment, LLC*, 256 F. Supp.3d 497, 506 (S.D.N.Y. 2017) ("[T]he heartland of [the 'superior knowledge'] doctrine is the realization that an arm's-length negotiation cannot honestly operate if one party keeps secret a material fact that the other party cannot reasonably discover."); *see also P.T. Bank Cent. Asia v. ABN AMRO Bank N.V.*, 301 A.D.2d 373, 378 (1st Dep't 2003) (finding allegations demonstrating that defendant's representations to plaintiff may have been overstated in light of the information uniquely in defendant's possession were sufficient to state a fraud claim under NY law).

## C.  Plaintiff Adequately Pled Reasonable Reliance

Though a fact dependent argument almost never is appropriate for resolution at the dismissal stage, Defendants argue that Plaintiff cannot establish reasonable reliance as a matter of law because it was unreasonable for ARE to have relied on "the finality and exclusivity of the October 2020 Criteria" in light of the 10th Amendment's Cooperation Clause, Plaintiff's alleged "misinterpretation" of the Flaherty Letter, and the context of the parties' "decade-long negotiations of the Option."  (Mot. at 12-16.)  Defendants are wrong.[11]

ARE alleges it repeatedly resisted entering into a cooperation agreement with Defendants because Defendants could not provide ARE with final design criteria for the FPS.  (Am. Compl

---

[11] Defendants' reliance on *Brock Cap. Grp. LLC v. Siddiqui*, 2022 US Dist. LEXIS 101738 (S.D.N.Y. June 7, 2020) is misplaced.  In *Brock*, this Court found that an investment bank did not reasonably rely on a teenager's representation about his father's employment history because the bank failed to conduct "any investigation of [the father's] background at any point . . . even when supposedly confronted with conflicting descriptions of [the father's] job experience[.]"  *Brock Cap.*, 2022 US Dist. LEXIS 101738, at *5.  Here, ARE has provided extensive details on its efforts to confirm that the FPS design criteria were final.

at ¶¶ 65-81.)  After years of back-and-forth, Defendants presented ARE with the October 2020 Report, representing that this report, not the April 2020 Report, reflected the "basis for establishing ARE's responsibility" for the FPS portion intersecting with the North Tower.  (*Id.* at ¶ 90, Ex. 3.)  In response to ARE's persistent questions, Defendants finally confirmed in the Flaherty Letter that the October 2020 Report reflected "settled" criteria, and encouraged the parties to move forward.  (*Id.* at ¶¶ 93-94.)  Defendants reiterated those representations prior to ARE's execution of the 10th and 11th Amendments.  (*Id.* at ¶ 106.)  It was only then, after this ongoing series of assurances and in clear reasonable reliance thereon, that ARE entered into the 10th Amendment and agreed to "cooperate" to attempt to develop "mutually agreeable written parameters" related to the Landlord's proposed flood mitigation requirements.[12]  (*Id.* at ¶ 103.)

Construing these allegations in ARE's favor, it was entirely reasonable for ARE to rely on Defendants' representations in the face of the Cooperation Clause because, based on Defendants' assurances that the October 2020 Criteria were settled, ARE believed the parties would "cooperate" to "fine tun[e]" the designs, as opposed to materially changing their fundamental components.  (*Id.* at ¶¶ 93-94.)  Far from negating ARE's reasonable reliance, the Flaherty Letter's express confirmation that such "refinements" were necessary, combined with ARE's resistance to formally agreeing to cooperate with Defendants absent confirmation that the criteria were final, fully supports ARE's reasonable reliance.  *See Wild Bunch, SA*, 256 F. Supp.3d at 509 (stating that plaintiff's allegations that it relied on "a steady drumbeat of false assurances" of defendant's ability to perform the contract "more than satisfie[d] [plaintiff's]

---

[12]  Contrary to Defendants' arguments, (Mot. at 14), the Amended Complaint specifically alleges that the "written parameters" referenced in the Cooperation Clause were different than the FPS design criteria.  As ARE alleges, ARE understood that the Cooperation Clause related to (i) ARE's agreement to "continue to work with H+H and EDC to implement its design for the North Tower based on the October 2020 Criteria" and (ii)  the "agreements for reimbursement of ARE's costs, the operation and maintenance of the FPS, and any access easements necessary for construction of the FPS."  (*Id.* at ¶ 103.)

limited pleading burden on the element of reasonable reliance."); *Pentacon BV*, 725 F. Supp. 3d at 377 (finding plaintiffs sufficiently pled reliance where the "alleged information asymmetry" between plaintiffs and defendants provided "some amount of *de facto* reliance").

In any event, whether Plaintiff's reliance on Defendants' representations was "reasonable" is a question of fact that typically cannot be resolved on a motion to dismiss, particularly where, as here, the complaint contains numerous fact laden allegations on the issue. *Wild Bunch, SA*, 256 F. Supp.3d at 507. ("[D]ismissals for failure to allege reasonable reliance are heavily disfavored."); *Maloul v. Berkowitz*, 2008 U.S. Dist. LEXIS 56314, at *6 (S.D.N.Y. July 22, 2008) (stating whether or not reliance on alleged misrepresentations is reasonable … is "intensely fact-specific"). ARE alleged more than sufficient facts to support the inference that it reasonably relied on Defendants' representations when it entered into the Amendments. *See Langhamer v. Johnson*, 2023 U.S. Dist. LEXIS 183960, at *25-26 (S.D.N.Y. Oct. 12, 2023) (denying motion to dismiss and noting that the Second Circuit has cautioned that "the reasonableness of a plaintiff's reliance is a 'nettlesome' and 'fact-intensive' question" which should not be "lightly dispos[ed] of at the motion to dismiss stage").

### D.    The Amendments' Merger Clauses Do Not Bar Plaintiff's Claims

ARE's fraudulent inducement claims are not barred by the merger clauses in the Ground Lease and Amendments. It is well established that a general merger clause is ineffective to preclude parol evidence that a party induced a contract by means of fraud. *See Nielsen Co. (US), LLC v. Success Sys., Inc.*, 2013 WL 1197857, at *8–9 (S.D.N.Y. Mar. 19, 2013) ("[E]ven when the contract contains an omnibus statement that the written instrument embodies the whole agreement, or that no representations have been made, a party may still assert that he was induced to enter the contract by fraud."); *Aero Media LLC v. World Healing Ctr. Church, Inc.*, 2013 U.S. Dist. LEXIS 83891, at *14 (S.D.N.Y. June 11, 2013) (noting that "New York courts

routinely permit fraudulent inducement claims to go forward although the written contract contains a merger clause").[13]  ARE's fraud claims are premised on Defendants' knowing misrepresentations and omissions of material fact concerning the FPS.  (*See* pp. 6-10, *supra*.) The merger clauses in the Ground Lease and Amendments therefore cannot operate as a bar to ARE's fraud claims.

ARE's fraudulent inducement claims likewise fully comply with the factors set forth in the Second Circuit's *Bridgestone* decision.  *See Bridgestone/Firestone v. Recovery Credit Servs.*, 98 F.3d 13 (S.D.N.Y. 1996).  *Bridgestone* expressly states that a fraudulent inducement claim shall not be dismissed as duplicative where, as here, the alleged misrepresentation or omission of material fact is "collateral or extraneous to the contract."  *Id.* at 20.  Defendants' express assurances that the October 2020 Criteria were "settled" or "final" were not contract terms, but rather a collateral commitment, confirming that ARE's fraud and covenant claims are distinct and independently viable.  *See Sequoia Healthcare Servs., LLC v. Essex Capital Corp.*, 2018 U.S. Dist. LEXIS 116265, at *13 (S.D.N.Y. July 11, 2018) (parallel fraud and contract claims sustainable if plaintiff "demonstrate[s] a fraudulent misrepresentation collateral or extraneous to the contract" (internal quotation marks omitted));[14] *DM Manager LLC v. Fid. Nat'l Info. Servs.*, 2024 U.S. Dist. LEXIS 59835, at *18 (S.D.N.Y. Mar. 29, 2024) (finding plaintiffs' allegations of "ongoing affirmative misrepresentations, or misrepresentations of present facts" sufficient to support claims of fraud collateral to the parties' contract); *Minnie Rose LLC v. Yu*, 169 F. Supp.

---

[13]  *Koch Indus. v. Hoechst Aktiengesellschaft*, 727 F. Supp. 2d 199 (S.D.N.Y. 2010) is inapposite. (Mot. at 21.)  In *Koch*, the Court determined that the merger clause barred the fraud claim because the alleged misrepresentations expressly contradicted the representations made in the contract, and, thus, were not collateral to the agreement.  That is not the case here.  (*See* pp. 22-23, *infra*.)

[14]  In *Sequoia Healthcare Servs.*, this Court determined that the complaint failed to satisfy the *Bridgestone* factors because, unlike here, the "alleged misrepresentation [fell] directly within the scope of the loan agreement's contractual terms."  *Sequoia Healthcare Servs.*, 2018 U.S. Dist. LEXIS 116265, at *15.

3d 504, 520-21 (S.D.N.Y. 2016) (finding sufficient allegations of fraud where Plaintiff did not claim that Defendants failed to perform under the agreement, but rather that "Defendants actively misrepresented present facts" by "actively conceal[ing] the actual price of manufacturing each time they sent Plaintiff invoices").

While this Court has recognized that facts falling within the "purview" of a contract's terms may render a fraudulent inducement claim invalid, *In re Enron Corp.*, 2005 U.S. Dist. LEXIS 2134 (S.D.N.Y. Feb. 14, 2005), Defendants' misrepresentations concerning the October 2020 Report do not concern matters falling within the purview of the Amendments.[15]  As set forth above, Defendants' representations concerning the FPS do not conflict with either the Cooperation Clause's express language or subject matter because the parties contemplated that once the design criteria were settled—*i.e.* by the October 2020 Report—the parties would cooperate to "refine" and "fine tun[e]" the final designs "as is typical" in the design phase of a construction process.  (Am. Compl. at ¶ 94.)  In fact, the parties went so far as attaching ARE's design to the North Tower in the 10th Amendment because they planned to work together to ensure those designs complied with the October 2020 Report.  (Id. at ¶ 108.)  ARE also understood that the parties would work through ancillary agreements related to the FPS, including "agreements for reimbursement of ARE's costs, the operation and maintenance of the FPS, and any access easements necessary for construction of the FPS."  (Id. at ¶ 103.)

---

[15]  The complaint in *In re Enron Corp.* alleged "essentially a claim that Enron" did not comply with the contract at issue by claiming that plaintiff did not receive "fair value" in exchange for its exercise of the put option.  Here, however, ARE's fraud claims are collateral to the Ground Lease.  *Cf. Four Finger Art Factory, Inc. v. DiNicola*, 2000 U.S. Dist. LEXIS 1221 (S.D.N.Y. Feb. 9, 2000) (dismissing fraud claim where issues concerned matters specifically covered by contract); *DynCorp v. GTE Corp.*, 215 F. Supp. 2d 308 (S.D.N.Y. 2002) (same); *Lam v. Am. Express Co.*, 265 F. Supp. 2d 225 (S.D.N.Y. 2003) (same); *Kriegel v. Donelli*, 2014 U.S. Dist. LEXIS 90086 (S.D.N.Y. June 30, 2014) (same); *Sequoia Healthcare Servs.*, 2018 U.S. Dist. LEXIS 116265, at *13 (Buchwald, J.) (dismissing fraud claim where defendant's alleged "misrepresentation [fell] directly within the scope of the loan agreement's contractual terms").

Though Defendants may disagree as to the intent behind their representations concerning the FPS as it relates to the Cooperation Clause, ARE has, at this early stage in the case, alleged sufficient facts to demonstrate Defendants' representations were collateral to the contract. *See e.g., Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012) ("The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion."); *Permanens Capital L.P. v. Bruce*, 2022 U.S. Dist. LEXIS 131926, at *11 (S.D.N.Y. July 22, 2022) (finding defendant's "argument eschews the applicable standards on a motion to dismiss and, at best, raises disputed issues of fact that cannot be the basis for granting" the motion to dismiss).

ARE has thus adequately alleged its fraud claims.

### III.    Plaintiff Properly Pled Good Faith and Fair Dealing Claims

In moving to dismiss Plaintiff's good faith and fair dealing claim, Defendants largely repeat their arguments that the Cooperation Clause and Flaherty Letter demonstrate that the parties always anticipated changes to the FPS design criteria such that ARE cannot allege that Defendants breached the implied covenant by changing the criteria. (Mot. at 23-25.)

As shown above, Defendants' interpretation of the Cooperation Clause and Flaherty Letter ignores the Amended Complaint's allegations concerning the circumstances leading up to, and following, the Flaherty Letter and Cooperation Clause. The language within the Cooperation Clause and Flaherty Letter upon which Defendants rely is entirely consistent with ARE's allegations that Defendants represented the **material** design criteria in the October 2020 Report reflected the "settled" and "final" criteria for the portion of the FPS intersecting with the North Tower. (*See,* pp. 7-8, *supra.*)

Defendants' argument that allegations concerning the parties' contract negotiations in 2023 cannot support a good faith and fair dealing claim also fails. (Mot. at 23-24.) ARE does

not allege that Defendants' negotiation tactics violated the implied covenant. Rather, ARE alleges that in 2023 Defendants frustrated ARE's ability to close on the Option because Defendants did not inform ARE that they planned to change the design criteria less than one year prior to the closing date for the Option. (Am. Compl. at ¶¶ 16, 123-125.) Setting aside whether or not Defendants made fraudulent misrepresentations concerning the finality of the FPS design criteria, Defendants' delay in providing new or modified criteria in 2023 and 2024 necessarily frustrated ARE's ability to close on the Option because it was impossible for ARE to satisfy the Predevelopment Obligations, including finishing design and commencing construction, with less than one year prior to the Closing (scheduled for November 2024).

Even assuming Defendants' 2023 conduct could not support a good faith and faith dealing claim, ARE's claim is far broader than Defendants' 2023 conduct or their representations concerning the October 2020 Report. As the Amended Complaint alleges, Defendants' violations of the implied covenant began in at least August 2019.

Beginning in or about August 2019—only weeks after ARE's exercise of the Option—Defendants began to pressure ARE to enter into a "cooperation agreement" to develop a design for the floodwall. (*Id.* at ¶¶ 65-69.) After ARE rejected Defendants' demands, Defendants turned up the pressure, informing ARE in December 2019 it had two options: (1) cooperate with Defendants to build a FPS that would intersect with the North Tower's foundation or (2) refuse to cooperate, in which case, Defendants would pursue an "independent" floodwall strategy, *i.e.* build a floodwall that would bisect the ACLS campus from the North Tower. After ARE continued to reject Defendants' demands, Defendants obstructed ARE's efforts to close on the Option, including by withholding their signature on a required building permit application that ARE needed to submit under the 7th Amendment, in order to extract ARE's written

24

acknowledgement it would cooperate with Defendants on the FPS in exchange for the signature. (*Id.* at ¶¶ 76-79.)

These allegations, at a minimum, demonstrate Defendants engaged in conduct that obstructed or interfered with ARE's exercise of, closing on, and development of the Option in violation of the implied covenant of good faith and fair dealing. *See S. Telecom Inc. v. ThreeSixty Brands Grp., LLC*, 520 F. Supp. 3d 497, 510 (S.D.N.Y. 2021) (denying motion to dismiss complaint that alleged defendants denied plaintiff the benefit of its bargain by delaying their review of plaintiff's product application, notwithstanding defendants' discretion over the review of such application); *Fisher Sci. Co. L.L.C. v. Ortho-Clinical Diagnostics, Inc.*, 2019 U.S. Dist. LEXIS 54316, *16-17 (S.D.N.Y. March 29, 2019) (denying motion to dismiss implied covenant claim where plaintiff alleged defendant prevented its performance under the contract by delaying in providing plaintiff with a plan for the services contemplated under the agreement and purporting to invoke the original completion date for the services after agreeing to extend the date); *see also Leukemia & Lymphoma Soc'y, Inc. v. Walter & Eliza Hall Inst of Medical Rsch.*, 2024 U.S. Dist. LEXIS 150883, *31 (S.D.N.Y. Aug. 20, 2024) (stating that the implied covenant prevents a party from doing "anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.").  Defendants' Motion to dismiss Plaintiff's good faith and fair dealing claim should be denied.

## CONCLUSION

For all the foregoing reasons, ARE respectfully requests that the Court deny Defendants' Partial Motion to Dismiss in its entirety.  In the event the Court grants Defendants' Motion, in full or part (and there is no basis to do so), ARE respectfully requests that the Court grant it leave to amend pursuant to Fed. R. Civ. P. 15.

Dated: May 1, 2025

Respectfully submitted,

LOEB & LOEB LLP


By: /s/ *Paul M. O'Connor III*
    Paul M. O'Connor III
    Mark P. Ressler
    Melissa A. Barahona

    345 Park Avenue
    New York, New York 10154
    Tel.: (212) 407-4000
    poconnor@loeb.com
    mressler@loeb.com
    mbarahona@loeb.com

    *Attorneys for Plaintiff ARE-East*
    *River Science Park, LLC*