UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------X

ARE-EAST RIVER SCIENCE PARK, LLC,

                    Plaintiff,       **MEMORANDUM AND ORDER**

        - against -         24 Civ. 5956 (NRB)

NEW YORK CITY HEALTH AND HOSPITALS
CORPORATION and NEW YORK CITY
ECONOMIC DEVELOPMENT CORPORATION,

                  Defendants.

---------------------------------X

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Plaintiff ARE-East River Science Park, LLC ("plaintiff" or "ARE") brought this action against defendants New York City Health and Hospitals Corporation ("H+H") and the New York City Economic Development Corporation ("EDC" and, together with "H+H," "defendants" or the "City") on August 6, 2024. ECF No. 1. On January 24, 2025, ARE filed an amended complaint asserting four claims: (i) fraudulent inducement arising out of the "10th Amendment" to the "Ground Lease" agreement between ARE and H+H; (ii) fraudulent inducement arising out of the "11th Amendment" to the same lease; (iii) breach of the implied covenant of good faith and fair dealing; and (iv) declaratory judgment pursuant to 28 U.S.C. § 2201 et seq. ECF No. 33 ("Amended Complaint" or "AC"). Now pending before the Court is the City's March 17, 2025 motion

to dismiss ARE's fraudulent inducement and implied covenant claims pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6). ECF No. 39.  Importantly, the City does not seek to dismiss ARE's fourth claim for declaratory relief, which both parties agree "turns on a . . . fact question not appropriate for a motion to dismiss[.]"[1]  ECF No. 40 ("Mot.") at 1 n.1; see also ECF No. 45 ("Opp.") at 1 n.2.  Before turning to the merits of the parties' legal arguments, the Court will first restate the key factual allegations in the Amended Complaint.

## BACKGROUND

This case arises from a flood protection system (the "FPS" or "floodwall") designed to protect the proposed "North Tower" of the Alexandria Center for Life Science ("ACLS") and adjoining areas. ARE, the developer of ACLS, has leased a plot of land between 28th and 30th Streets along Manhattan's East River since 2006 pursuant to a ground lease agreement, ECF No. 41-1 (the "Ground Lease"), with H+H, the owner of the land.  AC ¶ 5.  Since 2006, ARE has successfully constructed and operated an "East Tower" and "West Tower" on the premises.  Id. ¶ 6.  Following Superstorm Sandy,

---

[1]    "Specifically, there is a dispute regarding whether H+H's failure to meet its obligations under, among other things, Section 5.2 of the 7th Amendment, has tolled the Closing Date under the Agreement pursuant to Section 24.1(f) of the Ground Lease and the relevant portions of the 7th Amendment."  AC ¶ 193. Plaintiff "seeks a declaratory judgment that (i) the Closing Date is currently tolled; (ii) the Option has not terminated; and (iii) Defendants are not permitted under the Agreement to market the Option Premises."  Id. ¶ 195.

which devastated large parts of the Tri-State Area in 2012, H+H and EDC approached ARE in 2015 with proposals to build a floodwall to better protect ACLS and nearby areas from future storms.  Id. ¶¶ 43-45.  When ARE exercised its contractual option (the "Option") to build the North Tower in 2019, H+H pushed for a "cooperation clause" amendment to the Ground Lease, which would oblige ARE to work with H+H and EDC on designing and constructing the FPS.  Id. ¶¶ 58-81.  After a period of negotiation regarding the FPS' potential impact on the proposed North Tower, ARE entered into the 10th Amendment to the Ground Lease on July 1, 2021, ECF No. 41-3 (the "10th Amendment").  Id. ¶¶ 82-109.  The 10th Amendment contained a cooperation clause requiring "[ARE] and [H+H] [to] cooperate in good faith to attempt to reach mutually agreeable written parameters related to [H+H's] proposed flood mitigation requirements[.]"  See 10th Amendment § 4.b. (the "Cooperation Clause").  The parties further entered into an 11th Amendment to the Ground Lease on November 3, 2022, ECF No. 41-4 (the "11th Amendment" and, together with the 10th Amendment, the "Amendments"), which contained the same clause, id. § 4.b.  AC ¶ 112.

ARE alleges that before it signed the 10th and 11th Amendments, the City represented that the FPS design criteria in a report sent to ARE by email on October 29, 2020 and dated October 20, 2020, ECF No. 33-3 (the "October 2020 Report" or "October 2020

Criteria"), were final and exclusive of any other criteria, including criteria listed in an earlier April 26, 2020 report, ECF No. 41-5 (the "April 2020 Report" or "April 2020 Criteria").  AC ¶ 96.  In particular, ARE points to a December 10, 2020 letter sent by Christine Flaherty, a Senior Vice President at H+H, which stated that the design criteria "should not change."  See ECF No. 33-4 ("Flaherty Letter") ¶ 2.  ARE alleges that the Flaherty Letter and several similar representations were false because after ARE entered into the Amendments the City revealed a series of design criteria not included in the October 2020 Report.  Id. ¶¶ 117-28. These alleged misrepresentations and delays have supposedly "prevented" ARE from closing on the Option and forced "ARE to incur significant expenses and lost opportunity costs" due to the "soften[ing]" of the life sciences market since 2019, when it exercised the Option.  Id. ¶ 130.  ARE claims at least $50 million in actual and compensatory damages arising from the City's alleged misrepresentations that the October 2020 Report was final and exclusive of other criteria and alleged breaches of the implied covenant of good faith and fair dealing.  Id. ¶¶ 155, 179, 188.

## I.    The Parties

ARE is a Delaware limited liability company whose sole member, Alexandria Real Estate Equities, L.P., is a Delaware limited partnership.  AC ¶ 20.  None of the partners of Alexandria Real Estate Equities, L.P. are citizens of New York.  Id.  Alexandria

Real Estate Equities, L.P. is owned by Alexandria Real Estate Equities, Inc., a California-based company incorporated in Maryland and listed on the S&P 500. Id.; see also ECF Nos. 33-1 at 1, 33-5 at 6. Alexandria Real Estate Equities, L.P. is also partially owned by ARS-QRS Corporation, also a California-based company incorporated in Maryland. Id. H+H, purportedly the largest public health care system in the country, is a public benefit corporation with its principal place of business in New York, New York. Id. ¶ 21. EDC is a non-profit corporation with its principal place of business in New York, New York. Id. ¶ 22. EDC's business, inter alia, is "developing real estate," and EDC served as "lease administrator under the ground lease" throughout the relevant time period.[2] Id.

## II.  The Ground Lease and Early Development

The parties' relationship began on November 12, 2004, when H+H issued a request for proposals (the "RFP") for the development of Block 962 of Lot 100 on the Borough of Manhattan Tax Map (the "Original Premises"). AC ¶ 27. The RFP also mentioned an additional parcel between East 29th and East 30th Streets, directly north of the Original Premises (the "Option Premises" and, together with the Original Premises, the "Premises"). Id. The Option

---

[2]    The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties and the claimed damages amount exceeds $75,000. See AC ¶ 23.

Premises "would be made available to the winner of the RFP as an option at a later date, anticipated to be in or around 2010." Id.

H+H conditionally designated ARE as the winner of the design contest, and on December 8, 2005 the New York City Council approved H+H's request to lease the Premises to ARE. Id. ¶¶ 28-31. "After substantial negotiations," ARE and H+H entered into the Ground Lease on December 29, 2006, which, inter alia, obliged ARE to "develop a commercial bioscience and scientific research and development facility, in furtherance of the City's goal of creating additional space in New York City for commercial bioscience companies." Id. ¶ 32 (internal quotation marks omitted). Pursuant to the Ground Lease, ARE would develop an "East Tower" and "West Tower" on the Original Premises. Id. ¶ 33. The Ground Lease also provided ARE with a contractual option to "develop[], use and operat[e] the Option Premises as a commercial bioscience and scientific research and development facility" by building a third, "North Tower." Id. ¶ 34 (alterations in original). Pursuant to the Ground Lease, H+H delegated "all rights, obligations and duties of Landlord under the Lease" to EDC as the lease administrator. Id. ¶ 35.

ARE subsequently constructed the East Tower, completed in 2010, and the West Tower, completed in 2013. Id. ¶¶ 36-40. Both properties were successfully sub-leased to various commercial life

sciences tenants such as the pharmaceutical company Eli Lilly. Id. ¶ 38.

## III.   Preliminary Negotiations and the 7th Amendment

On November 6, 2014, in the aftermath of Superstorm Sandy, Senator Charles Schumer and Mayor Bill de Blasio announced that FEMA had allocated $1.6 billion to repair New York City's public hospital system, and that approximately $376 million of those funds would be allocated to H+H-operated Bellevue Hospital for, among other things, a floodwall or FPS.  Id. ¶ 42.  After initially conceiving the FPS as a U-shaped structure confined to the Bellevue Campus, in October 2015 H+H reconceived the FPS as a linear structure "beginning near East 26th Street and extending north as far as East 34th Street," a path which would also protect the ACLS campus.  Id. ¶ 43.  Early designs for the linear structure, which were exchanged between the City and ARE in late 2015 and 2016, showed the FPS outside the property line of the Premises.  Id. ¶¶ 44-46.

In November 2016, Michael Rawlings, H+H's then-Chief Operating Officer, warned ARE "that the contemplated FPS design might capture unwanted stormwater runoff flowing east and down East 30th Street from First Avenue."  Id. ¶ 47.  The parties conferred on how to address the potential flooding issues in a series of meetings and exchanges from November 2016 through June 2018, which included Stantec, ARE's engineering firm, and Arcadis,

H+H's engineering consultant.  Id. ¶¶ 48-56.  On March 13, 2017, "Arcadis, on behalf of H+H, stated that it expected to complete the FPS 'by 2023,' and that H+H planned to apply for FEMA accreditation through FEMA's Conditional Letter of Map Revision process."  Id. ¶ 53.  ARE alleges that it worked "in parallel" to both analyze H+H's draft plans and formulate plans of its own. Id. ¶ 56.

This initial phase of planning was put on hold, however, on June 18, 2018, when Rawlings informed Connie Hildesley, an executive at ARE, that the FPS had been put on the "backburner." Id. ¶ 57.  Following this communication, "ARE shifted its focus from the design of the FPS to negotiations with EDC . . . for a contemplated seventh amendment to the Ground Lease and continuing development of design plans for the North Tower."  Id.

On October 3, 2018, ARE and H+H executed the 7th Amendment to the Ground Lease, ECF No. 41-2 (the "7th Amendment").  Id. ¶ 58. The 7th Amendment set June 30, 2019 as the outside date for ARE to exercise the Option and July 3, 2020 as the closing date (the "Closing"), with an option to extend the Closing to July 31, 2021. Id.  Prior to the Closing, ARE was required to deliver "schematic designs" and various other permits and reviews, all of which required ARE to effectively "finalize its designs" for the North Tower.  Id. ¶ 59.  ARE alleges that "[a]t no point during any discussions concerning the 7th Amendment did H+H or EDC inform ARE

8

it would be expected to coordinate the North Tower's design with that of the FPS, to fund the FPS design and construction costs without reimbursement, or to delay construction of the North Tower pending the completion of the entire FPS design." Id. ¶ 60. ARE does not, however, plead that it was fraudulently induced to sign the 7th Amendment. See id. ¶¶ 137-55 (Count I, "Fraudulent Inducement – 10th Amendment"), 156-79 ("Count II, "Fraudulent Inducement – 11th Amendment").

On July 24, 2019, ARE informed H+H and EDC that it was exercising the Option and tendered a $2.25 million security deposit. Id. ¶ 63. ARE alleges that at the time it exercised the Option, the City "knew [and] concealed that ARE would be required to delay construction of the North Tower pending FEMA's approval of the FPS design and specifications, and that H+H had no intention of reimbursing ARE for FPS costs." Id. ¶ 64. However, ARE does not plead that it was fraudulently induced to exercise the Option. See id. ¶¶ 137-55 (Count I, "Fraudulent Inducement – 10th Amendment"), 156-79 (Count II, "Fraudulent Inducement – 11th Amendment").

## IV. H+H's Requests for Cooperation

On August 5, 2019, Rawlings and other officials from ARE and H+H met to discuss the FPS. Id. ¶ 65. At that meeting, Rawlings told ARE "the FPS was no longer delayed, and that H+H needed 'evidence' of ARE's cooperation on the FPS in order to submit H+H's

new linear design to FEMA." Id. ARE was "surprised" because "ARE never anticipated that its own consultants would engage in substantial design work for the FPS, or that ARE would be required to incur costs for structural floodproofing elements that [went] beyond [Department of Buildings] requirements." Id. ¶¶ 66-67. H+H began to persistently request that ARE "cooperate" in the design and construction of the floodwall. Id. ¶¶ 67-68. But, as stated by ARE:

> ARE was reluctant to execute an open-ended formal agreement to 'cooperate' on a vague and unspecified design plan . . . because the underlying parameters of any such Agreement, including technical requirements, cost structure, and timeline, remained unknown.

Id. ¶ 69. H+H also communicated plans to seek "remapping" of the flood insurance maps in the area "that would result in the removal of the areas protected by the FPS from the FEMA-designated flood zone." Id. ¶ 70. ARE was concerned about remapping, "noting that it could delay the North Tower's design and construction schedule." Id. ¶ 72.

On December 13, 2019, H+H presented ARE with two options for the FPS: one in which an "Independent Wall" bisected the ACLS campus, and one in which the floodwall would be integrated into the North Tower's foundation. Id. ¶ 73. ARE communicated ongoing concerns about remapping and one of the two options: the

10

"Independent Wall."[3]  Id. ¶¶ 74-75.  On December 16, 2019, Ross Moskowitz, a lawyer for ARE, asked for an update on ARE's application to the New York City Department of Buildings ("DOB"), and was informed by Jeremy Berman, counsel for H+H, that H+H could not yet sign the application for a "biz" reason.  Id. ¶¶ 77-80.  Christine Flaherty, Senior Vice President of Capital Design for H+H, also communicated the following to ARE:

> I cannot move forward with my fema [sic] project protecting this whole superblock without us starting to move forward together . . . [t]he full way to create a solution that is most effective and keeps ARE moving and allows us to eventually build a FEMA compliant floodwall at a date to be determined is by having our technical teams coordinate so vetted technical solutions are found in interest of both sides.

Id. ¶¶ 78.  ARE alleges that these communications and other similar communications from the City were intended to strong-arm ARE, "left [ARE] with no choice but to affirm in writing that it would continue to cooperating with H+H," and that "H+H signed the DOB application only after Cunningham sent [an] email [one day later] to reaffirm ARE's commitment to cooperate."[4]  Id. ¶ 81.

**V.   April 2020 and October 2020 Criteria**

Between January and February 2020, "ARE's and Arcadis' design teams met on various occasions to further discuss the FPS design

---

[3]     The Independent Wall would bisect the ACLS campus and defeat ARE's vision for an integrated development.  Id. ¶ 75.

[4]     Notably, ARE had not at this point made any contractual commitment to cooperate.

11

criteria." Id. ¶ 83. "During this period, Arcadis explained that H+H would need to resolve any drainage issues on the Option Premises in order for H+H to successfully pursue remapping,[5] but neither Arcadis nor H+H disclosed any plans for a solution or a timeline to resolve the issues." Id. The City also allegedly asked that the proposed design for the FPS "meet FEMA levee standards." Id. ¶ 84; but see Flaherty Letter ¶ 4 (during negotiations the City rejected the term "levee standards" as "imprecise" and "not helpful" and said "[t]he relevant question is whether the wall will meet [FEMA's] 500-year flood standards").

Due to the ongoing negotiations and exchanges of draft designs, which ARE alleges "effectively precluded" it from closing on the Option, "[o]n February 14, 2020, ARE issued an Unavoidable Delay Notice pursuant to Sections 3.2(b) and 6.8(h) of the 7th Amendment and 24.1(f) of the Existing Ground Lease" and "[t]hereafter, ARE continued to work closely with H+H to attempt to assist in finalization of the FPS design criteria." Id. ¶ 84. In subsequent meetings, "ARE explained that H+H's demand that the FPS comply with FEMA levee requirements without articulating

---

[5]    A close examination of the Amended Complaint reveals that the remapping and "drainage issues" allegations are one and the same. Remapping was to be pursued following the construction of the FPS, Flaherty Letter ¶ 4, and ARE's possible responsibility would be to "resolve any drainage issues on the Option Premises" to facilitate it, AC ¶ 83. ARE does not specify what these drainage issues were, except to say that the October 2020 Report "did not require" that ARE solve those issues. Id. ¶ 142.

design criteria for a building to meet these requirements would prevent ARE from closing in 2020 and constructing the North Tower by Q3 2023 as planned and required by the 7th Amendment." Id. ¶ 85.

ARE alleges that James Patchett, President of EDC, relieved some of its concerns by communicating (i) that the North Towner would not need to comply with the "levee requirements" and could just comply with the lesser DOB regulations and (ii) that ARE "would not need to 'solve for drainage' on the Option Premises." Id. ¶ 87.  However, Patchett's reassurances were contradicted by a "design criteria report" sent by Arcadis to ARE on April 27, 2020 "that included FEMA design criteria."[6]  ARE objected to the April 2020 Report, and "[a]t ARE's insistence, EDC ultimately agreed to extend the closing date for the Option to February 3, 2021." Id. ¶ 88.  ARE continued to communicate its concerns with the April 2020 Report, which put the requirements related to remapping and the levee requirements "back on the table." Id. ¶ 89.

---

[6]     Although ARE provided the October 2020 Report, on which they purportedly relied, as an attachment to their Amended Complaint, they did not provide the April 2020 Report, which the October 2020 Report allegedly replaced.  AC ¶ 88. The City provided a copy of the April 2020 Report as Exhibit 5 to the Declaration of Jeremy Berman in support of the motion.  See April 2020 Report; see also ECF No. 41 ("Berman Decl.").  A review of the April 2020 Report, dated April 26, 2020, shows that it was transmitted to ARE via email on April 27, 2020.  See April 2020 Report at 1; see also Flaherty Letter ¶ 1 (referencing the "design criteria . . . issued to ARE on April 27, 2020").

13

On October 29, 2020, Flaherty sent John Cunningham, then a Senior Vice President at ARE, a "letter enclosing a diagram and design criteria report covering ARE's portion of the FPS."[7]  Id. ¶ 90.  The cover letter to the October 2020 Report stated that "[f]or ARE's North Tower to be a part of the Community Floodwall, it needs to comply with the attached 'Scope Delineation and Design Criteria Diagram 10.20.20.PDF' with supporting design load requirements." Id. ¶ 90.  The 7-page October 2020 Report was significantly shorter than the 20-page April 2020 Report, and only consisted of a Section 5.3, describing "Design Load Requirements."  See October 2020 Report at 5.  By contrast, the April 2020 Report contained numerous other sections, for example, a Section 5.2.6 describing requirements for a "Seepage Cutoff Wall" and other specifications. Compare October 2020 Report at 4-11 with April 2020 Report at 8. ARE preferred the October 2020 Report to the April 2020 Report because the October 2020 Report "did not expressly seek to require that ARE adhere to FEMA's levee design criteria, implement drainage solutions on the Option Premises to assist H+H with its remapping application, or, most importantly, delay construction of the North Tower pending FEMA's review."  Id. ¶ 91.

---

[7]    ARE alleges that Flaherty sent Cunningham a letter on October 20, 2020 "threatening 'to block the intent of [ARE's] development' if ARE did not agree to the [design] criteria" but that she revised the letter to remove the language in the final October 2020 Report.  AC ¶ 92.

14

On November 6, 2020, ARE asked Flaherty a series of "remaining questions" about which ARE was still confused.  AC ¶ 93.  One of these questions was when the "design criteria" would "become formally finalized."  Id. ¶ 94.  Flaherty responded in Section 2 of a December 10, 2020 letter as follows:

> **[ARE Question:] Based on your schedule, when in the H+H process will the Community Floodwall design criteria become formally finalized so that we can be confident no further material criteria will be added and that no further material changes will be made?**
>
> [Flaherty Response:]  The criteria are already settled and, based on existing information and current conditions, it should not change.  As stated above an engineer will have to perform appropriate quality checks and calculations to refine the existing preliminary designs to ensure they conform to the criteria.  The necessary refinements are more accurately viewed as fine tuning rather than changing the designs as is typical as one moves through the design process to final construction drawings.

Flaherty Letter ¶ 2; see also AC ¶ 94 (excerpting Section 2 of the Flaherty Letter).  Flaherty also stated that because the FPS "will be designed to the 500 year-storm event standards . . . remapping may be pursued once the project is completed."  Flaherty Letter ¶ 4; see AC ¶ 95.

The Amended Complaint omits several other qualifications and clarifications in the Flaherty Letter.  Most important is the following statement in Section 1, directly before Section 2:

> **[ARE Question:] Please confirm that the design criteria issued on October 29** [i.e., the October 2020 Report] **supersede any previously shared criteria.**

15

[Flaherty Response:] The design criteria **have not changed since they were issued to ARE on April 27, 2020** (Report dated April 26, 2020) [i.e., the April 2020 Report]. To address multiple questions by ARE, further clarifications and redacted versions have been made culminating in the October 29, 2020 correspondence that **clarified but did not supersede** the prior material shared.

Flaherty Letter ¶ 1 (emphasis and alterations added). Without ever citing to or explaining Section 1, ARE alleges that it "regarded the October 2020 Criteria as the final design criteria for the portion of the FPS which H+H wanted ARE to integrate into the North Tower" and "regarded the October 2020 Criteria as the only criteria applicable to [ARE's] portion of the FPS—not the prior, more expansive criteria report issued in April 2020." Id. ¶ 96 (emphasis in original). Indeed, ARE states it relied on the Flaherty Letter in forming this belief. Id.

## VI.  10th and 11th Amendments to the Ground Lease

In January 2021, the parties began negotiations for a proposed 10th Amendment to the Ground Lease. Id. ¶ 99. H+H and EDC insisted on a "cooperation clause" to the 10th Amendment, which would document ARE's informal commitments to cooperate with the FPS design and construction. Id. ¶¶ 100-101 (H+H told ARE that "[p]utting off the [FPS] issues will not make them go away and it may put pressure on your schedule later when you cannot afford it[.]"). ARE wanted to avoid such formalities, stating in a letter to H+H that ARE "remain[s] interested and willing to [cooperate

16

with H+H] so long as H+H confirms in writing, among other things, that the materials are being provided for non-binding, informational purposes only, and without reliance, obligation or prejudice." Id. ¶ 102.

Before the execution of the 10th Amendment, the City allegedly "continued to represent that the October 2020 Criteria reflected the final design." Id. ¶ 106. ARE offers two examples. First, on April 26, 2021, Deborah Bindler, an attorney for EDC, proposed an edit to the 10th Amendment that would add an "explanation" that supposedly "reiterat[ed] that that floodwall criteria were reflected in the October 2020 Criteria." Id. Second, ARE transmitted a "Draft Specified Project Drawings and Analysis" that incorporated the October 2020 Criteria for review by Arcadis, but which Arcadis, in a May 24, 2021 response, see ECF No. 41-6 (the "Arcadis Analysis"), did not indicate "needed to comply with the broader criteria identified in [the] April 2020 [R]eport." Id. ¶ 107.

On July 1, 2021, ARE agreed to enter into the 10th Amendment, including the "cooperation clause" proposed by the City. That clause stated as follows:

> Cooperation. [ARE] and [H+H] shall cooperate in good faith to attempt to reach mutually agreeable written parameters related to [H+H]'s proposed flood mitigation requirements in respect of the integration of the Option Premises with adjoining properties leased by [H+H] and/or owned by the City.

17

10th Amendment § 4.b.; see also AC ¶ 103.  ARE allegedly interpreted this clause as an agreement "that it would continue to work with H+H and EDC to implement its design for the North Tower based on the October 2020 Criteria."  AC ¶ 103.  As part of the 10th Amendment, ARE also agreed to pay a $5 million extension fee, which would extend the Closing until November 3, 2022, with the option to further extend this date to November 3, 2024.  Id. ¶ 104.

After the 10th Amendment was executed on July 1, 2021, the parties continued to cooperate on the FPS.  ARE states that "[d]uring this period, H+H never disclosed that it planned to substantially change the FPS design requirements or materially overhaul the October 2020 Criteria[.]" Id. ¶ 111. ARE paraphrases an October 12, 2022 oral conversation with two EDC employees, Gbenga Dawodu and Melissa Burch, in which Dawodu and/or Burch said the October 2020 Report was final.[8]  Id. ¶ 113 (the "Oral Representation").  ARE also alleges that it "requested that the parties incorporate the October 2020 Criteria into the 11th Amendment . . . during [those] in-person negotiations at EDC's office on October 12, 2022."  Id.  ARE does not allege that it proposed this idea at any point during the prior year of

---

[8]     ARE does not allege that Dawodu or Burch said the October 2020 Report was exclusive.  See infra Discussion Section I.b.ii.  This representation unlike the prior two examples, was not made before the signing of the 10th Amendment, but rather between the 10th and 11th Amendments.

negotiation between the execution of the 10th and 11th Amendments, or that it made this request in writing.  Rather, ARE insists its October 12, 2022 oral proposal was not implemented because "in a deliberate attempt to mislead ARE, EDC's Bindler indicated to ARE's counsel that the October 2020 Criteria could not be incorporated into the 11th Amendment merely because the person responsible for signing off on this request was unavailable."  Id.  ARE pleads that it was obliged to enter the 11th Amendment, including the unchanged Cooperation Clause, because it was "misled" by Bindler and had no choice but to sign before the November 3, 2022 deadline. Id. ¶ 114.

## VII.  Alleged Corrective Disclosures in 2023 and 2024

After the 11th Amendment was executed on November 3, 2022, the parties began negotiations "concerning a potential 13th Amendment" to the Ground Lease.  AC ¶ 119.  During those negotiations, which continued through late 2023, the City unveiled proposals that allegedly contradicted its "prior assurances that the FPS design criteria as reflected in the October 2020 Report were final[.]"  Id. ¶ 120.  The first of these supposedly new revelations was a February 15, 2023 statement that the New York City Department of Design and Construction ("DDC") "may be changing the FPS' design criteria," id., even though the City allegedly "had [n]ever disclosed to ARE that H+H's October 2020 Criteria were even subject to DDC review, much less approval," id. ¶¶ 121-

19

22.    The second of these alleged corrective disclosures was an October 23, 2023 draft of a proposed 13th Amendment, which attached a "new design report" and a separate proposal that ARE "agree[s] to implement any additional design changes."  Id. ¶ 123.  ARE states that, as of October 23, 2023, "it became clear to ARE that the FPS design criteria were an indecipherable moving target, and that negotiations over the 13th Amendment had failed."  Id. ¶ 124. ARE thereafter refused to "[p]roceed with construction drawings (which follow design development drawings)" and sent an "Unavoidable Delay Notice" to the City on January 11, 2024.  Id. ¶ 125.

ARE also points to several pieces of information it received after it suspended negotiations on the 13th Amendment.  The first of these was a March 20, 2024 proposal for a "seepage cut-off wall," which ARE alleges "was never discussed with ARE prior to March 2024."  Id. ¶¶ 16, 127.  ARE also points to an April 15, 2024 design report from Arcadis, which included FPS "infrastructure within the roadway of East 30th Street that [would] conflict with ARE's ability to deliver electric feeders to the North Tower," did not consider the North Tower's construction, and "admit[ted]" that Arcadis was in the "planning stage" back in 2020. Id. ¶ 128.  This was followed by a June 7, 2024 letter, in which Arcadis made clear -- allegedly for the first time -- that "ARE should have followed its design criteria report issued in April

26, 2020." Id. These communications are offered in support of ARE's core allegation: that "the criteria in the October 2020 Report were never 'final,' despite [the City's] repeated representations to the contrary." Id.

ARE alleges that the City's misrepresentations in the lead up to the 10th and 11th Amendments and breaches of the implied covenant of good faith and fair dealing "prevented ARE from delivering a much-needed North Tower on the ACLS" and that "[t]he delays caused by [the City] also caused ARE to miss the life science bull market that occurred while ARE was seeking to exercise its option, but which has now substantially softened nationally." Id. ¶ 130. ARE seeks $50 million in "compensatory damages related to the North Tower's design and construction costs, as well as lost profits related to the North Tower's construction delays."[9] Id. ¶ 131.

## PROCEDURAL HISTORY

ARE filed its complaint on August 6, 2024. ECF No. 1. After several stipulated extensions, the City requested a conference on a proposed motion to dismiss, ECF No. 16, which the Court held on October 31, 2024.[10] Following that conference and subsequent

---

[9] ARE also pleads a set of facts in support of its fourth cause of action, for declaratory judgment to toll the Closing and prevent the City from marketing the Option Premises. See AC ¶¶ 133-36. Given that those facts are not directly relevant to the challenged claims, we will not repeat them here.

[10] ARE's first line in its brief is an admonishment that the City "makes this partial dismissal motion on the same grounds that drew skepticism from the

letters, the Court granted permission to bring the motion.  ECF No. 28.  On December 13, 2024, the City filed an opening brief on the motion.[11]  ECF No. 30.  Instead of opposing, ARE opted to file the Amended Complaint on January 24, 2025 pursuant to Federal Rule of Civil Procedure 15(a)(1)(B).  AC; see also ECF No. 37.  On March 17, 2025, the City filed a renewed opening brief and supporting papers.[12]  Mot.; see also Berman Decl.; ECF Nos. 39, 42 ("Bindler Decl."); 43 ("City's 2(C) Letter").  On May 1, 2025, ARE filed its opposition papers.  Opp.; see also ECF No. 46 ("ARE's 2(C) Letter").  Finally, on May 22, 2025, the City replied.  ECF No. 48 ("Reply").[13]

---

Court at the October 31, 2024 pre-motion conference[.]"  Opp. at 1.  While it is true the Court expressed skepticism, it did so without the benefit of formal briefing and before copies of critical documents referenced in the pleadings had been filed, including the Amendments, the April and October 2020 Reports, and the Flaherty Letter.

[11]    Following ARE's decision to amend, the City's preliminary briefing was struck from the record.  ECF Nos. 29-31.

[12]    Also on March 17, 2025, ARE's current counsel, Loeb & Loeb LLP substituted in for ARE's prior counsel.  ECF No. 44.

[13]    During this period the Court also resolved a dispute between the parties about whether discovery should proceed while the motion to dismiss was pending. See ECF Nos. 47, 49, 50, 51.  The Court ordered that all discovery be stayed "until the motion to dismiss is resolved" because "proceeding with discovery only with respect to plaintiff's declaratory judgment claim would be unworkable."  ECF No. 52.  The Court also clarified the record, making it clear that "[c]ontrary to [ARE's] representation, the Court never instructed or directed during the October 31, 2024 conference that discovery should proceed while there was a pending motion to dismiss.  Rather, the Court urged the parties to either proceed initially by motion practice or forgo the filing of a motion to dismiss and proceed to discovery."  Id. (emphasis added).

**LEGAL STANDARDS**

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient facts "to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). While the Court accepts the pleaded facts as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Brown v. Daikin Am., Inc., 756 F.3d 219, 225 (2d Cir. 2014) (quoting Iqbal, 556 U.S. at 678). "In addition to the facts stated on the face of the complaint, the Court may consider on a Rule 12(b)(6) motion 'documents . . . incorporated in the complaint by reference, and . . . matters of which judicial notice may be taken.'"[14] Brandon, 2012 WL 135592,

---

[14] As relevant here, the Court may take judicial notice of the documents attached by ARE to its Amended Complaint, such as the October 2020 Report and the Flaherty Letter. The Court may also take judicial notice of documents attached by the City to its motion to dismiss, including the 10th and 11th Amendments, the April 2020 Report, and the Arcadis Analysis, because each of these documents is referenced numerous times in the Amended Complaint. See Brandon v. Musoff, 2012 WL 135592, at *3 (S.D.N.Y. Jan. 17, 2012) ("In addition to the facts stated on the face of the complaint, the Court may consider on a Rule 12(b)(6) motion documents . . . incorporated in the complaint by reference[.]") (citation and internal quotation marks omitted). "[W]hen a plaintiff chooses not to attach to the complaint or integrate by reference a document . . . which is integral to the complaint, the court may nevertheless

23

at *3 (quoting <u>Leonard F. v. Israel Disc. Bank of New York</u>, 199 F.3d 99, 107 (2d Cir. 1999)).

## **DISCUSSION**

The City moves to dismiss the fraudulent inducement claims and the implied covenant of good faith and fair dealing claim. We will first consider whether the City fraudulently induced ARE to enter the 10th or 11th Amendments to the Ground Lease. Then we will consider whether ARE has adequately alleged that the City breached the implied covenant of good faith and fair dealing.

## **I. Fraudulent Inducement**

The City makes four primary arguments in favor of its motion to dismiss plaintiff's fraudulent inducement claims: (i) the alleged misrepresentation in the Flaherty Letter that the FPS design criteria "should not change" "is the only purported misrepresentation" pled with the particularity required by Rule 9(b), Mot. at 10-12; (ii) neither the Flaherty Letter nor any other statement contained an actionable misrepresentation, and there was no actionable omission, <u>id.</u> at 16-19; (iii) "it was objectively unreasonable for ARE to have relied, based on the Flaherty Letter or any other alleged communication from Defendants, on the finality and exclusivity of the October 2020 Criteria," <u>id.</u> at 12-16; and

---

take the document into consideration in deciding the defendant[s'] motion[] to dismiss, without converting the proceeding to one for summary judgment." <u>Id.</u> (quoting <u>Int'l Audiotext Network, Inc. v. AT & T Co.</u>, 62 F.3d 69, 72 (2d Cir.1995)).

(iv) the purported misrepresentations were not "collateral or extraneous" representations of "present fact," as required by the Second Circuit's decision in <u>Bridgestone/Firestone v. Recovery Credit Servs.</u>, 98 F.3d 13 (2d Cir. 1996), AC at 19-22.  We will consider each of these arguments in turn.

### a. Fraudulent Inducement and Rule 9(b)

Under New York law, "[t]o state a claim for fraud in the inducement, the party must allege: (i) a material misrepresentation of a presently existing or past fact; (ii) an intent to deceive; (iii) reasonable reliance on the misrepresentation by [plaintiff]; and (iv) resulting damages." <u>Johnson v. Nextel Commc'ns, Inc.</u>, 660 F.3d 131, 143 (2d Cir. 2011) (citation omitted).  Fraudulent inducement claims are subject to the additional pleading requirements of Federal Rule of Civil Procedure 9(b).  <u>Hoffenberg v. Hoffman & Pollok</u>, 248 F. Supp. 2d 303, 310 (S.D.N.Y. 2003).  Under Rule 9(b), "a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b).  More specifically, a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." <u>Rombach v. Chang</u>, 355 F.3d 164, 170 (2d Cir. 2004).  "Allegations that are conclusory or unsupported by factual assertions are insufficient." <u>State St. Glob. Advisors Tr. Co. v. Visbal</u>, 462 F. Supp. 3d 435,

440 (S.D.N.Y. 2020) (quoting ATSI Commc'ns Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007)).  For a claim "premised on an omission, a plaintiff must specify the person responsible for the failure to speak, the context of the omission, and the manner in which the omission misled the plaintiff."  Amusement Indus., Inc. v. Stern, 786 F.Supp.2d 758, 775 (S.D.N.Y. 2011).  Plaintiff must also allege that defendant had a duty to disclose the omitted fact.  Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc., 500 F.3d 171, 181 (2d Cir. 2007).

### i. Alleged Misrepresentations

The City argues that "[t]he [December 10, 2020] Flaherty Letter is the only alleged misrepresentation that meets Rule 9(b)'s standard."  Mot. at 11.  ARE responds that "the Amended Complaint alleges, Defendants represented . . . on at least four separate occasions that the October 2020 Report reflected the design criteria that applied to the portion of the FPS that Defendants demanded ARE integrate into the North Tower."  Opp. at 13.  These four alleged misrepresentations are as follows: (i) "[the] October 29, 2020 . . . [cover] letter stating that the North Tower needed to comply with the attached October 2020 Report, which Flaherty represented was the 'basis for establishing ARE's responsibility for the continuation of the Floodwall,'" Opp. at 13 (quoting AC ¶ 90); see also October 2020 Report at 2; (ii) the representation in the Flaherty Letter on December 10, 2020 that the design criteria

"should not change" except for "necessary refinements" and "fine tuning," Opp. at 13 (quoting Flaherty Letter ¶ 2); (iii) Bindler's April 26, 2021 draft of the 10th Amendment proposing an "edit" that "reiterat[ed] that the design criteria for the FPS were reflected in the October 2020 Report," Opp. at 13 (citing AC ¶ 106); see also ECF No. 42-1 (the "Bindler Draft"); and (iv) an oral statement by "EDC's Dawodu and Burch during in-person negotiations at EDC's office on October 12, 2022—that [the October 2020 Criteria] were final," AC ¶ 113; see also Opp. at 13-14.

The Court finds that the first alleged misstatement is not pled with sufficient particularity as required under Rule 9(b) because plaintiff does not "explain why the statement[] w[as] fraudulent." Rombach, 355 F.3d at 170. In the cover letter to the October 2020 Report, Flaherty represented that the October 2020 Report was the "basis for establishing ARE's responsibility for the continuation of the Floodwall." October 2020 Report at 1. However, this cover letter does not say that the October 2020 Report was either "final" or "exclusive" of the more expansive April 2020 Report.

Indeed, ARE subsequently sought clarification on this exact issue in its November 6, 2020 letter. See AC ¶¶ 93-95; Flaherty Letter ¶¶ 1 (responding to ARE's November 6, 2020 question: "Please confirm that the design criteria issued on October 29 supersede any previously shared criteria"), 2 (responding to ARE's November

6, 2020 question: "when in the H+H process will the Community Flood Wall criteria become formally finalized so that no further material criteria will be added and no further material changes will be made?"). Thus, the pleadings make clear that the October 29, 2020, cover letter was at most ambiguous, and that actually the alleged misrepresentation on which plaintiff relied was the December 10, 2020 Flaherty Letter, which -- according to ARE -- represented that the October 2020 Report was final and the "only criteria applicable," i.e., exclusive. AC ¶ 96 (emphasis in original).

### ii. Alleged Omissions

ARE further argues it has alleged "actionable omissions" because the City failed to disclose (i) that the City "had not even formally designed the FPS, or resolved the drainage issues," (ii) that "FEMA had not signed off on . . . the October 2020 Report, or even H&H's retention of Arcadis," and (iii) that "DDC review and sign off were required." Opp. at 17 (citing AC ¶¶ 104, 115, 122); see also Opp at 16 (citing AC ¶¶ 109, 115, 122). The Court finds that only the last alleged omission is pleaded with sufficient particularity under Rule 9(b).

The first alleged omission is only described in full once in the Amended Complaint, which states that the City "knew these representations [that the October 2020 Report was final] to be false when made because, among other things, H+H had not even formally designed the FPS, or resolved the drainage issues on and

28

around the Option Parcel that would affect the design of the North Tower." AC ¶ 109. At best, this "omission" could be interpreted as a failure to disclose that the October 2020 Report was not "exclusive" because there were other requirements, such as an obligation to resolve "drainage issues" related to "remapping" not contained within it. That omission is indistinguishable from the alleged misrepresentation that the October 2020 Report was final and exclusive. Even if it were particularized, it would therefore fail for the same reasons stated infra, Discussion Section I.b.

The second alleged omission that "FEMA had not signed off on either the October 2020 Report, or even H&H's retention of Arcadis,"[15] Opp. at 17 (quoting AC ¶ 14); see also AC ¶ 115, is likewise inactionable because there is no omission. Amusement Indus., Inc., 786 F.Supp.2d at 775. The letter provided by

---

[15] ARE's brief also states, apparently as proof that "[d]efendants knew" the design criteria were not final, that in late September 2022 "[d]efendants knew H+H had only recently engaged Arcadis to perform 'Preliminary and Final Design Services' for the FPS, contrary to its representations that Arcadis had long been H+H's FPS design engineer and that Arcadis had finalized the design criteria as reflected in the October 2020 Report." Id. ¶ 115; see Opp. at 17 (citing AC ¶ 115). However, it is clear from the face of the Amended Complaint that Arcadis had been retained in some capacity by the City and had been an active participant in negotiations regarding the FPS for over a decade. See, e.g., AC ¶ 44 ("On . . . November 19, 2015, Hildesley and Michael Mohin (ARE Security Director) met with Rawlings, Steven Alexander (Executive Director of Bellevue Hospital), John Levy of Base Tactical (H+H's FEMA funding consultant), and Peter Glus of Arcadis (H+H's engineering firm for flood protection design) to discuss the FPS and any potential impacts on the Option Premises.") (emphasis added). The Amended Complaint fails to explain how a formal engagement for "Preliminary and Final Design Services" practically altered the relationship between the City and Arcadis or indicated that Arcadis' decade of work for H+H -- including on the April and October 2020 Reports -- was a nullity. To the extent ARE alleges this is an actionable omission, see Opp. at 16, rather than a fact supporting scienter, the Court finds that it is not sufficiently particularized or, in the alternative, not materially misleading.

Flaherty on December 10, 2020 extensively described FEMA's involvement in the planning process and the timing thereof, and was appended to the Amended Complaint.[16]  Moreover, Flaherty made

---

[16]    Flaherty's December 10, 2020 letter stated as follows, in response to ARE's question about the FEMA process:

**[ARE Question:] Please share the application materials that were shared with FEMA for the COMMUNITY Floodwall, the listed requirements from FEMA for the grant, (technical, administrative, etc.) and any responses or approvals from FEMA and or any other City or State agency so that ARE can best understand the larger effort and what is required. Please also provide a description of the outstanding items/materials still needed for FEMA to issue the grant for the Community Floodwall.**

[Flaherty Response:] This question reflects a number of unfortunate misconceptions about how FEMA operates – "unfortunate" in that it would be better if FEMA operated in the manner assumed. In fact, we already have our FEMA grant in a form that gives us considerable flexibility in how the grant funds are to be applied. The grant is for all of H+H's Sandy related projects including the construction of a new part of Coney Island Hospital, many important, but smaller, projects at Bellevue, the H+H part of the floodwall and others. The issue is how and on what conditions we can draw down the funds. We have regular, ongoing discussions with FEMA on different aspects of our Sandy mitigation efforts including the Bellevue wall. The overriding principle of the grant is that it be used to reduce the chance of a repeat of Sandy, i.e., flood mitigation. Over the years, we have described our plans for the wall in general terms and, unsurprisingly, gotten FEMA's indication that the project qualifies for the grant. As our discussions with ARE have progressed, we have described our idea of a shared structure and this has also been positively received. But FEMA does not commit itself in advance with respect to any expenditure or initiative; instead it gives non-binding and generally unwritten advice. One never gets 100% assurance that any expenditure is reimbursable because all FEMA expenditures are audited after the fact and are subject to claw-back. But some comfort is attained when one files a "Project Worksheet" for a part of a project. If the "PW" is accepted, then one is further along the way and is assured that the initiative is approved and that expenditures listed will be reimbursed, subject to claw-back. But ARE doesn't need to be concerned with the financial aspects of our relationship with FEMA. ARE is more likely to be concerned with FEMA's approval of the design and construction of the wall and that H+H maintains the 500-year event standards. Upon completion of the Agreement between H+H and ARE, the project scope will be submitted to FEMA for approval of the Project Worksheet.

If ARE's question is when the design of the wall will be final, the answer is that the current designs are final in that they are not

clear that FEMA had not approved the "design" -- including, impliedly, the October 2020 Report -- as of December 2020. See Flaherty Letter ¶ 7. Among other things, the Flaherty letter explained that (i) drawing upon FEMA funds was contingent on "FEMA's approval of the design and construction of the wall and that H+H maintains the 500-year event standards," (ii) FEMA approval had not yet been secured as of October 2020 or December 2020, (iii) FEMA approval was not under the City's control, (iv) FEMA reimbursement was never "100% assur[ed]" and only "some comfort" could be obtained through the submission and "approval of [a] Project Worksheet," and (v) FEMA approval was contingent on a review by an engineer from the DDC who "will certify to FEMA the compliance of the wall with the 500-year flood standard." Id. These statements make perfectly clear that "FEMA had not signed off on . . . the October 2020 Report," Opp. at 17 (quoting AC ¶ 14). To the extent these processes or their timing in relation to the actual commencement of construction were ambiguous, it was because FEMA itself was not controlled by the City or its agencies. And insofar as this allegation circles back to the core allegation

_____

expected to be changed except to be refined and modestly adjusted to meet the criteria set out in Question 3. The engineer engaged by DDC for this project will certify to FEMA the compliance of the wall with the 500-year flood standard. FEMA does not, itself, inspect the projects it funds because it relies instead on the certification of the engineer of record.

Flaherty Letter ¶ 7.

in the Amended Complaint -- that the City falsely represented that the October 2020 Report was final and exclusive -- it would fail for the same reasons stated infra, Discussion Section I.b.[17]

The remaining omission and alleged misstatements are sufficiently particularized under Rule 9(b), and we will consider them substantively in the following sections.

### b. Falsity

We now turn to whether ARE has sufficiently alleged "a material misrepresentation of a presently existing or past fact." Johnson, 660 F.3d at 143.  The City argues that the alleged misrepresentations regarding the finality or exclusivity of the October 2020 Report were of "future expectations" and, in any case, too "indefinite and ambiguous" to be actionable.  Mot. at 16-19. ARE responds that the alleged misrepresentations, including but not limited to Flaherty's statement that the FPS design criteria "should not change," were of then-existing fact and were sufficiently definite to sustain a claim.  Opp. at 2, 15-16.

An examination of the City's response to a list of questions submitted by ARE is instructive to whether there were, in fact,

---

[17]    The Court does not view the allegations regarding the City's retention of Arcadis, see Opp. at 17; AC ¶¶ 14, 115, 145, as an independent, particularized claim because there is no explanation of how FEMA approval of Arcadis is distinct from the FEMA approval process that was clearly ongoing and incomplete as of the date of the Flaherty Letter.  Furthermore, the Amended Complaint fails to articulate the basis for ARE's belief that Arcadis had been "approved" by FEMA as of the signing of either the 10th or 11th Amendments or plead why the City had a duty to disclose this facet of the broader FEMA process to ARE.

any misrepresentations.   In response to a list of questions submitted by ARE on November 6, 2020 after it had received the October 2020 Report, Flaherty's December 10, 2020 letter stated the following:

> **[ARE Question:] Based on your schedule, when in the H+H process will the Community Flood Wall criteria become formally finalized so that no further material criteria will be added and no further material changes will be made?**
>
> [Flaherty's Response:] The criteria are already settled and, based on existing information and current conditions, it should not change.  As stated above an engineer will have to perform appropriate quality checks and calculations to refine the existing preliminary designs to ensure they conform to the criteria.  The necessary refinements are more accurately viewed as fine tuning rather than changing the designs as is typical as one moves through the design process to final construction drawings.

Flaherty Letter ¶ 2.

As ARE stated in its Amended Complaint:

> In light of assurances Defendants provided in Flaherty's letter, ARE regarded the October 2020 Criteria as the final design criteria for the portion of the FPS which H+H wanted ARE to integrate into the North Tower . . . . ARE regarded the October 2020 Criteria as the only criteria applicable to its portion of the FPS—and not the prior, more expansive criteria report issued in April 2020.

AC ¶ 96 (emphasis in original).   ARE explains further that the October 2020 Report "is at the heart of the numerous material misrepresentations the City made to ARE and on which ARE relied to its significant detriment in agreeing to enter into the Amendments."  Opp. at 12.  Indeed, each alleged misrepresentation

is, at base, a representation that the October 2020 Report was final and/or exclusive.  See supra Discussion Section I.a.  Each alleged omission is likewise a design or planning process detail that was not included in the October 2020 Report.  See supra Discussion Section I.a.  Thus, ARE's allegations of fraudulent inducement rise or fall on the following question: whether the City actually represented that the October 2020 Report was final and exclusive.  For the following reasons, the Court concludes that the City never made such a representation, and that any subjective belief ARE may have formed was clearly contradicted by other statements made by the City to ARE before the Amendments were signed.

### i.    Finality of October 2020 Report

ARE has failed to sufficiently allege that the City made a false representation of present fact that the October 2020 Report was final.  ARE's conclusory pleadings are contradicted by the plain language of (i) Section 2 of the Flaherty Letter, (ii) the Cooperation Clause in Section 4.b. of the Amendments, (iii) Section 4.a. of the Amendments, and (iv) a close reading of the remaining misrepresentations.

First, Section 2 of the Flaherty Letter contained numerous qualifications, each of which indicated that the plans could change in the future.  It made clear that the finality of the October 2020 Report was "based on existing information and current

conditions" and thus, impliedly, could change if "information" or "conditions" changed.  Flaherty Letter ¶ 2.  It further stated that the October 2020 Report "should not change."  Id.  The Court finds that these representations are of "future expectations" and are insufficient to establish falsity, as required to state a fraudulent inducement claim.  "Mere promissory statements as to what will be done in the future are not actionable."  Liberty Mut. Ins. Co. v. Harvey Gerstman Assocs., Inc., No. Civ. 11-4825 (SJF) (ETB), 2012 WL 5289606, at *10 (E.D.N.Y. Sept. 13, 2012), report and recommendation adopted, 2012 WL 5289587 (E.D.N.Y. Oct. 24, 2012) (citation omitted).  Although statements of future expectations may be actionable if there are pleaded facts "that give rise to a strong inference" of "[then-]present intent to deceive," such facts are not sufficiently pleaded here.  Phoenix Companies, Inc. v. Concentrix Ins. Admin. Sols. Corp., 554 F. Supp. 3d 568, 593-94 (S.D.N.Y. 2021).  Among other deficiencies, ARE has failed to plead any motive as to why the City would want to scuttle ARE's plans after so many years of mutually beneficial cooperation.

Second, the promissory -- rather than committal -- nature of the Flaherty Letter, the Bindler Draft, and the Oral Representation is established by the language of the Amendments themselves.  See Mot. at 23.  The "Cooperation Clause" into which ARE was allegedly fraudulently induced says as follows:

> <u>Cooperation.</u> Tenant and Landlord shall cooperate in good faith **to attempt** to reach mutually agreeable written parameters related to Landlord's **proposed** flood mitigation requirements in respect of the integration of the Option Premises with adjoining properties leased by Landlord and/or owned by the City.

10th Amendment § 4.b. (emphasis added). The 11th Amendment contained the same language. 11th Amendment § 4.b. The reference to "<u>proposed</u> flood mitigation requirements" in both Amendments clearly implies that the parties had not yet established "final" criteria. <u>Id.</u> (emphasis added). Likewise, the phrase "to attempt" fully anticipates that such "mutually agreeable written parameters" regarding the FPS may <u>never</u> be reached. <u>Id.</u> Falsity is not sufficiently alleged where, as here, "[ARE] knew, from the very terms of [ARE's] agreement with [the City], that [contract] classifications could be changed." <u>Liberty Mut. Ins. Co.</u>, 2012 WL 5289606, at *8.

Third, the references to "Draft Specified Project Drawings and Analysis" in Section 4.a of both the 10th and 11th Amendments did not imply the October 2020 Report was either final or exclusive. 10th Amendment § 4.a.; 11th Amendment § 4.a. Both sets of plans were self-described "drafts," i.e., not final. The drafts were also submitted for "review" per the contract, <u>id.</u>, further implying that changes were possible. Finally, the "Draft Specified Project Drawings and Analysis," defined as "that certain

memorandum dated as of April 27,2021 by Thornton Tomasetti and the drawings attached thereto," see 10th Amendment "Definitions," itself incorporated criteria set forth in the April 2020 Report. See infra Discussion Section I.b.ii.

Fourth, the two remaining alleged misrepresentations identified by plaintiff -- the Bindler Draft and Oral Representation -- are alleged in less detail than the Flaherty Letter and did not contradict the more specific statements made by Flaherty.  See Opp. at 13-14.  The Bindler Draft allegedly "reiterat[ed] that the floodwall criteria were reflected in the October 2020 Criteria." AC ¶ 106.  Upon examination of the Bindler Draft, which the City attached to a declaration, the Court agrees with the City that these proposed edits to a draft of the 10th Amendment merely suggested that the October 2020 Criteria were included, not that they were final or exclusive.[18]  Similarly, the alleged content of the Oral Representation was that the October

---

[18]    "Bindler merely edited the definition of 'Draft Specified Project Drawings and Analysis' [in the 'Definitions' Section of the 10th Amendment] to state that they should comply with the October 2020 Criteria. [] Bindler also added a comment stating that the Tenth Amendment should include some explanation of the floodwall criteria.  The parties ultimately did not include Bindler's proposals." Mot. at 7 (citing Bindler Draft at 26 (redline specifying that the "Draft Specified Drawings and Analysis" were attached "to ensure that they perform to the floodwall criteria set forth in Section 5.3 of the attachment to the letter dated October 29, 2020" i.e. the October 2020 Report)).  Even if Bindler had represented that the "Draft Specified Project Drawings and Analysis" said the October 2020 Report was final or exclusive, such representations would be flatly contradicted by the contract itself: the report was a "Draft" subject to "review" by the "Landlord" H+H.  See 10th Amendment § 4.a.; 11th Amendment § 4.a.

37

2020 Report was "final," not that it was exclusive.[19]  There is no allegation that the Bindler Draft or Oral Representation went beyond the statements in the Flaherty Letter, or somehow nullified the qualified, promissory language therein: that the criteria in the October 2020 Report "should not change."  Flaherty Letter ¶ 2. Thus, ARE has failed to allege that the City made a misrepresentation that the October 2020 Report was final.

### ii. Exclusivity of the October 2020 Report

Next, the Court turns to ARE's allegation that the October 2020 Report was exclusive, i.e., the "only criteria applicable." AC ¶ 96 (emphasis in original).  Exclusivity must be examined separately because, although ARE pleads various procedural steps and design features that were "not require[ed]" in the October 2020 Report, see, e.g., AC ¶ 142, it fails to plead that any specific provision October 2020 Report was directly reversed or contradicted.  Indeed, ARE acknowledges as much in its opposition brief, which points to the inclusion of factors listed in the April 2020 Report as the basis for the falsity allegations here:

> Defendants' focus on the Amended Complaint's alleged failure to demonstrate how the design criteria changed is an inappropriate inquiry on a motion to dismiss.  In any event, the Amended Complaint specifically alleges that Defendants, through their consultants, notified ARE it always needed to comply with the April 2020 Report, directly contradicting their [October 29, 2020] representation that the October 2020 Report, rather than

---

[19]    ARE does not directly quote what EDC employees Dawodu and Burch said but rather paraphrases their statement as saying the October 2020 Criteria "were final."  See AC ¶ 113.

the April 2020 Report, reflected the 'basis' for ARE's portion of the FPS.

Opp. at 17 n.10 (citing AC ¶ 128 ("[O]n June 7, 2024, ARE received a letter from Arcadis which stated, for the first time, that ARE should have followed its design criteria report issued in April 26, 2020.")).  Put differently, the only clearly articulated change from the October 2020 Report was the inclusion of criteria listed in the April 2020 Report.  Thus, we must assess whether the City misrepresented that only the October 2020 Report -- and not the "broader criteria identified in [the] April 2020 report," AC ¶ 107 -- were applicable.

Any subjective belief ARE may have held that the October 2020 Report was exclusive of the April 2020 Report or other criteria was objectively unreasonable.  ARE asked Flaherty whether the October 2020 Report was exclusive in its November 6, 2020 letter, and received the following response:

> **[ARE Question:] Please confirm that the design criteria issued on October 29 supersede any previously shared criteria.**
>
> [Flaherty Response:] The design criteria **have not changed since they were issued to ARE on April 27, 2020** (Report dated April 26, 2020).  To address multiple questions by ARE, further clarifications and redacted versions have been made culminating in the October 29, 2020 correspondence that **clarified but did not supersede** the prior material shared.

Flaherty Letter ¶ 1 (emphasis added).  This statement would place any reasonable recipient on notice that the October 2020 Report

39

"did not supersede" either the April 2020 Report or other "prior material shared," and that the October 2020 Report was a "clarification[]" of some of the terms of the April 2020 Report, not an exclusive replacement for it.  Id.  Put differently, for any provision of the April 2020 Report which was not directly contradicted by the express terms of the October 2020 Report, the only reasonable conclusion is that it "h[ad] not changed" and remained in effect.  Id.  Moreover, any reasonable plaintiff must read Question and Answer 2 of the Flaherty Letter, that the October 2020 Criteria "should not change," in light of Question and Answer 1, stating that the October 2020 Criteria "did not supersede" the April 2020 Criteria or other "prior material shared."[20]

The Court's understanding is confirmed by a review of the reports themselves.  As the City observes, and the Court has confirmed, "[t]he April 2020 Criteria is a 20-page report that includes a variety of 'requirements' for construction of the floodwall [whereas] [t]he October 2020 Criteria is a shorter [7-page] report that elaborates on the 'Design Load Requirements' set out in the April 2020 Criteria."  Mot. at 4; see also October 2020 Report.  The "Design Load Requirements" were included in the April

---

[20]    The City accurately observes that "ARE alleges Defendants changed the floodwall criteria in 2023 and 2024 by asking ARE to follow the April 2020 Criteria. . . . But the Flaherty Letter expressly states that the October 2020 Criteria did not supersede the April 2020 Criteria. . . . Thus, the April 2020 Criteria are among the floodwall criteria Flaherty stated 'should not change,' . . . and ARE has [also] not alleged material changes to them."  Mot. at 18 n.9.

2020 Report as Section 5.3.  See April Report at 8-16.  However, the April 2020 Report included a substantial number of other sections -- for example, Section 5.2.6 laying out specifications for a "Seepage Cutoff Wall" -- that are simply not within the scope of the narrower October 2020 Report.  Id. at 24.  The cover page of the October 2020 Report also makes clear that it is a "Rev[ised] Redacted Version," not an exclusive replacement for the April 26, 2020 version.  October 2020 Report at 4.

An examination of the documents referenced in ARE's pleadings demonstrates that the continued applicability of the April 2020 Report was disclosed to ARE.  For example, ARE alleges that it provided Arcadis with draft "plans and structural calculations for the North Tower, dated April 27, 2021, to EDC and H+H on May 3, 2021 ('Draft Specified Project Drawings and Analysis')", and that these plans were based on the October 2020 Report.  AC ¶ 107.  On May 24, 2021, Arcadis returned ARE's draft with comments and analysis, but Arcadis allegedly omitted "that [ARE's draft designs] relied on the October 2020 Criteria [and] that ARE needed to comply with the broader criteria identified in an April 2020 report[.]"  Id. ¶ 107.  This allegation is patently false.  The Arcadis Analysis explicitly referenced sections of the April 2020 Report that were not included in the October 2020 Report.  For example, the Arcadis Analysis repeatedly referenced "Design Criteria Table 5," a clear reference to the April 2020 Report.

41

Compare Arcadis Analysis at 3 (instructing ARE to, "[p]er Design Criteria Table 5, use 150 pcf for unit weight of concrete") with April 2020 Report at 5 ("Table 5: Material Unit Weights" listing "Concrete[]" as having a prescribed "Unit Weight" of "150 lbs./ft³"). "Pcf" means "pounds per cubic foot." PCF, DICTIONARY.COM, https://www.dictionary.com/browse/pcf (last accessed March 21, 2026). The October 2020 Report did not include a "Table 5" at all. See October 2020 Report. This exchange, made well after the Flaherty Letter and Bindler Draft, and shortly before the 10th Amendment was signed, totally undermines ARE's core allegation: that it was deceived that the October 2020 Report was final and exclusive. The "Draft Specified Project Drawings and Analysis," as revised per the Arcadis Analysis, were eventually referenced in Section 4.a. of the 10th and 11th Amendments. AC ¶ 108. Thus, not only the October 2020 Report, but also the April 2020 Report, was "specifically contemplated" by the contract itself. Id.

The continued applicability of the April 2020 Report defeats other allegations made by ARE. One of ARE's most specific allegations is that "[o]n March 20, 2024, Defendants informed ARE of yet another entirely new requirement not provided for in the Ground Lease, demanding for the first time that ARE also build a seepage cut-off wall into the North Tower, separate and apart from the FPS." AC ¶ 127. ARE alleges that "[t]his requirement was

42

never discussed with ARE prior to March 2024." Id. To the contrary, Section 5.2.6 of the April 2020 Report, which did not overlap with any section of the October 2020 Report, included explicit and detailed specifications for a "Seepage Cutoff Wall."[21] See April 2020 Report at 8. The City raised this critical point in its opening brief. See Mot. at 5 ("The April 2020 Criteria included a seepage-wall requirement."). Despite that, ARE has not made any effort to rebut this argument in its opposition. Indeed, ARE seems to have missed the point entirely. See Opp. at 10 (citing to AC ¶ 127 but failing to acknowledge the City's argument), 14 n.6 (commenting generally that "Defendants' Motion appears to acknowledge that the City always understood the FPS design criteria would change and that ARE was expected to comply with the April 2020 Report and faults ARE for 'misinterpret[ing]'

---

[21]    The specific requirements for the "Seepage Cutoff Wall" were as follows:

> **5.2.6 Seepage Cutoff Wall**[:] Seepage cutoff walls will be predominantly designed using ASTM A328 and A572 steel sheet piling with a minimum yield strength of 50 ksi. Fabricated sheet pile corners and connectors shall be bolted using 7/8 in. diameter high strength bolts meeting the requirements of ASTM A325, Type 3, or ASTM A490, Type 3. The bolts shall be spaced on 6 inch centers for the length of the section except for 2 feet at each end where they are spaced on 3 inch centers. Welding of the longitudinal sheet pile joint will only be permitted on seepage cut-off sheet piling driven in soft soils with no obstructions anticipated. The extruded pile corners and connectors shall be fabricated from the same grade and strength material as the adjoining sheet piling sections. At locations where interferences exist, mostly due to utilities, or because of unwanted vibration, alternate cut-off walls will be considered. Jet grout walls, slurry cut-off walls, or equivalent systems, are considered alternatives.

April 2020 Report at 8.

43

the Flaherty Letter."). The Flaherty Letter made perfectly clear that any portion of the April 2020 Report that was not directly contradicted by the shorter October 2020 Report was still effective. Flaherty Letter ¶ 1.

While the Court is bound to "draw all reasonable inferences" in ARE's favor and accept its pleadings as true, "documents appended to a complaint 'control, and this Court need not accept as true' a complaint's allegations about the content of the documents to the extent that the allegations contradict the documents themselves." In re AXA Equitable Life Ins. Co. COI Litig., No. 16 Civ. 740 (JMF), 2018 WL 3632500, at *2 (S.D.N.Y. July 30, 2018) (quoting Tongue v. Sanofi, 816 F.3d 199, 206 (2d Cir. 2016)). Here, the Court finds that any allegations that the October 2020 Report was final or exclusive are directly contradicted by the clear language of (i) the Flaherty Letter, (ii) the Cooperation Clause of both the 10th and 11th Amendments, (iii) Section 4.a. of the Amendments, considered in light of the "Draft Specified Drawings and Analysis" and Arcadis Analysis, and (iv) the April and October 2020 Reports themselves, all of which were either referenced by or directly attached to the Amended Complaint. Consequently, ARE has failed to allege "a material misrepresentation of a presently existing or past fact." Johnson, 660 F.3d at 143.

**iii. DDC Review**

44

ARE has also made a particularized allegation that the City misleadingly omitted that the DDC would review and/or approve design plans for the FPS.  See AC ¶¶ 119-22.  ARE alleges that "prior to [May 22, 2023], neither EDC nor H+H had ever disclosed to ARE that H+H's October 2020 Criteria were even subject to DDC review, much less approval" and that "[h]ad ARE known that the October 2020 Criteria were in fact not final, and would be subject to the review and approval of DDC -- an entirely distinct City agency -- ARE would not have agreed to enter into the 10th and 11th Amendments[.]"  Id. at 121; see also Opp. at 9 (ARE only "later learn[ed]" that DDC would be "overseeing the construction of the FPS").

Once again, ARE's allegation is flatly contradicted by the Flaherty Letter, which ARE itself attached to its Amended Complaint.  The Flaherty Letter stated as follows:

> **[ARE Question:] Please share H+H's timeline for approvals, design and construction.**
>
> [Flaherty Response:] As we have previously shared, **the community floodwall will be designed and constructed under contract with NYC DDC**. We will involve that agency in these discussions to respond on this point. We will circle back to advise you of status in that regard.

Flaherty Letter ¶ 6 (emphasis added).  In a separate section, the Flaherty Letter also stated that "[t]he engineer engaged by DDC for this project will certify to FEMA the compliance of the wall with the 500-year flood standard."  Id. ¶ 7 (emphasis added).

45

These statements, both individually and taken together, clearly explained that the DDC would have a substantive and, indeed, a leading role in the "design and construction" process. See Flaherty Letter ¶¶ 6-7 (FPS "will be designed and constructed under contract with NYC DDC" and "will [be] certif[ied]" by DDC's engineer); Reply at 6-7 ("ARE's position is also refuted by the Flaherty Letter, which . . . disclos[ed] DDC involvement as 'previously shared.'").

As with ARE's alleged misrepresentations, while the Court is bound to "draw all reasonable inferences" in ARE's favor, "'this Court need not accept as true' a complaint's allegations about the content of the documents to the extent that the allegations contradict the documents themselves." In re AXA Equitable Life Ins. Co. COI Litig., 2018 WL 3632500, at *2 (quoting Tongue, 816 F.3d at 206). Similarly, "a court 'need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of which the court may take judicial notice.'" Rockaway Beverage, Inc. v. Wells Fargo & Co., 378 F. Supp. 3d 150, 160 (E.D.N.Y. 2019) (quoting In re Livent, Inc. Noteholders Sec. Litig., 151 F. Supp. 2d 371, 405-06 (S.D.N.Y. 2001)). Thus, the Court concludes that, as a matter of law, ARE

46

has failed to allege a material misleading omission as required to state a claim for fraudulent inducement.

### c. Reliance

Although plaintiff's fraudulent inducement claim has already failed on particularity and falsity grounds, see supra Discussion Sections I.a. and I.b., the Court will -- for the avoidance of doubt -- consider additional arguments made by the City in favor of dismissal.  The first of these arguments is that ARE has failed to allege "reasonable reliance."  See Mot. at 12-16; Reply at 2-6.  Under New York law, plaintiff must allege "reasonable reliance" as well as falsity.  Johnson, 660 F.3d at 143.  Put differently, "[e]ven if [ARE] were able to establish that the alleged misrepresentation[s] made by [the City] w[ere] factual, rather than promissory, in nature, reliance upon that misrepresentation must be 'justifiable' in order to be actionable."  Liberty Mut. Ins. Co., 2012 WL 5289606, at *11; see Hoffenberg, 248 F. Supp. 2d at 310 (plaintiff must allege "that the other party rightfully did so rely [on the misrepresentation] in ignorance of its falsity").

The City argues that ARE's reliance was "objectively unreasonable" for five reasons: (i) the Cooperation Clause directly contradicted the alleged collateral representation that the October 2020 Report was final and exclusive, Mot. at 13-14; (ii) the relied-upon collateral representations were "ambiguous or indefinite," id. at 14; (iii) ARE has "misinterpreted" the Flaherty

47

Letter, especially Section 1 where Flaherty denied that the October 2020 Report "superseded" the April 2020 Report and other criteria, id. at 15; (iv) ARE was "sophisticated" and thus not able to rely on extracontractual representations it could have verified, id. at 15-16; and (v) the "context" of the parties' negotiations, including the "complexity and magnitude" of the project rendered it unreasonable for ARE to rely on extracontractual representations, id. at 16; see also Reply at 2-6.  We will consider each of these arguments in turn and also discuss them in relation to one another.

The Court agrees that the language of the Cooperation Clause, which stated the parties would "cooperate in good faith to attempt to reach mutually agreeable written parameters related to [H+H's] proposed flood mitigation requirements," contradicted any alleged extracontractual representation that the October 2020 Report was final and exclusive.  See supra Discussion Section I.b.i.  "Under New York law, reasonable reliance is precluded when an express provision in a written contract contradicts a prior . . . representation in a meaningful fashion."  Colonial Funding Network, Inc. for TVT Cap., LLC v. Epazz, Inc., 252 F. Supp. 3d 274, 284 (S.D.N.Y. 2017) (citation and internal quotation marks omitted); see also Robinson v. Deutsche Bank Tr. Co. Americas, 572 F. Supp. 2d 319, 323-24 (S.D.N.Y. 2008) (the relevant question is whether "the subject matter of the representation appears to be

48

more related to the subject matter that was included in the contract" or is "more remote"). While the "written parameters" may be distinct from the "flood mitigation requirements" i.e., the FPS criteria, the "flood mitigation requirements," are nonetheless described as "proposed." See 10th Amendment § 4.b.; 11th Amendment § 4.b.; see also infra p. 61 n.28 (describing the parties' dispute regarding these terms).

Even if the Cooperation Clause did not contradict the alleged misrepresentations, the alleged misrepresentations are also "ambiguous" and contradicted by the other, more specific statements made prior to the execution of the Amendments. See supra Discussion Section I.b. The Bindler Draft's (unadopted) suggestion that the "Draft Specified Drawings and Analysis" were attached "to ensure that they perform to the floodwall criteria set forth in" the October 2020 Report is ambiguous as to whether the October 2020 Report is either final or exclusive. Bindler Draft at 26. The Oral Representation that the October 2020 Report was "final" is paraphrased and, in any case, does not speak to exclusivity. Id. ¶ 113. It is well-established that "reliance on an inference drawn from one document [or oral representation] is unreasonable when it contradicts a more specific representation in another document." Herrick v. Grindr, LLC, 306 F. Supp. 3d 579, 596 (S.D.N.Y. 2018), aff'd, 765 F. App'x 586 (2d Cir. 2019). Here, the alleged misrepresentations were contradicted by the Flaherty

Letter's statements that (i) the April 2020 Report and other prior material was "not supersed[ed]," Flaherty Letter ¶ 1, (ii) the designs "should not change" based on "existing information and current conditions," id. ¶ 2, and (iii) the FPS would "be designed and constructed under contract with NYC DDC," with the engineer for the DDC "certif[ying]" compliance with the 500-year flood standard to FEMA, id. ¶¶ 6-7.  They are also contradicted by the non-overlapping, operative provisions of the April 2020 Report, such as Section 5.2.6 providing for a "seepage cutoff wall," April 2020 Report at 8, and the May 24, 2021 Arcadis Analysis requiring that provisions of the April 2020 Report be inserted into the "Draft Specified Drawings and Analysis" referenced in Section 4.a. of the Amendments.  See Arcadis Analysis at 3.

Next, the City highlights the "sophistication" of ARE and the "complexity" of the transaction at issue.  Mot. at 15-16.  "In assessing the reasonableness of a plaintiff's alleged reliance, we consider the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc., 343 F.3d 189, 195 (2d Cir. 2003).  As the City observes, ARE presented itself in the Amended Complaint as "the foremost developer of specialized commercial life science properties in the world."  Mot. at 16 (citing AC ¶ 4).  The proposed North Tower was a project valued in

the tens-of-millions.  AC ¶ 155.  "Had [ARE] wished to have enforceable representations and warranties with respect to the [October 2020 Report], it could have bargained for them or declined to proceed with the transaction if they had been refused.  But [here] there is no basis on which the Court may rewrite the contract that [ARE] elected to sign" or sustain a claim for "fraud based on [alleged] nondisclosure of material facts" not represented or warranted in the agreement.  KB Dissolution Corp. v. Great Am. Opportunities, Inc., No. 09 Civ. 8565 (LAK), 2010 WL 1379789, at *2-3 (S.D.N.Y. Mar. 26, 2010).  Even in the absence of specific disclaimers, "courts may disregard a fraudulent inducement claim . . . when the parties have negotiated at arms length and they are sufficiently sophisticated that they could have easily protected themselves either through obtaining readily available information or alternatively including a protective clause in the agreement."  Primedia Enthusiast Publ'n, Inc. v. Ashton Int'l Media, Inc., No. 02 Civ. 9997 (HB), 2003 WL 22220375, at *6 (S.D.N.Y. Sep. 25, 2003).  ARE's strenuous efforts to justify its failure to negotiate such a provision at any point in the years leading up to the signing of the 10th Amendment, or the 16 months between the signing of the 10th and 11th Amendments, are unavailing.[22]  Indeed, the fact that negotiations leading up to the

---

[22]    ARE suggests that it was forced to sign the Amendments through strong-arm tactics and trickery.  First, it alleges that the City falsely cited "biz" reasons for not signing a DOB application.  AC ¶ 77.  However, this alleged

signing of the Amendments were contentious only enhances the expectation that ARE should have protected itself through investigation and representations and warranties.  See Ortho-Clinical Diagnostics Bermuda Co. v. FCM, LLC, No. 15 Civ. 5607 (NRB), 2017 WL 2984023, at *5 (S.D.N.Y. July 6, 2017), aff'd, 739 F. App'x 664 (2d Cir. 2018).

While the Court does not believe a sophisticated party that signed general merger clauses, see Ground Lease §§ 18.2,[23] 31.1,[24]

---

incident occurred in December 2019, over a year before the parties entered into the 10th Amendment, and was resolved within one day.  Id. ¶¶ 77-81.  Second, ARE alleges that it proposed "incorporat[ing]" the terms of the October 2020 Report into the contract but was prevented because Bindler falsely stated "the person [from H+H or EDC] responsible for signing off on this request was unavailable."  Id. ¶ 113.  ARE does not allege that it attempted to incorporate the October 2020 Report at any prior time in the "sixteen months" between the execution of the 10th and 11th Amendments or explain why it could not attempt to notice an "Unavoidable Delay" as it did on two other occasions.  Id. ¶¶ 110, 84, 125.  The time pressure ARE blames on the City was as much caused by ARE's failure to make this proposal before October 12, 2022 (only weeks before the November 3, 2022 closing date), as it was by any alleged statement made by Bindler.   Moreover, ARE does not plead that its belated suggestion to "incorporate" the October 2020 Report would make the October 2020 Report either final or exclusive, or contradict the explicit representations to the contrary made by Flaherty.  See Flaherty Letter ¶¶ 1-2.

[23]    Section 18.2 Tenant's Acknowledgment of No Other Representations. Tenant confirms that, except for the  representations contained in Section 18. I  hereof  or  elsewhere  in  this  Lease,  (a)  no representations,  statements,  or  warranties,  express  or  implied, have been made by, or on behalf of Landlord or the City with respect to the Premises or the transaction contemplated by this Lease, the status of title thereto, the physical condition thereof, the zoning or other laws, regulations, rules and orders applicable thereto of the use that may be made of the Premises, and Tenant takes the Premises 'as-is' as of the Commencement Date, (b) Tenant has relied on no such representations, statements or warranties, and (c) except as otherwise expressly provided for in this Lease, Landlord shall not be liable in any event whatsoever for any latent or patent defects in the Premises.

Ground Lease § 18.2

[24]    Section  31.1  Entire  Agreement.  This  Lease,  together  with  the Exhibits  hereto,  contains  all  of  the  promises,  agreements,

41.11,[25] can <u>never</u> rely on a collateral representation, such reliance among "sophisticated businessmen" is more difficult to establish.   <u>Lazard Freres & Co. v. Protective Life Ins. Co.</u>, 108 F.3d 1531, 1541 (2d Cir. 1997).   As the Court in <u>Lazard</u> put it:

> [W]here, as here, a party has been put on notice of the existence of material facts which have not been documented and he nevertheless proceeds with a transaction without securing the available documentation <u>or inserting appropriate language in the agreement for his protection</u>, he may truly be said to have willingly assumed the business risk that the facts may not be as represented. Succinctly put, a party will not be heard to complain that he has been defrauded when it is his own evident lack of due care which is responsible for his predicament.

<u>Id.</u> at 1543 (quoting <u>Rodas v. Manitaras</u>, 552 N.Y.S.2d 618, 620 (N.Y. App. Div. 1990)).   In such circumstances, "the failure to insert such language into the contract -- by itself -- renders

---

conditions, inducements and understandings between-Landlord and Tenant concerning the Premises and there are no promises, agreements, conditions, understandings, inducements, warranties or representations, oral or written, expressed or implied, between them other than as expressly set forth herein and therein.

Ground Lease § 31.1

[25]   Section 41.11 <u>Waiver. Modification. Etc.</u> No covenant, agreement, term or condition of this Lease to be performed or complied with by either party, and no Default thereof by Tenant or Ldndlord's failure to perform thgm shall be changed, modified, altered, waived or terminated except by a written instrument of change, modification, alteration, waiver or termination executed by the other party. No waiver of any Default shall affect or alter this Lease, but each and every covenant, agreement, term and condition of this Lease shall continue in full force and effect with respect to any other then existing or subsequent Default thereof.

Ground Lease § 41.11.

reliance on the misrepresentation unreasonable as a matter of law." Id.

ARE's failure to reduce the allegedly critical promise that the October 2020 Report was final and exclusive to a contractual provision is all the more perplexing when considered in the context of the actual statements available to it: (i) contract provisions describing "Draft Specified Project Drawings and Analysis" and "proposed flood mitigation requirements," 10th Amendment § 4; 11th Amendment § 4; (ii) promissory representations that design plans "should not change," Flaherty Letter ¶ 2 (emphasis added); and (iii) countervailing statements that that other criteria like the April 2020 Report were "not supersed[ed]," id. ¶ 1.

ARE responds to the City's reliance arguments by reiterating some facts in the Amended Complaint: that "Defendants presented ARE with the October 2020 Report [and] represent[ed] that this report, not the April 2020 Report" was final and exclusive; that "Defendants finally confirmed in the Flaherty Letter that the October 2020 Report reflected 'settled' criteria"; and that defendants "reiterated those representations [in the Flaherty Letter] prior to ARE's execution of the 10th and 11th Amendments." Opp. at 19. But ARE once again fails to address Section 1 of the Flaherty Letter, which made perfectly clear that the April 2020 Report was "not supersed[ed]." Flaherty Letter ¶ 1; see also id. ¶ 2 (design "should not change"). While ARE cites some cases

54

suggesting the "fine tuning" language in Section 2 of Flaherty's Letter made the October 2020 Report seem more "settled" than it was, Opp. at 19-20, this approach does not rebut the fact that any "settled" criteria also included the April 2020 Report, Flaherty Letter ¶ 1.  Ultimately, it is not the Court or the City which have read Section 2 of the Flaherty Letter "in a vacuum," Opp. at 2, but ARE itself.

ARE also cites various cases saying that pre-discovery dismissals on reliance grounds are "disfavored" because reliance is "intensely fact-specific."  Opp. at 20 (citing Langhamer v. Johnson, No. 1:22 Civ. 05404 (JLR), 2023 WL 6691017, at *8 (S.D.N.Y. Oct. 12, 2023); Wild Bunch, SA v. Vendian Entertainment, LLC, 256 F. Supp.3d 497, 507 (S.D.N.Y. 2017); Maloul v. Berkowitz, No. 07 Civ. 8525 (LBS), 2008 WL 2876532, at *2 (S.D.N.Y. July 23, 2008)).  However, this "general[]" rule, Maloul, 2008 WL 2876532, at *2, is not applicable here.  "[C]ourts have been willing to dismiss a fraud claim for failure to plead reasonable reliance where a plaintiff 'failed to examine readily available information . . . or failed to properly investigate a transaction.'"  Kumaran v. Northland Energy Trading, LLC, No. 19 Civ. 8345 (MKV) (RWL), 2025 WL 1982945, at *10 (S.D.N.Y. July 9, 2025) (quoting Glidepath Holding B.V. v. Spherion Corp., 590 F. Supp.2d 435, 459 (S.D.N.Y. 2007)).  Once again, even assuming arguendo that Ms. Flaherty's statement in Section 2 of her letter or the other alleged

misstatements were unambiguous, Section 1 of that same letter stated that the October 2020 Report "clarified but did not supersede the prior material shared," including the April 2020 Report.  Flaherty Letter ¶ 1; see also id. ¶¶ 6-7 (forecasting DDC's definite, substantive involvement); April 2020 Report at 8 (describing a "seepage cutoff wall").  ARE clearly "failed to examine readily available information," Kumaran, 2025 WL 1982945, at *10, and thereafter failed to procure additional information or reduce its assumptions regarding the finality and exclusivity of the October 2020 Report to writing.  In light of this, and the other factors discussed, the Court concludes that ARE's reliance on the alleged misrepresentations was unreasonable as a matter of law.

### d. Bridgestone

In addition to establishing particularity under Rule 9(b) and the elements of fraudulent inducement, see supra Discussion Sections I.a, I.b., and I.c., a party claiming that it was fraudulently induced must "either: (i) demonstrate a legal duty separate from the duty to perform under the contract. . . ; or (2) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract. . . ; or (3) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages."  Bridgestone, 98 F.3d at 20.  Even if a plaintiff does not explicitly plead a breach of contract claim alongside its

fraudulent inducement claim, "this well-settled test also ensures that contract actions are not improperly converted into fraud actions by mere allegations that a contracting party did not intend to meet its contractual obligations." Osan Ltd. v. Accenture LLP, 454 F. Supp. 2d 46, 52 (E.D.N.Y. 2006).

"[C]ourts in this district . . . have employed a two-stage approach to determine whether a statement was collateral or extraneous to the contract." Koch Indus., Inc. v. Aktiengesellschaft, 727 F. Supp. 2d 199, 215 (S.D.N.Y. 2010) (citation omitted). "Under that approach, the first and threshold question is whether the alleged misrepresentation is a statement of present fact." Id. "The second, distinct question is whether the terms of the parties' agreement preclude a fraud suit on the basis of the alleged misstatement." Id.

Here, the alleged misrepresentations were not "collateral or extraneous" to the contract.[26] As the Court has already stated, at least some of the alleged misrepresentations are statements of "future intent" not "present fact" and are thus inactionable under Koch. See supra Discussion Section I.b.i. But even if the alleged

---

[26]    ARE does not clearly argue that the City owed ARE a "legal duty separate from the duty to perform" or that there were "special damages." See Opp. at 20-23.  To the extent ARE pleads that the City owed a duty to speak under the "special facts" doctrine, the Court rejects the idea that the relevant information was "not readily available" to ARE, see supra Discussion Section I.b., or that the City "kn[ew] that [ARE] [was] acting on the basis on mistaken knowledge."  Opp. at 16-17 (quoting Yusin Brake Corp. v. Motorcar Parts of Am., Inc., No. 13 Civ. 9223 (DLC), 2014 WL 2560612, at *9 (S.D.N.Y. June 6, 2014)).

misrepresentations were statements of present fact, they would also fail under the second prong of the analysis. In Koch, defendant allegedly "failed to disclose the [acquired business'] involvement in an antitrust conspiracy [and] misrepresented that the business was in compliance with the law" in the defendant's "response[s] to a list of questions that Koch sent . . . as part of the due diligence process." 727 F. Supp. 2d at 213-15. However, the Court held that the alleged misrepresentations were not "collateral or extraneous" because the "sophisticated" parties had included a disclaimer clause that defendant was selling the business "AS IS" and without "ANY OTHER REPRESENTATIONS OR WARRANTIES, WRITTEN OR ORAL, STATUTORY, EXPRESS OR IMPLIED." Id. at 215. The Court also pointed to the presence of "a merger clause" and "limited remedies provision" as enhancing the inference that there was no "collateral or extraneous" representation. Id. at 215-16.

The City and ARE included similar clauses in their agreement. In particular, ARE signed Section 18.2 of the Ground Lease, the "Tenant's Acknowledgment of No Other Representations," in which ARE "confirm[ed] that, except for the representations contained in Section 18 . . . (a) no representations, statements, or warranties, express or implied, have been made by, or on behalf of Landlord or the City with respect to the Premises . . . and Tenant takes the Premises 'as-is' as of the Commencement Date, (b) Tenant

58

has relied on no such representations, statements or warranties[.]" Ground Lease § 18.2. This disclaimer of representations and warranties was supplemented by a merger clause, stating that the contract constituted the whole of the parties' agreement and disclaiming any other "inducements, warranties or representations, oral or written, express or implied," id. § 31.1, and a provision limiting amendments to signed writings, id. § 41.11; see also Reply at 9.[27] Here, as in Koch, the "intent" of the parties is made clear by the "cumulative effect" of these clauses, the "sophistication" of each party, and other factors, such as the lack of a "carve[] out . . . exception for fraud claims." Koch, 727 F. Supp. 2d at 215.

Even if the Court agreed that the general disclaimer and merger clauses cited by the City, see Mot. at 21 (citing Ground Lease §§ 18.2, 31.1, 41.11), do not themselves preclude a "collateral or extraneous" representation, the claim could still not proceed under Bridgestone. This is because the general clauses are accompanied by additional, specific provisions in the contract that relate to the alleged misrepresentations. One of the City's

---

[27]    ARE's attempt to distinguish Koch falls flat. ARE states "the [Koch] Court determined that the merger clause barred the fraud claim because the alleged misrepresentations expressly contradicted the representations made in the contract, and, thus, were not collateral to the agreement." Opp. at 21 n.13. But, in fact, the disclaimer of "ANY OTHER REPRESENTATIONS OR WARRANTIES, WRITTEN OR ORAL, STATUTORY, EXPRESS OR IMPLIED" did not rebut any of the specific antitrust or legal compliance statements at issue. Koch, 727 F. Supp. 2d at 215. Put simply, the provision in Koch was a general disclaimer which, when considered together with the parties' sophistication and the presence of a merger clause, precluded collateral representations to support a fraud claim.

59

cited cases, Clifton v. Vista Computer Servs., LLC, is illustrative of this point.  No. 01 Civ. 10206 (JSM), 2002 WL 1585550, at *3 (S.D.N.Y. July 16, 2002).  In Clifton, the plaintiff alleged "that he signed the contract because of the promise that he would manage $3 million[.]"  Id.  The contract stated that "[t]he parties hereto acknowledge that [defendant] and [plaintiff] expect that [defendant] and [plaintiff] will succeed in obtaining, directly or indirectly, additional financing in the amount of approximately $3,000,000 from existing shareholders" of defendant.  Id.  However, the Court pointed out that the "contract states that Defendant 'expects' to obtain the financing, not that they have already acquired or that they will acquire it."  Id.  This "expects" language was fatal to plaintiff's fraudulent inducement claim because "[i]f the contract acknowledges the possibility that there will be no financing, a promise about what will happen to that financing cannot be 'extraneous' to the contract."  Id. (granting defendant's motion to dismiss under Bridgestone, 98 F.3d 13).

Here, the Cooperation Clause's language that the parties would "attempt" to reach "mutually agreeable written parameters related to [H+H's] proposed flood mitigation requirements," 10th Amendment § 4.b.; 11th Amendment § 4.b., precludes a finding that there was a fraudulent misrepresentation collateral or extraneous to the contract.  Even if the "written parameters" were not the

same as "FPS design criteria" like the October 2020 Report,[28] the Cooperation Clause also describes "proposed flood mitigation requirements" and Section 4.a. describes "Draft Specified Project Drawings and Analysis."[29]  10th Amendment § 4; 11th Amendment § 4. Each of these provisions clearly contemplates either changes to the designs or no ultimate agreement on the FPS.  Moreover, as the City observes, success pursuant to the Cooperation Clause was not a contractual precondition to the Closing.  See Mot. at 23. Ultimately, ARE's frustration about delays does not overcome the fact that the contract clearly contemplated a world in which the

---

[28]  While the Amended Complaint discusses design "criteria" and the Cooperation Clause uses the phrase "flood mitigation requirements," the City observes that "ARE has not distinguished the floodwall 'criteria' that were supposedly final from the 'flood mitigation requirements' the Cooperation Caluse says were proposed."  Mot. at 14.  ARE responds that "the 'written parameters' referenced in the Cooperation Clause were different than the FPS design criteria" and "ARE understood that the Cooperation Clause related to (i) ARE's agreement to 'continue to work with H+H and EDC to implement its design for the North Tower based on the October 2020 Criteria' and (ii) the 'agreements for reimbursement of ARE's costs, the operation and maintenance of the FPS, and any access easements necessary for construction of the FPS.'"  Opp. at 19 n.12. The City replies that ARE "attacks a straw man," as the City's argument is about the term "flood mitigation requirements" not the term "written parameters." Reply at 1.  The Court agrees with defendants that ARE has failed to distinguish the "design criteria" at issue from the "proposed flood mitigation requirements" in the Cooperation Clause.  See 10th Amendment § 4.b. (emphasis added); 11th Amendment § 4.b. (emphasis added).

[29]  ARE argues that the misrepresentations regarding the October 2020 Report do not fall under the "purview" of the contract because "the parties went so far as attaching ARE's design to the North Tower," i.e., the "Draft Specified Project Drawings and Analysis," to the 10th Amendment.  Opp. at 22.  As such, ARE urges that the "draft" and "proposed" language in the Cooperation Clause should only be interpreted as contemplating "fine tuning."  Id.  But ARE utterly overlooks the City's argument that the "Draft Specified Drawings and Analysis" also included criteria in the April 2020 Report.  See supra Section I.b.ii. (the Arcadis Analysis gave feedback on the "Drawing Specified Drawings and Analysis" specifying the inclusion of April 2020 Criteria); see also 10th Amendment § 4.a.; 11th Amendment § 4.a.

parties did not reach agreement as to the FPS at all, let alone an agreement that left the October 2020 Criteria unchanged.

For the preceding reasons, ARE's fraudulent inducement claims are dismissed.

## II.    Implied Covenant of Good Faith and Fair Dealing

ARE also brings a breach of implied covenant and fair dealing claim.   Specifically, ARE alleges that the City breached the implied covenant in November 2023 by "demand[ing] that ARE agree to (i) abide by a new set of incomplete design criteria and (ii) any criteria that H+H may develop in the future."[30]   Id. ¶ 186 (emphasis in original).   ARE summarizes this allegation as follows:

> [I]n 2023 Defendants frustrated ARE's ability to close on the Option because Defendants did not inform ARE that they planned to change the design criteria less than one year prior to the closing date for the Option . . . (scheduled for November 2024).

Opp. at 24.

"Under New York law, a covenant of good faith and fair dealing is implied in all contracts." S. Telecom Inc. v. ThreeSixty Brands Grp., LLC, 520 F. Supp. 3d 497, 504 (S.D.N.Y. 2021) (quoting State St. Bank & Tr. Co. v. Inversiones Errazuriz Limitada, 374 F.3d 158, 170 (2d Cir. 2004)).   "This covenant embraces a pledge that neither party shall do anything which will have the effect of

---

[30]    To the extent ARE alleges that this and other examples of the City's bad faith are alleged "[b]y way of example only," Opp. at 1-2, the Court also rejects the claim, as none of the facts in the alleged complaint, either individually or collectively, can sustain a claim for breach of the implied covenant of good faith and fair dealing.

destroying or injuring the right of the other party to receive the fruits of the contract."  Id. (citation and internal quotation marks omitted).  However, because "the implied obligation is in aid and furtherance of other terms of the agreement . . . [n]o obligation can be implied . . . which would be inconsistent with other [contract] terms[.]"  Murphy v. Am. Home Prods. Corp., 58 N.Y.2d 293, 304-05 (1983).  Relatedly, "the implied covenant does not extend so far as to undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's anticipated fruits from the contract."  M/A-Com Sec. Corp. v. Galesi, 904 F.2d 134, 136 (2d Cir. 1990) (citation and internal quotation marks omitted).

Once again, ARE's own pleadings defeat its claim.  "In a draft of the 13th Amendment sent to ARE's counsel, EDC included language requiring ARE to (i) cooperate with H+H on the FPS pursuant to design requirements set forth in an entirely new design report . . .  and (ii) agree to implement any additional design changes that H+H might seek to impose in the future."  AC ¶ 123 (emphasis added).  As the City correctly explains, "the implied covenant of good faith and fair dealing is limited to performance under a contract and does not encompass future dealings or negotiations between the parties."[31]  Mot. at 23-24 (quoting Bank of N.Y. v.

---

[31]    The City raises other arguments regarding the sufficiency of ARE's implied covenant claim, which we do not -- and need not -- address here.

63

Sasson, 786 F.Supp. 349, 354 (S.D.N.Y.1992)).    Because ARE "rel[ies] . . . on [the City's] conduct during the alleged negotiations to modify the terms of the [Ground Lease]," an implied covenant claim cannot be sustained.    Resol. Tr. Corp. v. Lesal Assocs., No. 91 Civ. 2025 (MBM), 1992 WL 98843, at *5 (S.D.N.Y. May 6, 1992).    ARE was not obligated to (and never did) accept the proposed 13th Amendment.    The Court will not extend the implied covenant to punish the City's negotiating position as to an amendment that was never signed.

In its opposition, ARE pivots its theory of liability away from the November 2023 negotiations regarding the proposed 13th Amendment -- the only specific event identified as a breach of the implied covenant in the Amended Complaint itself, see AC ¶ 186 -- and articulates a new theory: that ARE's actions in 2019, particularly the withholding of a signature on a DOB application, violated the implied covenant.    Opp. at 24-25 (citing AC ¶¶ 76-79).    This allegation cannot support an implied covenant claim because the standoff only lasted one day.    On December 16, 2019, H+H's counsel stated H+H would withhold its signature for "biz" reasons.    AC ¶ 77.    One day later, on December 17, 2019, ARE affirmed in an email that it was willing to "make its project team available to continue to meet with you and your colleagues on our respective projects to review our collective plans and engineering studies."    Id. ¶ 81.    After this rather modest representation was

made, the DOB application was signed.  Id.  Even if the Court were willing to read bad faith into the City's actions, this minor incident did not "have the effect of destroying or injuring" ARE's rights under the contract.  S. Telecom Inc., 520 F. Supp. 3d at 504.  Nor can ARE argue that its December 17, 2019 email created a binding obligation: indeed, the parties continued to negotiate over the then-proposed Cooperation Clause for almost 20 months before the signing of the 10th Amendment on July 1, 2021.  Id. ¶ 103.

To the extent ARE's new theory of liability is based on the City's proposed design that could "bisect" the ACLS campus, this also cannot support an implied covenant claim.  In its opposition, ARE states that the City "inform[ed] ARE in December 2019 it had two options: (1) cooperate with [the City] to build a FPS that would intersect with the North Tower's foundation or (2) refuse to cooperate, in which case, [the City] would pursue an 'independent' floodwall strategy, i.e., build a floodwall that would bisect the ACLS campus from the North Tower."  Opp. at 24.  The problem with this argument is simple: the Amended Complaint says no such thing. While it is alleged that the City "presented" ARE with "two FPS design options," including the "Independent Wall," the Amended Complaint does not say anywhere that the City threatened ARE in

the manner described.[32]  AC ¶ 73.  On October 29, 2020, Flaherty did say the City was prepared to pursue "an independent floodwall strategy" if it could not reach agreement with ARE.  See October 2020 Report at 1.  But the pleadings themselves do not connect this phrase to the plans presented by the City a year earlier.  As a practical matter, if ARE had refused to cooperate to build the floodwall the City's "strategy" would be, by definition, "independent."  In any event, in the absence of an allegation in the Amended Complaint that the "independent wall" idea was a threat, "the Court will not consider these factual allegations raised for the first time in a brief in opposition to a motion to dismiss."  Harrell v. New York State Dep't of Corr. & Cmty. Supervision, No. 15 Civ. 7065 (RA), 2019 WL 3817190, at *2 (S.D.N.Y. Aug. 14, 2019).

For the preceding reasons, ARE's implied covenant claim is dismissed.

---

[32]    Even if the City had used the "Independent Wall" as leverage to get ARE to "cooperate" with the "Integrated Wall," ARE's allegations would not support an implied covenant claim.  If H+H did not have a contractual or other legal right to build an "independent wall" that "bisected" the campus, ARE could have blocked H+H's efforts to build such a wall, and the threat would be empty. Alternatively, if H+H did have a contractual right under the Ground Lease to build an "independent wall," then an implied covenant claim could not stand because "the implied covenant does not extend so far as to undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's anticipated fruits from the contract."  M/A-COM Security Corp., 904 F.2d at 136.  Indeed, in New York "[a] party can exercise its rights under a contract for any reason it finds satisfactory, and such act will not constitute a breach of the implied covenant of good faith and fair dealing." In re Downtown Athletic Club of New York City, Inc., No. 98 B 41419 (JLG), 1998 WL 898226, at *10 (Bankr. S.D.N.Y. Dec. 21, 1998).

## III.   Leave to Amend

Having granted the City's motion to dismiss in its entirety, the Court must now consider ARE's request to amend its complaint pursuant to Federal Rule of Civil Procedure 15(a)(2).  See Opp. at 12 n.4, 25.  Although generally courts "should freely give leave [to amend] when justice so requires," Fed. R. Civ. P. 15(a)(2), "it is within the sound discretion of the district court to grant or deny leave to amend."  Nano Dimension Ltd. v. Murchinson Ltd., 681 F. Supp. 3d 168, 194 (S.D.N.Y. 2023), aff'd, 102 F.4th 136 (2d Cir. 2024) (citation omitted).  The Court denies ARE leave to amend for two reasons.

First, a plaintiff must "provide some indication of the substance of the contemplated amendment before a court [can] entertain the request."  Mariah Re Ltd. v. Am. Family Mut. Ins. Co., 52 F. Supp. 3d 601, 624 (S.D.N.Y. 2014).  Dismissal is appropriate here because ARE's request for leave, stated in two sentences in its opposition brief, gives no "indication of the substance" of any contemplated amendment.  Id.; see also Food Holdings Ltd. v. Bank of Am. Corp., 423 Fed. App'x 73, 76 (2d Cir. 2011) (summary order) (affirming district court's denial of leave to amend where plaintiff requested leave "on the final page of their brief in opposition" and "in boilerplate language and without any explanation as to why leave to amend was warranted").

Second, where "[p]laintiff[] ha[s] already amended once, after having the benefit of a pre-motion letter from Defendant stating the grounds on which they would move to dismiss," it is appropriate for the Court to deny leave to amend. Twohig v. Shop-Rite Supermarkets, Inc., 519 F. Supp. 3d 154, 168 (S.D.N.Y. 2021). Here, ARE has already amended its complaint once as a matter of right. AC. Significantly, it did so after the City had already filed a first motion to dismiss and after a pre-motion conference in which the City argued on the "same grounds," Opp. at 1, thus giving ARE a preview as to the substance of the City's criticisms. See ECF Nos. 30, 38 (order striking original memorandum of law after the filing of the first amended complaint several months later). Under these circumstances, dismissal without leave to amend is warranted. Twohig, 519 F. Supp. 3d at 168; see also Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n, 898 F.3d 243, 257 (2d Cir. 2018) (If "a plaintiff was aware of the deficiencies in his complaint when he first amended, he clearly has no right to a second amendment even if the proposed second amended complaint in fact cures the defects of the first.") (citation, internal quotation marks, and alterations omitted).

**CONCLUSION**[33]

For the preceding reasons, the City's motion to dismiss is granted in its entirety.   The Clerk of Court is respectfully directed to terminate the motion pending at ECF No. 39.


Dated:   New York, New York
         March 27, 2026

_____
NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

---

[33]   ARE and, impliedly, the City, see ECF No. 46, requested oral argument on the motion to dismiss.  See Opp.  Given that the issues presented in this action are resolvable on the basis of established law, the Court has determined that oral argument is not necessary.