**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ARE-EAST RIVER SCIENCE PARK, LLC,<br><br>               Plaintiff,<br><br>      -against-<br><br>NEW YORK CITY HEALTH AND HOSPITALS CORPORATION and NEW YORK CITY ECONOMIC DEVELOPMENT CORPORATION,<br><br>           Defendants. | Civil Action No.: 24-cv-05956 (NRB) |

## ANSWER TO FIRST AMENDED COMPLAINT WITH COUNTERCLAIMS

Defendants New York City Health and Hospitals Corporation ("H+H") and New York City Economic Development Corporation ("NYCEDC" and, with H+H, "Defendants"), by their attorney STEVEN BANKS, Corporation Counsel of the City of New York, as and for their Answer to the First Amended Complaint (the "FAC") of Plaintiff ARE-East River Science Park, LLC ("ARE"), allege as follows:

1 – 3.  Paragraphs 1 through 3 of the FAC make allegations and address claims dismissed by the Court on March 27, 2026, and therefore no response is required; Defendants deny the allegations of Paragraphs 1 through 3 on that ground.

4.  Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 4 of the FAC, except admit that, pursuant to the Gound Lease with H+H as landlord and NYCEDC as lease administrator, ARE developed two existing towers which form the Alexandria Center for Life Science ("ACLS") commercial life sciences campus.

5.     Deny knowledge or information sufficient to form a belief as to the allegations set forth in Paragraph 5 of the FAC, except admit that ARE was selected as developer of the ACLS in 2005, the ACLS is on City property at the location alleged, that H+H and ARE entered into the Ground Lease whereby ARE agreed to develop two towers for commercial life sciences and included an option to develop an additional tower (the "North Tower") which could be exercised and committed to in a document to be negotiated by the parties (the "Option").

6.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 6 of the FAC except admit that ARE constructed the East and West Towers.

7.     Deny the allegations set forth in Paragraph 7 of the FAC, except admit that ARE had an Option to develop the North Tower, and aver that the closing date has expired and the Option has terminated.

8 - 19.  Paragraphs 8 through 19 of the FAC make allegations and address claims dismissed by the Court on March 27, 2026, and therefore no response is required; Defendants deny the allegations of Paragraphs 8 through 19 on that ground.

20.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 20 of the FAC.

21.     Admit the allegations set forth in Paragraph 21 of the FAC that H+H is a public benefit corporation created and existing pursuant to with its principal place of business in New York, New York, and that H+H is the largest municipal health care system in the United States.

22.     Admit the allegations set forth in Paragraph 22 of the FAC that NYCEDC is a not-for-profit corporation with its principal place of business in New York, New York, and

that NYCEDC is the lease administrator of the Ground Lease; deny that the allegations of Paragraph 22 completely or accurately describe NYCEDC's "business."

23.    On information and belief, admit the jurisdictional allegations set forth in Paragraph 23 of the FAC.

24.    Deny the allegations set forth in Paragraph 24 of the FAC, except admit that Defendants H+H and NYCEDC are a public benefit corporation and non-profit corporation, respectively, with offices in this District.

25.    Admit the allegations set forth in Paragraph 25 of the FAC.

26.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 26 of the FAC.

27.    Admit the allegations set forth in Paragraph 27 of the FAC regarding the issuance of an RFP, deny that Paragraph 27 accurately or completely summarizes the terms, and respectfully refer the Court to the referenced document for a full and complete statement of its meaning and contents.

28.    Admit the allegations set forth in Paragraph 28 of the FAC that the RFP included the excerpts quoted, and respectfully refer the Court to the referenced document for a full and complete statement of its meaning and contents in context.

29.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 29 of the FAC, except admit that ARE submitted a response to the RFP in or around February 2005 and two revised responses dated May 2, 2005 and June 27, 2005, in response to questions and redesign requests, and respectfully refer the Court to the referenced documents for a full and complete statement of their meaning and contents.

30.     Admit the allegation set forth in Paragraph 30 of the FAC that on or about August 4, 2005, ARE was selected as developer of the project, admit that a press release attached to the FAC as Exhibit 1 includes the quoted excerpts alleged, and respectfully refer the Court to the referenced documents for a full and complete statement of their meaning and contents in context.

31.     Admit the allegations set forth in Paragraph 31 of the FAC and respectfully refer the Court to the referenced documents for a full and complete statement of their meaning and contents.

32.     Admit the allegations of Paragraph 32 of the FAC that ARE and H+H entered into a ground lease, which has since been amended (the "Ground Lease"), for the development of a commercial bioscience and scientific research and development facility on the subject premises, and that the quoted excerpt appears therein, and respectfully refer the Court to the referenced document for a full and complete statement of their meaning and contents.

33.     Deny the allegations set forth in Paragraph 33 of the FAC, except admit that pursuant to the Ground Lease, ARE agreed to develop, construct and operate two buildings on the premises as defined in the Ground Lease, and respectfully refer the Court to the referenced document for a full and complete statement of its meaning and contents.

34.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 34 of the FAC, except admit only that the Ground Lease provided ARE with an option to develop and lease the North Tower upon ARE's compliance with certain pre-closing terms and conditions required by the Ground Lease, and respectfully refer the Court to the referenced document for a full and complete statement of its meaning and contents.

35.     Deny the allegations set forth in Paragraph 35 of the FAC except admit that section 41.23 of the Ground Lease, entitled "Delegation to Lease Administrator; Payment Direction" provides that ARE, as Tenant, acknowledges that H+H, as Landlord, has the right to delegate any and all of its rights and obligations, admit that by Lease Administration Agreement entered into as of December 29, 2006, H+H designated NYCEDC as Lease Administrator, and respectfully refer the Court to the referenced document for a full and complete statement of its meaning and contents.

36 – 57.  Paragraphs 36 through 57 of the FAC make allegations and address claims dismissed by the Court on March 27, 2026, and therefore no response is required; Defendants deny the allegations of Paragraphs 36 through 57 on that ground.

58.     Admit the allegations set forth in Paragraph 58 of the FAC regarding the Seventh Amendment to the Ground Lease, dated October 3, 2018, and respectfully refer the Court to the referenced document for a full and complete statement of its meaning and contents.

59.     Deny the allegations set forth in Paragraph 59 of the FAC, except admit that the Seventh Amendment set June 30, 2019 as the Outside Option Date for ARE to exercise the Option, set July 3, 2020 as the Closing Date, and set July 3, 2021 as the Outside Closing Date, and admit that the Seventh Amendment required ARE to provide certain schematic drawings and documents among other Predevelopment Obligations as defined by the Seventh Amendment, and that construction was required to commence within 90 days of closing, and respectfully refer the Court to the referenced document for a full and complete statement of its meaning and contents.

60 - 62. Paragraphs 60 through 62 of the FAC make allegations and address claims dismissed by the Court on March 27, 2026, and therefore no response is required; Defendants deny the allegations of Paragraphs 60 through 62 on that ground.

63.     Admit the allegations set forth in Paragraph 63 of the FAC.

64 – 98. Paragraphs 64 through 98 of the FAC make allegations and address claims dismissed by the Court on March 27, 2026, and therefore no response is required; Defendants deny the allegations of Paragraphs 64 through 98 on that ground.

99.     Deny the allegations set forth in Paragraph 99 of the FAC, except admit only that the parties negotiated a Tenth Amendment to the Ground Lease and admit that ARE sought, and was provided with, an extension of the closing date.

100 – 103. Paragraphs 100 through 103 of the FAC make allegations and address claims dismissed by the Court on March 27, 2026, and therefore no response is required; Defendants deny the allegations of Paragraphs 100 through 103 on that ground.

104.     Admit only the allegations in Paragraph 104 of the FAC that the parties agreed to extend the Closing for the Option until November 3, 2022 and agreed that ARE could further extend this date to November 3, 2024 in exchange for payment of negotiated extension fees, and respectfully refer the Court to the referenced document for a full and complete statement of its meaning and contents; the remaining allegations in Paragraph 104 address claims dismissed by the Court on March 27, 2026, and therefore no response is required; Defendants deny the remaining allegations of Paragraph 104 on that ground.

105 – 111. Paragraphs 105 through 111 of the FAC make allegations and address claims dismissed by the Court on March 27, 2026, and therefore no response is required; Defendants deny the allegations of Paragraphs 105 through 111 on that ground.

112.     Deny the allegations set forth in Paragraph 112 of the FAC, except admit only that on November 3, 2022, ARE and H+H executed the Eleventh Amendment of the

Ground Lease, that ARE agreed to pay the amount negotiated by the parties for a further extension of the closing date, and respectfully refer the Court to the referenced document for a full and complete statement of their meaning and contents.

113 – 132. Paragraphs 113 through 132 of the FAC make allegations and address claims dismissed by the Court on March 27, 2026, and therefore no response is required; Defendants deny the allegations of Paragraphs 113 through 132 on that ground.

133.    Deny the allegations set forth in Paragraph 133 of the FAC, except admit only that, by letter dated January 11, 2024, ARE issued a purported notice of unavoidable delay but deny the truth of the contents therein, admit that ARE issued another letter to Defendants dated October 31, 2024 (after ARE had filed this litigation), but deny the truth of the contents therein, including ARE's claims that the closing date has been extended indefinitely and that the Option would not terminate, and respectfully refer the Court to the referenced documents for a full and complete statement of their meaning and contents.

134.    Deny the allegations set forth in Paragraph 134 of the FAC, except admit only that ARE issued a letter to Defendants dated October 31, 2024, deny that the letter is truthful or accurate, and aver that NYCEDC had previously stated in multiple letters that the Ground Lease limited "Unavoidable Delay" to six months which ARE had already exhausted, and respectfully refer the Court to the referenced documents for a full and complete statement of their meaning and contents.

135.    Deny the allegations set forth in Paragraph 135 of the FAC, except admit that at the pre-motion conference on October 31, 2025, Defendants' counsel stated Defendants' position in accordance with the Ground Lease that upon ARE's failure to close on the Option by

November 3, 2024, the Option would expire and ARE's rights to the Option would be terminated.

136.    Deny the allegations set forth in Paragraph 136 of the FAC that Defendants' Counsel's statements at the pre-motion conference are contrary to the terms of the Ground Lease, deny the allegations that ARE's notices change Defendants' rights and obligations under the Ground Lease, and admit that there is an actual and substantial controversy regarding whether the Option has expired or been "tolled" that impacts Defendants' ability to use or market the Option premises.

137-188. Paragraphs 137 through 188 of the FAC make allegations and address ARE's First, Second, and Third Causes of Action, which were dismissed by the Court on March 27, 2026, and therefore no response is required; Defendants deny the allegations of Paragraphs 137 – 188 on that ground.

189.    Defendants repeat and reallege their responses to Paragraphs 1 through 188 of the FAC as if fully set forth herein.

190.     Admit, on information and belief, the truth of the allegations set forth in Paragraph 190 of the FAC.

191.    Admit the allegations set forth in Paragraph 191 of the FAC that ARE and H+H are parties to the Agreement, which is a valid and binding contract, and aver that NYCEDC is the lease administrator for H+H under the Agreement.

192.    Admit the allegations set forth in Paragraph 192 of the FAC that there is a substantial, actual controversy between ARE and Defendants.

193.    Deny the allegations set forth in Paragraph 193 of the FAC.

194.    Deny the allegations set forth in Paragraph 194 of the FAC.

195.    Deny the allegations set forth in Paragraph 195 of the FAC and deny that ARE is entitled to any of the declaratory relief it seeks.

196.    Deny the allegations set forth in Paragraph 196 of the FAC

197.    Deny that ARE is entitled to any of the relief requested in its Prayer for Relief following Paragraph 196.

## AFFIRMATIVE DEFENSES

## AS AND FOR A FIRST DEFENSE

198.    The FAC fails to state a claim upon which relief may be granted.

## AS AND FOR A SECOND DEFENSE

199.    ARE's claims for declaratory judgment are barred by the Ground Lease provisions under which the closing date has expired and the Option has terminated.

## AS AND FOR A THIRD DEFENSE

200.    In the exercise of its discretionary authority under 28 U.S.C. §2201 the Court should decline to award ARE any declaratory relief.

## AS AND FOR A FOURTH DEFENSE

201.    ARE's claim for declaratory judgment is barred by the applicable statute of limitations and the doctrine of laches.

## COUNTERCLAIMS

Defendants/Counterclaim-Plaintiffs New York City Health and Hospitals Corporation ("H+H") and New York City Economic Development Corporation ("NYCEDC" and, with H+H, "Counterclaimants"), by their attorney Steven Banks, Corporation Counsel of the City of New York, for their counterclaims against Plaintiff/Counterclaim-Defendant ARE-East River Science Park, LLC ("ARE"), hereby allege as follows:

**INTRODUCTION**

1.      H+H's and NYCEDC's counterclaims arise primarily from ARE's improper and unilateral decision not to close on or relinquish an option to develop a third commercial life sciences building—the potential "North Tower"—on a portion of H+H's Bellevue Hospital Campus (the "Option"). The parties' written agreement provides that the Option would terminate if the parties failed to close by November 3, 2024. Although ARE did not close on the Option by that deadline, ARE refuses to accept the Option's termination. Instead, ARE filed a meritless lawsuit and a *lis pendens* that has encumbered the Option Premises, effectively preventing H+H from seeking an alternative development. Accordingly, Counterclaimants seek (1) a declaratory judgment that ARE's deadline to close on the Option passed on November 3, 2024; (2) a declaratory judgment that the Option terminated when ARE failed to close on or before that deadline; (3) a declaratory judgment that Counterclaimants are entitled to retain a $5 million Predevelopment Security Deposit, because ARE's decision not to close was a Predevelopment Default; and (4) damages for ARE's refusal to relinquish the Option following its termination, which is a breach of the implied covenant of good faith and fair dealing. H+H and NYCEDC also assert separate counterclaims related to ARE's breach of contractual terms related to parking.

2.      The Option arises from a 2006 Ground Lease between H+H and ARE, by which ARE developed two buildings—the "East Tower" and the "West Tower"—on H+H's Bellevue Hospital Campus on the east side of Manhattan.

3.      Over years, ARE and its outside counsel negotiated extensively with H+H and H+H's lease administrator, NYCEDC, regarding terms by which ARE could close on the Option and develop the potential North Tower. Those terms are memorialized in written amendments to the 2006 Ground Lease.

4.    In 2018, the parties executed the Seventh Amendment to the Ground Lease, which set the framework for closing on the Option.

5.    That framework includes four pertinent components, which track H+H's and NYCEDC's first four counterclaims below.

6.    *First,* the Seventh Amendment includes a Closing Date within two years, as well as limited grounds for ARE to extend the Closing Date for defined periods by paying agreed extension fees (which ultimately exceeded $200,000 per month) and for up to six months in the case of defined "Unavoidable Delays."

7.    In the years following execution of the Seventh Amendment, ARE used the full six months of Unavoidable Delays provided for in the Seventh Amendment and exercised all of its right to paid extensions, including those allowed by the Tenth Amendment, which resulted in a final Outside Closing Date of November 3, 2024.

8.    ARE's position in this litigation is that the Closing Date is currently "tolled" to some undefined future date.

9.    ARE's position creates a controversy ripe for adjudication, which this Court should resolve by issuing a declaratory judgment that the Closing Date passed on November 3, 2024.

10.    *Second,* the Seventh Amendment framework includes, in Section 2.1(d), consequences for ARE's failure to close on or before the Closing Date: ARE's right to lease the Option Premises "shall terminate with no need for any further documentation or agreement."

11.    The parties did not close on the November 3, 2024 deadline, because ARE chose not to close.

12. ARE could have proceeded to Closing under the terms of the Ground Lease, and Counterclaimants could not have prevented ARE from closing without breaching the Ground Lease.

13. ARE did not proceed to Closing; instead, ARE made the unilateral decision that the Closing would not occur, thereby depriving H+H of an opportunity to perform its ministerial obligations to deliver executed forms at the Closing or to deliver the Premises "as is" after Closing.

14. Thus, under the terms of the Seventh Amendment, ARE's failure to close on or before the Closing Date resulted in the Option "terminat[ing] with no need for any further documentation or agreement."

15. ARE's position in this litigation is that the Option has not terminated.

16. ARE's position creates a controversy ripe for adjudication, which this Court should resolve by issuing a declaratory judgment that the Option has terminated.

17. *Third,* the Seventh Amendment further provides that, if the parties did not close due to ARE's Predevelopment Default(s), including its willful failure to close, H+H and NYCEDC would also be entitled to retain a $5 million Predevelopment Security Deposit as liquidated damages.

18. ARE's decision not to close was a Predevelopment Default, which entitles Counterclaimants to retain the $5 million Predevelopment Security Deposit.

19. ARE's position in this litigation is that ARE is not in default of its contractual obligations and that, even if ARE were in default, Counterclaimants cannot enforce their contractual remedies.

20.     ARE's position creates a controversy ripe for adjudication, which this Court should resolve by issuing a declaratory judgment that ARE's refusal to close was a Predevelopment Default entitling Counterclaimants to retain the $5 million Predevelopment Security Deposit.

21.     *Fourth,* the Seventh Amendment includes an implied covenant that, if ARE did not close on the Option on or before its deadline, ARE would relinquish the Option so that H+H could put that property to beneficial use.

22.     This implied covenant arises from the Seventh Amendment framework summarized above, which expressly requires that ARE close on the Option by a date certain and provides that failure to do so would result in the Option terminating.

23.     The benefit of that bargain was the prompt development or relinquishment of the Option so that H+H could put that property to beneficial use, either with ARE or another developer.

24.     Today, more than a year after the November 3, 2024 deadline, and despite the plain terms of the Ground Lease, as amended, ARE has neither closed on nor relinquished the Option.

25.     Instead, ARE has encumbered the Option Premises, thus preventing H+H from putting it to beneficial use, based on two meritless arguments:

    a.  Beginning in 2023, ARE sent H+H and NYCEDC letters purporting to unilaterally extend the Closing Date indefinitely due to purported "Unavoidable Delays." But the Ground Lease, as amended, plainly does not allow ARE to extend the Closing Date beyond November 3, 2024 based on Unavoidable Delays.

b. On August 6, 2024, ARE filed its Complaint in this action, asserting baseless claims of fraud and breach of the implied covenant of good faith and fair dealing, which this Court has dismissed. In support of those claims, ARE focused on the parties' negotiation of a floodwall for potential inclusion in North Tower development. ARE claimed that it could not close on the Option due to changes to "criteria" for development of the floodwall, which H+H had purportedly promised were final. Yet, when litigating H+H's and NYCEDC's successful motion to dismiss, ARE could neither identify changes to the "criteria" nor establish that H+H had promised that they were final. Critically, moreover, ARE has never maintained that the Ground Lease, as amended, required ARE to include the floodwall in the North Tower development nor explained why ARE did not simply decline to include the floodwall in its design and proceed to Closing without it.

26. Upon information and belief, ARE's arguments about the floodwall and floodwall criteria are pretexts.

27. Upon information and belief, ARE did not proceed to Closing on the Option due to perceived weakness in the market for commercial life sciences real estate in New York City.

28. Upon information and belief, ARE brought this action, asserting meritless claims of fraud, in part to extend the Option without payment, thereby extending its ability to decide whether to proceed with the Option without paying millions of dollars per year in extension fees or committing to construct the North Tower and pay rent for the new ground lease's 49-year term.

-14-

29.    In sum, ARE has breached the implied covenant of good faith and fair dealing by refusing to relinquish the Option and instead encumbering the Option Premises, thereby preventing H+H from putting it to beneficial use. Through this conduct, ARE has frustrated the purpose of the Option portions of the Ground Lease, as amended, which is the prompt development or relinquishment of the Option so that H+H could develop the property, either with ARE or another developer. By breaching the implied covenant in this way, ARE has damaged Counterclaimants in an amount to be determined at trial but not less than the cost of paid extensions under the terms of the Seventh and Tenth Amendments, which were over $200,000 per month. In addition, Counterclaimants have and will continue to incur foreseeable consequential damages due to the delays in Counterclaimants ability to develop the Option Premises as a result of ARE's misconduct.

30.    Finally, and separately from H+H's and NYCEDC's other counterclaims, Counterclaimants are entitled to specific performance, damages, and/or a declaratory judgment as remedies for ARE's breach of certain provisions of the Ground Lease related to parking.

## THE PARTIES

31.    Defendant/Counterclaim Plaintiff H+H is a public benefit corporation under NY CLS Unconsol. ch. 214-A with its principal place of business in New York, New York.

32.    Defendant/Counterclaim Plaintiff NYCEDC is a not-for-profit corporation with its principal place of business in New York, New York.

33.    Upon information and belief, based upon, inter alia, ARE's Rule 7.1 statement and the affirmation of Gary Dean (the Executive Vice President of one of ARE's members), ARE is a Delaware limited liability company with its principal place of business in Pasadena, California. ARE's sole member is Alexandria Real Estate Equities, L.P. a Delaware limited partnership with two partners: Alexandria Real Estate Equities, Inc. and ARS-QRS

Corporation, both of which are Maryland corporations with principal places of business in Pasadena, California.

## JURISDICTION AND VENUE

34.    This Court has subject matter jurisdiction over this case pursuant 28 U.S.C. Section 1332 based on the diversity of citizenship of the parties and that the amount in dispute exceeds $75,0000.

35.    For the Counterclaimants' declaratory judgment claims, brought pursuant to 28 U.S.C. Section 2201, the values of the assets in dispute —the Option, the Predevelopment Security Deposit, and parking rights—far exceed $75,000.

36.    This Court has personal jurisdiction over ARE based on its presence and conduct in this District and because the parties agreed to have claims determined by state or federal courts in New York City.

37.    Venue is proper in this District pursuant to 28 U.S.C. Section 1391(b)-(d) because the parties reside in the District, a substantial part of the events giving rise to the claims at issue occurred in this District, and the real property at issue is located in this District.

## FACTS

### I.   The Original Ground Lease

38.    H+H, as "Landlord," and ARE, as "Tenant," entered into a ground lease dated as of December 29, 2006 (the "Original Ground Lease"), which the parties have amended twelve times.

39.    NYCEDC is the Lease Administrator for H+H under the Ground Lease.

40.    ARE represents itself, on its website and in public filings by its ultimate parent entity, Alexandria Real Estate Equities, Inc., to be a commercial real estate developer focused on the commercial life sciences industry.

-16-

41.    In 2006, H+H entered into the Original Ground Lease with ARE for the purpose of "develop[ing] a commercial bioscience and scientific research and development facility, in furtherance of the City's goal of creating additional space in New York City for commercial bioscience companies."

42.    To accomplish that goal, the Original Ground Lease provided for ARE's development of the East and West Towers and granted ARE the Option to develop the North Tower, all on specified portions of the Bellevue Hospital Campus and all primarily consisting of laboratory and office space that must be used for commercial life sciences tenants or subtenants.

43.    ARE completed the East Tower in or around 2010 and completed the West Tower in or around 2014.

44.    ARE's Option to develop the North Tower is the subject of this litigation.

## II.  The Seventh Amendment Framework for Exercising and Closing on the Option

45.    H+H and ARE have entered into twelve amendments to the Original Ground Lease, each of which is memorialized in a written agreement executed by the parties (collectively, the "Ground Lease").

46.    The Seventh Amendment, dated October 3, 2018, creates a framework by which ARE could exercise and, later, close on the Option.

47.    That framework specified a path toward execution of an "Amended and Restated Ground Lease" on the Closing Date, which could occur only after ARE's completion of a Due Diligence Period and various Predevelopment Obligations.

### A.  The Amended and Restated Ground Lease

48.    Article 6 and Section 2.1 of the Seventh Amendment set the terms by which the parties could enter into an Amended and Restated Ground Lease through which ARE would lease the Option Premises, if and when ARE exercised the Option and then closed on it.

-17-

49.     Sections 2.1 and 6.1 of the Seventh Amendment provide that the Amended and Restated Ground Lease shall amend and restate the existing Ground Lease, "but only to conform with provisions expressly included in this Amendment."

50.     Sections 6.2 through 6.8 of the Seventh Amendment set forth the material terms and conditions that would be included in the Amended and Restated Ground Lease and by which ARE would lease the Option Premises, if and when ARE decided to move forward with the project.

51.     These terms include, but are not limited to, the potential Option lease's term, the method for establishing ARE's base rent for the Option Premises, limitation of the Option Premises' uses to primarily commercial life sciences tenants, the date on which ARE was required to begin construction of the potential North Tower, and the consequences of ARE's failure to timely reach substantial completion of construction.

52.     These rights and obligations would be triggered by the parties' Closing on the Option and execution of the Amended and Restated Ground Lease.

### B. The Parties' Closing Obligations

53.     The Seventh Amendment specifies the parties' respective obligations on the Closing Date.

54.     Sections 5.1 and 5.2, respectively, set out the "Tenant Closing Deliverables" and the "Landlord Closing Deliverables," which are documents the parties must deliver to one another "[a]t the Closing" in "duly executed" form.

55.     Under Sections 5.1 and 5.2, both Tenant and Landlord Closing Deliverables included "the Amended and Restated Ground Lease upon mutual agreement between Landlord and Tenant that the terms thereof incorporate only the modifications required pursuant to this

-18-

Amendment;" an "Amended memorandum of lease in recordable form;" specified tax forms; and specified certificates.

56.    Under Section 5.1, ARE's required Closing Deliverables also included a payment guaranty, certain insurance documents, specified payments, and several other deliverables.

57.    Under Section 3.8 of the Lease, if ARE timely exercised the Option and completed the Closing, then H+H would be required to "deliver the Option Premises to Tenant on the Closing Date in 'as is' condition . . . ."

58.    At all relevant times, H+H and NYCEDC were prepared to close if ARE had performed its obligations.

59.    More generally, Counterclaimants have fully complied with their obligations under the Ground Lease, except and only to the extent they were prevented from doing so by ARE.

C.   The Due Diligence Period and Deadline to Exercise the Option

60.    Article 1 of the Seventh Amendment creates a 270-day Due Diligence Period, starting on the date the parties executed the Seventh Amendment, and establishes the parties' due-diligence-related rights and obligations.

61.    Section 2.1 of the Seventh Amendment requires ARE, in its sole discretion, to either exercise or not exercise the Option by the conclusion of the Due Diligence Period.

62.    If ARE exercised the Option, then Section 2.1(c) would require ARE to deliver to H+H a Predevelopment Security Deposit in the form of a letter of credit in an amount "equal to five percent (5%) of the fair market value of the Option Premises (as determined by the Appraisal) as security for Tenant's performance under this Amendment."

-19-

63.     By contrast to ARE's "sole discretion" to exercise or not exercise the Option, subject to narrow exceptions, following ARE's exercise of the Option, ARE would be "required to close on the Option Premises."[1]

64.     If ARE chose not to exercise the Option, Section 2.1(b) of the Seventh Amendment provides that ARE's "right to exercise the Option shall terminate" without the "need for any further documentation or agreement."

### D.  ARE's Predevelopment Obligations and Predevelopment Defaults

65.     Article 3 provides that, if ARE exercises the Option, then it must satisfy a series of Predevelopment Obligations "on or prior to the Closing Date."

66.     ARE's Predevelopment Obligations include providing NYCEDC with schematic drawings; delivery to H+H of a payment guaranty; obtaining all necessary government approvals for the construction of the Option Project, including final approval from the NYC Public Design Commission; payment and/or reimbursement of all of H+H's, the City's, and NYCEDC's out-of-pocket fees, costs, and expenses related to the Option Project; and obtaining documentation necessary to prove that, on or before Closing, ARE had formally engaged construction contractors and subcontractors and had spent at least $20 million on materials manufactured for construction.

67.     Under Section 3.7 of the Seventh Amendment, "Tenant shall promptly and in good faith take all steps necessary to fulfill the Tenant's Predevelopment Obligations and Landlord shall use good faith efforts to assist Tenant in such regard."

68.     Section 4.1 sets forth the Predevelopment Defaults, which include ARE's failure to perform Predevelopment Obligations under Section 3.3, ARE's failure to deliver to H+H

---

[1] As set out further below, ARE exercised the Option on or about July 24, 2019, but never closed on the Option.

the Tenant Deliverables under Section 5.1, or "if any Landlord closing obligation is unsatisfied on such date due to a Tenant default."

69.     Another Predevelopment Default is: "if on the Closing Date all of Landlord's obligations, if any, are satisfied (other than those which could not be satisfied because of a Tenant default) and Tenant willfully fails to close."

### E.  The Closing Date and Outside Closing Date

70.     The "Closing Date" is the deadline by which ARE was required to close on the Option.

71.     Section 3.2 of the Seventh Amendment defines the Closing Date, provides grounds for its extension, and creates an "Outside Closing Date" beyond which the Closing Date could not be extended.

72.     Under Section 3.2(b), both ARE and H+H could "request and obtain one or more extensions of the Closing Date for Unavoidable Delay not to exceed six (6) months in the aggregate for each party."

73.     Under Section 3.2(c), ARE could extend the Closing Date for up to six months by exercising its right to a Paid Extension by paying NYCEDC an "amount equal to 1/12th of the fair market rental value for the Option Premises in accordance with the Appraisal ("Extension Fee") in payment of an administrative fee for each month of such requested extension . . . .'"

74.     Under Section 3.2(d), subject to one inapplicable exception, the Closing Date could not be extended beyond a final "Outside Closing Date" of July 3, 2021.

F. *The Consequences of ARE's Failure to Close on or Before the Closing Date*

75.     Section 2.1(d) of the Seventh Amendment governs the Option's status following ARE's failure to close on or before the Closing Date.

76.     Section 2.1(d) of the Seventh Amendment provides: "In the event that Tenant exercises the Option, in accordance with the requirements of Section 2.1(a) above, but the Closing does not occur on or before the Closing Date, the right of the Tenant to lease the Option Premises shall terminate with no need for any further documentation or agreement, unless, and only to the extent, that the Closing does not occur on the Closing Date because the Landlord failed to perform Landlord's obligations pursuant to Sections 3.8 and 5.2 in connection therewith (other than those which could not be satisfied solely because of a Tenant default that remains uncured). In addition, in the event that such failure to close is due to a Tenant Predevelopment Default, EDC shall have the right to retain the Predevelopment Security Deposit as liquidated damages for loss of a bargain and not as a penalty."

77.     Under this provision, the Option terminates immediately upon ARE's failure to close on or before the Closing Date "unless, and only to the extent," the Closing did not occur due to H+H's failure to perform its obligations under Sections 3.8 and 5.2 of the Seventh Amendment.

III. **The Parties' Progress Toward Closing**

78.     Over the years following execution of the Seventh Amendment in 2018, the parties attempted to progress toward a final agreement regarding ARE's potential development of the Option Premises.

79.     On or about July 3, 2019, the parties executed the Ninth Amendment.

-22-

80.    Among other things, the Ninth Amendment memorialized the parties' agreement regarding the then-fair market value of the Option Premises ($45 million), which established the annual Base Rent ARE would pay ($2,475,000) under the Amended and Restated Ground Lease, if and when ARE exercised and closed on the Option.

81.    The Ninth Amendment also specified the size of the building ARE would be required to build, if and when it exercised and closed on the Option: 430,000 zoning square feet.

82.    On or about July 24, 2019, ARE exercised the Option by sending to NYCEDC: (1) written notice of its election to exercise the Option; and (2) the $2.25 million Predevelopment Security Deposit.

83.    On or about July 1, 2021, the parties executed the Tenth Amendment.

84.    Among other things, the Tenth Amendment provided for additional paid extensions to the Closing Date and Outside Closing Date.

85.    The Tenth Amendment also memorialized the parties' agreement to cooperate regarding a potential floodwall, which H+H had been planning to build around the Bellevue Hospital campus and which the parties discussed integrating into the potential North Tower's foundation.

86.    Section 4(b) of the Tenth Amendment provides that "Tenant and Landlord shall cooperate in good faith to attempt to reach mutually agreeable written parameters related to Landlord's proposed flood mitigation requirements in respect of the integration of the Option Premises with adjoining properties leased by Landlord and/or owned by the City."

87.    Nothing in the Tenth Amendment required that the floodwall be included in the North Tower's final design.

88.    On or about November 3, 2022, the parties executed the Eleventh Amendment.

89.    The parties attached as Exhibit A to the Eleventh Amendment a draft Amended and Restated Ground Lease, which the parties agreed "incorporate only the modifications to the Existing Ground Lease required pursuant to the Seventh Amendment, as modified by the Tenth Amendment (together with such other modifications as have been agreed to by Landlord and Tenant in their discretion)."

90.    The Eleventh Amendment also memorialized the parties' agreement to reduce the size of the building ARE would be required to build, if and when it closed on the Option, from 430,000 zoning square feet to a minimum of 416,000 zoning square feet of floor area.

91.    If and when ARE closed on the Option, the parties would be required to execute the Amended and Restated Ground Lease attached as Exhibit A to the Eleventh Amendment.

**IV. ARE Extends the Closing Date and Outside Closing Date to November 3, 2024**

92.    ARE attempted to extend the Closing Date and Outside Closing Date several times.

93.    Between February 13, 2020 and July 31, 2020, ARE notified H+H on several occasions that it was asserting "Unavoidable Delays" on various grounds pursuant to Section 3.2(b) of the Seventh Amendment.

94.    By letter dated August 10, 2020, NYCEDC notified ARE that, in response to ARE's requests, "Landlord consents to Tenant's request to use Tenant's six months of Unavoidable Delay in accordance with Seventh Amendment Section 3.2(b)," thereby extending the Closing Date to February 3, 2021.

-24-

95.    When ARE thereafter attempted to provide further notices of Unavoidable Delay, NYCEDC responded, by letter dated December 14, 2020, that ARE had already been granted a six-month Unavoidable Delay extension and that "the Tenant has no right to a further extension of the Closing Date due to Unavoidable Delay and its request for an extension of the Closing Date for an Unavoidable Delay is rejected."

96.    ARE also exercised all of the Paid Extensions under Section 3.2(c) of the Seventh Amendment, as well as all extensions permitted under the Tenth Amendment, concluding with ARE's exercise, on November 3, 2022, of its right to a "Second Paid Extension" to extend the Closing Date and Outside Closing Date two years, to November 3, 2024.

97.    In consideration for the Second Paid Extension, pursuant to Section 7(b) of the Tenth Amendment, ARE paid a Second Extension Fee in the amount of $5,250,000.

98.    As required by the Tenth Amendment, ARE also delivered a Second Extension Security Deposit in the amount of $5,000,000 as a Replacement Predevelopment Security Deposit.

99.    Finally, pursuant to Section 7(c) of the Tenth Amendment, upon ARE's exercise of the Second Paid Extension, the November 3, 2024 Closing Date/Outside Closing Date could be further extended by ARE only for an "Access Delay," which ARE has never claimed occurred and for which ARE has never provided the requisite written notice.

## V.    ARE Did Not Close on the Option

100.  On November 7, 2022, ARE had obtained final approval from the NYC Public Design Commission—one of ARE's Predevelopment Obligations under Section 3.3(f) of the Seventh Amendment—for development of a North Tower with 416,000 zoning square feet.

101.  The 416,000 zoning square feet minimum requirement had been memorialized in the Eleventh Amendment.

102.  Approximately three months later, however, in or around February 2023, ARE began advising NYCEDC that it no longer sought to develop a North Tower with 416,000 zoning square feet.

103.  Instead, ARE sought to reduce the size of the potential North Tower to approximately 330,000 zoning square feet based on "a different financial time" and to "make it more affordable for the seed and early stage tenants that comprise the NYC life science ecosystem . . . ."

104.  H+H and NYCEDC were under no contractual obligation to agree to a reduction in the size of the potential North Tower.

105.  A reduction in the size of the potential North Tower would also require a new submission to, and approval from, the NYC Public Design Commission.

106.  Nevertheless, H+H and NYCEDC were willing to consider ARE's request and engaged in negotiations regarding a potential Thirteenth Amendment in good faith.

107.  For months, ARE, H+H, and NYCEDC negotiated terms of a potential Thirteenth Amendment.

108.  Those terms included among other things, ARE's request for a reduction in the size of the potential North Tower; H+H's request for a firm contractual commitment from ARE regarding inclusion of the floodwall in the North Tower development; redress of ARE's failure to honor its parking obligations under the Ground Lease; and a further extension of the Closing Date and Outside Closing Date.

109. ARE, H+H, and NYCEDC ultimately did not reach agreement on a Thirteenth Amendment, with ARE breaking off negotiations, thereby leaving ARE without the right to reduce the size of the North Tower and without the obligation to incorporate the floodwall into the North Tower's design.

110. ARE also informed H+H and NYCEDC that it would not be proceeding to Closing on the Amended and Restated Ground Lease on or before the November 3, 2024 Closing Date or Outside Closing Date.

111. Due to ARE's decision not to close, no Closing occurred on the November 3, 2024 Closing Date or on any other date.

112. Instead, ARE brought this action, claiming that H+H and NYCEDC fraudulently induced ARE to enter into the Tenth and Eleventh Amendments and breached the implied covenant of good faith and fair dealing during negotiation of the potential Thirteenth Amendment.

113. When ARE failed to close on the Closing Date and Outside Closing Date of November 3, 2024, under the terms of the Ground Lease, the Option "terminate[d] with no need for any further documentation or agreement."

114. In fact, ARE admitted in paragraph 123 of its original Complaint in this action that, after November 2024, "ARE would no longer be permitted to develop the Option at all."

115. When ARE filed a First Amended Complaint on January 24, 2025, ARE omitted the above admission and added a cause of action for declaratory judgment that "(i) the Closing Date is currently tolled; (ii) the Option has not terminated; and (iii) Defendants are not permitted under the Agreement to market the Option Premises."

-27-

116. ARE filed a *lis pendens* (Dkt. 24) with respect to the Option Premises on November 4, 2024.

117. ARE also filed a Notice of Pendency in the Supreme Court of the State of New York, County of New York (Dkt. 25).

118. The *lis pendens* and notice of pendency effectively prevent H+H and NYCEDC from putting the Option Premises to beneficial use.

**VI. ARE Chose Not to Close on the Option for Business Reasons**

119. Upon information and belief, ARE decided not to close on the Option solely for business reasons.

120. In this action, ARE claims that it did not close on the Option due to changes in the "criteria" for development for the floodwall.

121. However, ARE has been unable to articulate how these "criteria" have changed.

122. In addition, no purported changes to the floodwall criteria could have prevented ARE from closing on the Option because, as ARE has frequently stated, ARE was under no contractual obligation to include a floodwall in the North Tower's ultimate design.

123. For example, in a May 2024 letter, ARE stated its position that it "does not have a 'longstanding agreement' to incorporate the FPS into the North Tower. In fact, there is no obligation, nor any agreement, to incorporate the FPS into the North Tower, whether in the Ground Lease or anywhere else. Rather, the only 'longstanding agreement' is the limited one set forth in the Tenth Amendment."

124. Under the terms of the Ground Lease, ARE could have proceeded to Closing on a North Tower with a minimum of 416,000 zoning square feet and no floodwall, and H+H and

NYCEDC could not have refused to close without breaching their obligations under the Ground Lease, including those set out in Sections 3.8 and 5.2 of the Seventh Amendment.

125.   Upon information and belief, ARE's arguments about the floodwall and floodwall criteria are pretexts.

126.   Upon information and belief, ARE chose not to close on the Option due to perceived weaknesses in the commercial life sciences market in New York City.

127.   In its Complaint in this action, filed three months before the November 3, 2024 Closing Date, ARE alleged that it "miss[ed] the life science bull market," which has "now substantially softened"; that there has been "a material overbuilding of life science space in NYC"; and that there is "significantly constrained commercial life science demand."

128.   On November 6, 2024, three days after the November 3, 2024 Closing Date, ARE submitted testimony in opposition to NYCEDC's efforts to develop a commercial life sciences building near ARE's East and West Towers in Midtown East, repeatedly citing the purportedly weak demand for commercial life sciences real estate in New York City.

129.   Upon information and belief—based on ARE's efforts to reduce the size of the potential North Tower, ARE's statements in its First Amended Complaint, and ARE's other public statements—ARE chose not to proceed to Closing in November 2024 due to concerns about perceived weaknesses in the commercial life sciences market in New York City.

## CAUSES OF ACTION

### FIRST COUNTERCLAIM
*(Declaratory Judgment that Option Closing Date*
*and Outside Closing Date Passed on November 3, 2024)*

130.   Counterclaimants repeat and reallege each of the allegations set forth above as if fully set forth herein.

131. Under 28 U.S.C. § 2201 et seq., this Court has jurisdiction to declare the rights of the parties in dispute.

132. H+H as Landlord, NYCEDC as Lease Administrator, and ARE as Tenant are parties to the Ground Lease, which is a valid and binding contract.

133. There is a substantial, actual controversy regarding the Ground Lease between H+H and NYCEDC on the one hand, and ARE on the other, who are parties with adverse legal interests.

134. Specifically, there is a dispute regarding whether the Closing Date and Outside Closing Date, as defined in the Ground Lease, were extended beyond November 3, 2024.

135. Counterclaimants have legally protectible interests in this controversy, specifically, their rights as Landlord and Lease Administrator.

136. This controversy is ripe for adjudication, and a judicial declaration is required to dispose it.

137. In a series of letters sent between July 2023 and October 2024, ARE repeatedly asserted purported "Unavoidable Delays" and unilaterally asserted that it was extending the November 3, 2024 Closing Date to an unspecified future date because of the purported Unavoidable Delays.

138. ARE's attempt to use "Unavoidable Delay" as a basis to unilaterally extend the November 3, 2024 Closing Date and Outside Closing Date is not permitted pursuant to the terms of the Ground Lease.

139. First, the Ground Lease, in Section 3.2(b) of the Seventh Amendment, allowed ARE to "request" no more than six months of extensions of the Closing Date for "Unavoidable Delay."

140. In 2020, ARE used its allocated six months of Unavoidable Delay extensions.

141. Second, the Ground Lease, in Sections 3.2(b) and 3.2(d) of the Seventh Amendment, does not allow ARE to use Unavoidable Delays to extend the Closing Date beyond the Outside Closing Date.

142. Third, the Ground Lease, in Section 7(c) of the Tenth Amendment, does not allow ARE to use Unavoidable Delays to extend the Closing Date or Outside Closing Date beyond November 3, 2024.

143. In this litigation, ARE seeks a declaratory judgment that "the Closing Date is currently tolled."

144. ARE alleges that the Closing Date is "tolled" due to "H+H's failure to meet its obligations under, among other things, Section 5.2 of the 7th Amendment."

145. To the extent H+H failed to meet its ministerial obligations under Section 5.2 of the Seventh Amendment to deliver executed forms "[a]t the Closing," such failure resulted solely from ARE's Tenant defaults, including its decision not to close.

146. In any case, nothing in the Ground Lease allows the Closing Date or Outside Closing Date to be "tolled" or otherwise extended due to H+H's alleged failure to meet its obligations under Section 5.2 of the Seventh Amendment.

147. Counterclaimants therefore seek a declaratory judgment that the Closing Date and Outside Closing Date were never extended beyond November 3, 2024; that the Closing

Date and Outside Closing Date can no longer be extended; and that November 3, 2024 was the final Closing Date and Outside Closing Date.

148. A justiciable controversy exists between the parties as to whether, pursuant to the Ground Lease, the Closing Date and Outside Closing Date have passed.

149. H+H and NYCEDC have no adequate remedy at law to accomplish substantial justice.

150. Granting the requested declaratory judgment will serve a useful and essential purpose in settling the controversy regarding whether the Closing Date and Outside Closing Date have passed and will offer relief from uncertainty relating to this issue.

**<u>SECOND COUNTERCLAIM</u>**
*(Declaratory Judgment that the Option Has Terminated)*

151. Counterclaimants repeat and reallege each of the allegations set forth above as if fully set forth herein.

152. Under 28 U.S.C. § 2201 et seq., this Court has jurisdiction to declare the rights of the parties in dispute.

153. H+H as Landlord, NYCEDC as Lease Administrator, and ARE as Tenant are parties to the Ground Lease, which is a valid and binding contract.

154. There is a substantial, actual controversy regarding the Ground Lease between H+H and NYCEDC, on the one hand, and ARE, on the other, regarding whether the Option has terminated.

155. Counterclaimants have legally protectible interests in this controversy, specifically, their rights as Landlord and Lease Administrator.

156. This controversy is ripe for adjudication, and a judicial declaration is required to dispose it.

157. In this litigation, ARE seeks a declaratory judgment that "the Option has not terminated," based on an untenable interpretation of the Lease.

158. Under Section 2.1(d) of the Seventh Amendment, the Option terminated immediately upon the parties' failure to close on or before the Closing Date/Outside Closing Date "unless, and only to the extent, that the Closing d[id] not occur on the Closing Date because the Landlord failed to perform Landlord's obligations pursuant to Sections 3.8 and 5.2 in connection therewith (other than those which could not be satisfied solely because of a Tenant default that remains uncured)."

159. The Closing Date and Outside Closing Date were November 3, 2024.

160. ARE did not close on or before November 3, 2024.

161. ARE's failure to close was not a result of H+H's purported failure to perform its ministerial obligations pursuant to Sections 3.8 or 5.2 of the Seventh Amendment.

162. At all times, Counterclaimants were ready, willing, and able to perform their Closing-related obligations under the terms of the Ground Lease.

163. However, the parties did not proceed to Closing on or before the November 3, 2024 deadline, because ARE chose not to close and communicated that decision to H+H and NYCEDC well before the November 3, 2024 deadline.

164. To the extent H+H failed to meet its ministerial obligations under Section 5.2 and 3.8 of the Seventh Amendment, such failures resulted solely from ARE's Tenant defaults, including its unilateral decision not to close.

165. ARE's unilateral decision not to close was also a Predevelopment Default under the terms of the Seventh Amendment.

-33-

166. Thus, pursuant to the terms of Section 2.1(d) of the Seventh Amendment, ARE's failure to close on or before the Closing Date resulted in the Option "terminat[ing] with no need for any further documentation or agreement."

167. Counterclaimants therefore seek a declaratory judgment that the Option has terminated.

168. A justiciable controversy exists between the parties as to whether, pursuant to the Ground Lease, the Option has terminated.

169. Counterclaimants have no adequate remedy at law to accomplish substantial justice.

170. Granting the requested declaratory judgment will serve a useful and essential purpose in settling the status of the Option and will offer relief from uncertainty relating to this issue.

### THIRD COUNTERCLAIM
*(Declaratory Judgment that Counterclaimants Are Entitled to Retain*
*and Draw Down the Predevelopment Security Deposit)*

171. Counterclaimants repeat and reallege each of the allegations set forth above as if fully set forth herein.

172. Under 28 U.S.C. § 2201 et seq., this Court has jurisdiction to declare the rights of the parties in dispute.

173. H+H as Landlord, NYCEDC as Lease Administrator, and ARE as Tenant are parties to the Ground Lease, which is a valid and binding contract.

174. There is a substantial, actual controversy regarding the Ground Lease between H+H and NYCEDC, on the one hand, and ARE on the other, who are parties with adverse legal interests.

-34-

175. Specifically, there is a dispute regarding whether the Option has terminated and whether H+H and NYCEDC are entitled to retain and draw down on the Predevelopment Security Deposit.

176. Counterclaimants have legally protectible interests in this controversy, specifically, their rights as Landlord and Lease Administrator.

177. This controversy is ripe for adjudication, and a judicial declaration is required to dispose it.

178. Sections 2.1(d) and 4.2 of the Seventh Amendment provide that, if the Closing does not occur on or before the Closing Date as a result of ARE's Predevelopment Default, then the Option shall terminate and Counterclaimants "shall have the right to retain and draw down on the Predevelopment Security Deposit as liquidated damages and not as a penalty."

179. In this litigation, ARE has alleged that it "fully complied with its obligations under the [Ground Lease]."

180. To the contrary, ARE committed a Predevelopment Default when it failed to close on or before the November 3, 2024 Closing Date/Outside Closing Date.

181. Specifically, ARE's decision not to close was a Predevelopment Default under Section 4.1(b) of the Seventh Amendment, because ARE "willfully fail[ed] to close."

182. ARE's failure to close was also a Predevelopment Default under Sections 4.1(a) and 4.1(c) of the Seventh Amendment, because:

    a. ARE did not deliver the "Tenant Closing Deliverables" in duly executed form "[a]t the Closing," as required by Section 5.1 of the Seventh Amendment; and

b.  To the extent H+H failed to meet its ministerial obligations to deliver executed forms at the Closing and to deliver the Premises "as is" after Closing, such failures resulted only from ARE's "Tenant defaults," including its decision not to close. ARE's unilateral decision not to close was a Tenant default at least in part because it breached the Seventh Amendment requirement that, after exercising the Option, "Tenant shall be required to close on the Option Premises."

183.  ARE committed additional Predevelopment Defaults under Sections 4.1(a) and 4.1(c) of the Seventh Amendment by failing to perform all of its Predevelopment Obligations before the November 3, 2024 Closing Date/Outside Closing Date.

184.  Indeed, as late as October 31, 2024, ARE admitted in correspondence to H+H, NYCEDC, and the NYC Law Department that "certain of the Predevelopment Obligations have not been performed . . . ."

185.  For example, ARE's Predevelopment Obligation under Section 3.3(f)(iii) of the Seventh Amendment, and one of ARE's Closing Deliverables under Section 5.1(k), was to provide "scanned copies of fully executed construction contracts and subcontracts for the construction of the North Tower, invoices, and other documentary evidence reasonably required by the Lease Administrator documenting that Tenant is contractually obligated for and has spent, on or before Closing, an amount for materials manufactured for construction of the North Tower which is not less than twenty million ($20,000,000.00) dollars."

186.  Neither NYCEDC nor H+H received the documentation ARE was required to provide under Sections 3.3(f)(iii) and 5.1(k) of the Seventh Amendment.

187.  Upon information and belief, ARE did not obtain and could not provide the documentation required by Sections 3.3(f)(iii) and 5.1(k) of the Seventh Amendment, including evidence that, on or before the November 3, 2024 Closing Date/Outside Closing Date, ARE had formally engaged construction contractors and subcontractors and had spent at least $20 million on materials manufactured for construction.

188.  Accordingly, the Option has terminated and Counterclaimants are entitled to retain the Predevelopment Security Deposit under the terms of Sections 2.1(d) and 4.2 of the Seventh Amendment.

189.  Counterclaimants therefore seek a declaratory judgment that (i) ARE failed to close on the Option due to its Predevelopment Defaults, (ii) the Option has thus terminated, and (iii) Counterclaimants are thus entitled to retain the $5 million Predevelopment Security Deposit.

190.  A justiciable controversy exists between the parties as to whether, pursuant to the Ground Lease, Counterclaimants may retain the Predevelopment Security Deposit.

191.  Counterclaimants have no adequate remedy at law to accomplish substantial justice.

192.  Granting the requested declaratory judgment will serve a useful and essential purpose in settling the controversy relating whether Counterclaimants may retain the Predevelopment Security Deposit and will offer relief from uncertainty relating to this issue.

## FOURTH COUNTERCLAIM
### *(Breach of Implied Covenant of Good Faith and Fair Dealing Regarding the Option)*

193.    Counterclaimants repeat, reallege, and incorporate each of the allegations set forth above as if fully set forth herein.

194.    H+H as Landlord, NYCEDC as Lease Administrator, and ARE as Tenant are parties to the Ground Lease, which is a valid and binding contract.

195.    Among other things, the Ground Lease grants ARE the Option to develop the North Tower.

196.    The Ground Lease sets out strict deadlines, called the Closing Date and the Outside Closing Date, by which the parties must close on the Option.

197.    The Ground Lease also provides, in Section 2.1(d) of the Seventh Amendment, that, if the parties fail to close by the contractual deadlines, the Option "shall terminate with no need for any further documentation or agreement," unless and only to the extent the Closing did not occur due to H+H's failure to perform its ministerial obligations to deliver executed forms and the Option Premises at the Closing.

198.    The purpose of the Option portion of the Ground Lease is the prompt development of the Option Premises.

199.    The Ground Lease, like all contracts in New York, includes an implied covenant of good faith and fair dealing.

200.    Among other things, the implied covenant of good faith and fair dealing requires ARE to relinquish the Option if it does not close on the Option on or before its deadline—unless and only to the extent the Closing does not occur due to H+H's failure to perform its ministerial obligations.

201.    Through no fault of Counterclaimants, ARE chose not to close on the Option on or before its November 3, 2024 deadline to do so.

202.    Counterclaimants have fully complied with their obligations under the Ground Lease, except and only to the extent they were prevented from doing so by ARE.

203. Despite the parties' failure to close by their November 3, 2024 deadline, ARE has refused to relinquish the Option Premises and has instead encumbered the Option Premises and effectively prevented H+H from putting the Premises to beneficial use. In addition, ARE has engaged in this conduct based on meritless legal positions taken and in violation of its covenant of good faith and fair dealing.

204. Accordingly, since at least November 4, 2024, ARE has breached the implied covenant of good faith and fair dealing by refusing to relinquish the Option, encumbering the Option Premises, and effectively preventing H+H from developing the Option Premises.

205. Through this conduct, ARE has frustrated the purpose of the Option provisions of the Ground Lease, which is the prompt development or relinquishment of the Option Premises so that H+H and NYCEDC could put that property to beneficial use, either with ARE or another developer

206. Due to ARE's breach of the implied covenant, H+H and NYCEDC cannot pursue alternative development opportunities until they remove the encumbrances ARE has placed on the Option Premises.

207. As a direct and proximate result of the foregoing, Counterclaimants have been damaged and are entitled to recover damages in an amount to be determined at trial that is based on the fair market rental value of the Option Premises over the period since November 3, 2024.

208. Before breaching the implied covenant, ARE paid Counterclaimants in excess of $200,000 per month to extend the Option and prevent Counterclaimants from putting the Option Premises to other uses.

209.    Most recently, on or about November 3, 2022, ARE paid a Second Extension Fee in the amount of $5,250,000, pursuant to Section 7 of the Tenth Amendment, to extend the Closing Date and Outside Closing Date two years, to November 3, 2024.

210.    That paid extension amounts to monthly rental payments of $218,750.

211.    Accordingly, as a direct and proximate result of ARE's breach of the implied covenant of good faith and fair dealing, which has prevented Counterclaimants from putting the Option Premises to other uses, Counterclaimants have been damaged and are entitled to recover damages in an amount to be determined at trial but not less than $3,777,812.5, and the continuing rate of at least $218,750 per month.

212.    In addition, Counterclaimants have and will continue to incur foreseeable consequential damages due to the delays in Counterclaimants ability to develop the Option Premises as a result of ARE's misconduct.

## FIFTH COUNTERCLAIM
### *(Breach of Contract Regarding the 100 Parking Spaces Requested by H+H –*
### *Specific Performance)*

213.    Counterclaimants repeat and reallege allegations 30-41 set forth above as if fully set forth herein.

214.    H+H as Landlord, NYCEDC as Lease Administrator, and ARE as Tenant are parties to the Ground Lease, which is a valid and binding contract.

215.    In the Original Ground Lease, ARE agreed, among other things, to provide up to 400 parking spaces to H+H for the exclusive use of Bellevue staff in the parking garage constructed as part of the East and West Tower project. The Original Ground Lease parking provision and the subsequent provision in the Fifth Amendment set forth a notice procedure for H+H to request parking spaces to which ARE was obligated to respond within six months, specified a maximum monthly rate per space, and provided for the parties to agree on payment

-40-

and management procedures. H+H requested 100 parking spaces in March 2022 but ARE did not provide the spaces, claimed it was not obligated to provide 400 spaces, and raised specious objections to the payment and management procedures proposed by H+H. The upshot is that, still today, ARE has not provided the parking spaces requested by H+H. Counterclaimants accordingly request that the Court order specific performance of ARE's obligations or, alternatively, monetary damages for breach of contract as set forth in the Sixth Counterclaim, as well as a declaratory judgment that H+H is entitled to 400 parking spaces, as requested in the Seventh Counterclaim.

216.    On November 21, 2001, the New York City Planning Commission adopted a resolution for the grant of a special permit to allow two attended parking garages with a total maximum capacity of 720 spaces, including 310 off-site spaces to be used by H+H (Resolution C 101713 ZSM, Calendar No. 26).

217.    This parking special permit was adopted in connection with the New York City Planning Commission's adoption, on November 21, 2001, of a resolution for the grant of a special permit for the development of a scientific research and development facility on H+H's Bellevue Hospital Campus on the east side of Manhattan.

218.    ARE and H+H agreed, in Article 23(d) of the Original Ground Lease, with respect to providing parking spaces to H+H as follows:

> Parking Requirements: The Project shall include a parking garage that contains (i) a minimum of 400 parking spaces for exclusive use by Bellevue staff (the 'Bellevue Parking Spaces') at a per-space monthly rate of no more than $220 in the first year of parking garage operation, with an escalation of no more than 3% per year throughout the term of the Lease, provided, however, that Tenant [ARE] shall have the right, following consultation with and reasonable approval of Landlord [H+H], to relocate the Bellevue Parking Spaces to an alternative location within reasonable proximity to the Premises provided that either (x) the cost of such alternative spaces shall not exceed the monthly rates to be charged for the Bellevue Parking Spaces as provided herein, or (y) Tenant [ARE] pays for

-41-

the difference, if any, between (I) the cost for such alternative spaces and (II) the monthly rates to be charged for the Bellevue Parking Spaces as provided for herein; and (ii) additional parking to accommodate the needs of the Project, but in no event more than the number of spaces for each portion of the Premises permitted under the Parking Special Permit. This parking garage shall be substantially completed upon the Substantial Completion Date of the Second Building. Landlord and Tenant shall negotiate appropriate payment and management procedures in connection with the parking spaces allocated for use by Bellevue users."

219. ARE built the underground parking garage as part of its construction of the East and West Towers.

220. ARE and H+H thereafter agreed to the Fifth Amendment, dated August 30, 2013, which modified and amended the Original Ground Lease relating to the parking requirements. The Fifth Amendment states the following:

Bellevue Parking Spaces

(a) Landlord [H+H] and Tenant [ARE] acknowledge that Bellevue does not currently require any parking spaces within the parking garage of the Project (the "Parking Garage") for the exclusive use of its staff. . . .

(b) From and after the date of this Agreement, Landlord [H+H] shall have the right to make two requests for parking spaces in the Parking Garage for the exclusive use of Bellevue staff by written notice to Tenant. The total number of parking spaces requested in the Parking Garage for the exclusive use of Bellevue Staff shall not exceed 400. Any parking spaces requested within the foregoing guidelines shall be provided, for the exclusive use of Bellevue Staff by the later of six months after Tenant's [ARE's] receipt of such notice from Landlord and as soon as reasonably practicable after such six months. The amount payable to Tenant per parking spaces shall be Tenant's then-current per-spaces monthly rate for the number of requested parking spaces, provided that the monthly rate shall not be more than $220 per space, escalated by (x) 1.5% on January 1, 2014 and (y) 3% per year on each January 1, thereafter during the term of the Lease.

221. On March 11, 2022, H+H gave notice to ARE, pursuant to the Original Ground Lease and the Fifth Amendment, requesting 100 parking spaces.

222. In the March 11, 2022 parking notice, H+H requested that, to the extent possible, ARE provide the requested parking spaces as close as possible to April 1, 2022.

-42-

223.  Pursuant to the Fifth Amendment, ARE was required to provide the requested parking spaces "by the later of six months after Tenant's [ARE's] receipt of such notice from Landlord and as soon as reasonably practicable after such six months as possible."

224.  Following H+H's March 11, 2022 parking notice, ARE informally advised H+H that the parking garage did not include sufficient space to provide H+H with the 310 parking spaces required in the parking special permit, let alone the 400 parking spaces required in the Fifth Amendment, and offered H+H 50 parking spaces in the ARE parking garage in response to H+H's March 11, 2022 parking notice.

225.  By letter dated August 25, 2022, ARE formally responded in writing to the H+H March 11, 2022 parking notice.

226.  In its August 25, 2022 parking response ARE stated that ARE would provide 60 spaces by September 11, 2022, at a monthly rate of $282.82, subject to annual 3% escalations; that ARE would provide 40 additional spaces by the end of 2023 for a total of 100 parking spaces for exclusive use by Bellevue; and that ARE would provide 100 additional Bellevue spaces after the potential North Tower was completed at the then escalated monthly rates, on-site, or off-site, or payment in-lieu of providing the spaces.

227.  ARE also stated in the August 25, 2022 parking response that Bellevue should only receive a total of 200 parking spaces "or compensation therefore" rather than a total of 400 spaces.

228.  ARE's offer in its August 25, 2022 parking response to provide less than the 100 requested parking spaces, and its statement that H+H should only receive a total of 200 parking spaces, rather than 400 parking spaces, were in breach of its parking-related obligations as set forth in the Original Ground Lease and Fifth Amendment.

-43-

229.  On September 14, 2022, H+H advised ARE's attorney via email, in response to ARE's August 25, 2022 parking response, that "ARE's August 25 proposal is not acceptable."

230.  By letter dated November 3, 2022, ARE agreed to provide 100 Bellevue Parking Spaces in the parking garage "upon the applicable terms and conditions set forth in Section 23.1(d) of the Existing Ground Lease, as amended pursuant to that certain Fifth Amendment . . . as soon as appropriate payment mechanisms and management procedures in connection with the Requested Parking Spaces have been negotiated between Landlord and Tenant pursuant to Section 23.1(d)(i) of the Existing [Ground] Lease."

231.  ARE's November 3, 2022 letter also stated: "This letter supersedes Tenant's letter . . . on this subject dated as of August 25, 2022."

232.  H+H and ARE thereafter engaged in negotiations regarding the 100 requested parking spaces but were unable to reach an agreement, because ARE continually sought to impose terms that were inconsistent with the parking obligations ARE assumed under the Original Ground Lease and Fifth Amendment.

233.  For example, on December 5, 2022, ARE sent H+H (1) a ten-page draft parking agreement that was between H+H and ABM Parking Services, Inc. ("ABM"), which is, upon information and belief, the entity that manages the parking garage for ARE, which was for 100 parking spaces for a one-year term, and permitted termination by either party on thirty days' written notice, and (2) a one page agreement titled "online monthly parking agreement" that was to be signed by the parking space users for ABM.

234.  On December 14, 2022, H+H sent ARE a significantly revised draft parking agreement and one-page agreement. H+H's revisions to the draft parking agreement included

(but were not limited to) the following: (1) making the agreement between H+H and ARE, rather than between H+H and ABM; (2) changing the term from a one-year term, to a term to expire upon the expiration of the Gound Lease; (3) changing the definition of "Bellevue staff" entitled to be allocated one of the parking spaces from "members of Bellevue's staff" to "all persons regularly working at Bellevue whether employed by H+H, New York University, an agency of the City or another third party"; (4) allocating 175 designated users on the designated user list at any given time, for the 100 allocated parking spaces, in order to accommodate the users who worked different shifts at the hospital – *i.e.*, the daytime shifts and the nighttime shifts; (5) eliminating additional fees and terms included by ARE that were not authorized by the Original Ground Lease or Fifth Amendment; and (6) eliminating the requirement that designated users of the parking spaces insure and indemnify the garage operator.

235. In early to mid-January 2023, ARE responded to H+H's proposed revisions, refusing to agree to most of H+H's proposed revisions, including (but not limited to) (1) refusing to change the parties to the parking agreement from H+H and ABM to H+H and ARE; (2) refusing to change the definition of "Bellevue staff" to include all persons that regularly work at Bellevue, whether employed by H+H, New York University, an agency of the City, or another third party; (3) refusing to allow more than 100 designated users to use the 100 parking spaces; (4) refusing to eliminate the right to terminate the parking agreement on notice; and (5) refusing to eliminate the insurance and indemnification provisions.

236. ARE's refusal to accept that "Bellevue staff" included "all persons that regularly work at Bellevue, whether employed by H+H, New York University, an agency of the City or another third party" was unacceptable to H+H, because most doctors who work at Bellevue are actually employed by New York University. In addition, there are doctors and staff

who regularly work at Bellevue who are employed by the City and by H+H contractors. Among the former are people who regularly work at Bellevue who are employed by the City's Department of Correction and provide security and supervision for jail population hospitalized at Bellevue or undergoing outpatient treatments, such as chemotherapy.

237.   ARE's refusal to agree to designate more than 100 users for the 100 parking spaces was also unacceptable to H+H, because, as H+H had previously advised ARE, the Bellevue staff workers who would be using the parking spaces work different shifts, so more than one user can utilize the same parking space at different times.

238.   Neither the Ground Lease nor the Fifth Amendment limits the number of Bellevue Staff who can use the designated parking spaces. The Ground Lease and the Fifth Amendment merely limit the total number of parking spaces that ARE must provide to H+H for use by Bellevue staff to 400.

239.   Moreover, the parking provisions in both the Ground Lease and Fifth Amendment state that ARE will provide parking garage spaces for the "exclusive" use of Bellevue staff. This exclusivity term makes clear that ARE was required to provide parking spaces, not just a right for a particular person to park in the garage.

240.   On February 23, 2023, ARE proposed an interim agreement to give H+H immediate access to parking spaces while the parties continued to negotiate a tri-party parking agreement between H+H, ARE, and ABM.

241.   On March 2, 2023, H+H rejected ARE's proposal for an interim agreement, and advised ARE as follows:

> We sent our demand for 100 parking on March 11, 2022 but about a year later, ARE has still not met its obligations under the lease. ARE's latest "proposal," like the others, does not comply with the lease which, among other things, does not provide for termination of the parking spaces by ARE. In fact, ARE has not even

really made a proposal; it has merely invited us to negotiate the meaning of "Bellevue Staff," which ARE has not done since we suggested a reasonable definition of the term months ago.

We see no need for an interim agreement. Our request is for 100 parking spaces for the term of the lease and the issues ARE alludes to working out are not ones that are necessary for the transaction and they are ones ARE has not shown a willingness to justify or discuss.

We regret ARE's continuing violation of the lease terms.

242.  On March 10, 2023, ARE reached out to NYCEDC, characterizing H+H's rejection of ARE's offer for an interim agreement as "disappointing" and stating, "[t]he main hurdle has always been H+H's desire to turn 100 spaces into 170 spaces by rotating in 170 users, which has frustrated our efforts to get this done in a timely manner. However, in the interest of reaching a mutually acceptable resolution, we're hoping that H+H will revert to the Ground Lease framework of one pass per parking space. On that basis, ABM, the parking operator, is prepared to issue parking agreements to H+H parkers . . . ."

243.  The parties thereafter attempted to reach a financial settlement relating to the parking spaces, but such attempts were also unsuccessful.

244.  To date, ARE has failed to provide H+H the 100 parking spaces in the Parking Garage for Bellevue staff it had originally requested on March 11, 2022.

245.    As a direct and proximate result of the foregoing, Counterclaimants have been damaged.

246.  H+H and NYCEDC have no adequate remedy at law to accomplish substantial justice with respect to the enforcement of its request to ARE for the 100 parking spaces pursuant to the Ground Lease and the Fifth Amendment. Upon information and belief, there are relatively few available alternative parking spaces in the vicinity of Bellevue for use by Bellevue staff, and it would be difficult to ascertain the value of such parking spaces over the

term of the Ground Lease, which was for an initial term of 49 years, with the option to extend for two 25-year terms.

247.  As a result of the foregoing breach by ARE in failing to provide H+H with the 100 requested parking spaces, H+H is entitled to specific performance, requiring ARE to provide H+H with 100 parking spaces pursuant to the terms of the Ground Lease and the Fifth Amendment.

### SIXTH COUNTERCLAIM
*(In the alternative, Breach of Contract*
*Regarding the 100 Parking Spaces Requested by H+H – Damages)*

248.  Counterclaimants repeat and reallege allegations 30-41 and 213-47 set forth above as if fully set forth herein.

249.  ARE has breached the Original Ground Lease and Fifth Amendment by failing to provide H+H with the 100 parking spaces it requested in the March 22, 2022 parking notice.

250.  In the event the Court does not grant H+H's request for specific performance with respect to ARE's failure to provide H+H with the 100 parking spaces, then H+H should be awarded damages for this breach by ARE in an amount to be determined at trial that is based on the fair market rental value of the 100 parking spaces H+H requested, less the amount H+H was required to pay for the 100 parking spaces under the terms of the Ground Lease.

### SEVENTH COUNTERCLAIM
*(Declaratory Judgment Regarding the 400 Total Parking Spaces)*

251.  Counterclaimants repeat and reallege allegations 30-41 and 213-50 set forth above as if fully set forth herein.

252. As noted above, ARE stated in the August 25, 2022 parking response that Bellevue should only receive a total of 200 parking spaces "or compensation therefore" rather than a total of 400 spaces.

253. ARE took a similar position in 2023.

254. Accordingly, a justiciable controversy exists between the parties as to whether, pursuant to the Original Ground Lease, as amended by the Fifth Amendment, H+H has the right to request up to 300 additional parking spaces, following its request for 100 parking spaces, for a total of 400 parking spaces in the parking garage.

255. H+H has a legally protectible interest in this controversy, specifically, its right, as Landlord, to request up to 400 spaces for Bellevue staff in the parking garage.

256. This controversy is ripe for adjudication, and a judicial declaration is required to dispose it.

257. Granting the requested declaratory judgment will help to settle the legal issue involved relating to this parking issue and will finalize the controversy relating to the number of parking spaces at issue and offer relief from uncertainty relating to this issue.

258. H+H and NYCEDC have no adequate remedy at law to accomplish substantial justice.

259. As a result of the foregoing, H+H is entitled to a declaratory judgment that it is entitled to be provided a total of 400 parking spaces by ARE pursuant to the Original Ground Lease and Fifth Amendment.

**WHEREFORE**, Defendants/Counterclaimants respectfully request that the Court enter judgment in favor of Defendants/Counterclaimants and against ARE:

(A)   Dismissing ARE's sole remaining Cause of Action, the Fourth Cause of Action for declaratory relief, with prejudice and in all respects;

(B)   Granting the First Counterclaim and issuing a declaration, order, and judgment holding that the Closing Date and Outside Closing Date were not extended beyond November 3, 2024; that the Closing Date and Outside Closing Date can no longer be extended; and that November 3, 2024 was the final Closing Date and Outside Closing Date;

(C)   Granting the Second Counterclaim and issuing a declaration, order, and judgment holding that the Option has terminated;

(D)   Granting the Third Counterclaim and issuing a declaration, order, and judgment holding that (i) ARE failed to close on the Option due to its Predevelopment Defaults, (ii) the Option has thus terminated, and (iii) Counterclaimants are thus entitled to retain the $5 million Predevelopment Security Deposit;

(E)   Granting the Fourth Counterclaim for breach of the implied covenant of good faith and fair dealing and awarding monetary damages in an amount to be determined at trial but not less than $3,777,812.5 and the continuing rate of at least $218,750 per month;

(F)   Granting the Fifth Counterclaim for breach of contract and ordering specific performance of ARE's obligation to provide 100 parking spaces for H+H's exclusive use;

(G)   In the alternative, if the Court does not grant the relief sought in the Fifth Counterclaim for specific performance, granting the Sixth Counterclaim for breach of contract and awarding monetary damages in an amount to be determined at trial;

(H)   Granting the Seventh Counterclaim and issuing a declaration, order, and judgment holding that H+H is entitled to be provided a total of 400 parking spaces by ARE pursuant to the Original Ground Lease and Fifth Amendment;

-50-

(I)    Awarding indirect and consequential damages;

(J)    Awarding pre- and post-judgment interest at the maximum rate allowed by law;

(K)    Awarding costs, disbursements, and reasonable attorneys' fees in this action pursuant to applicable law and the Ground Lease; and

(L)    Awarding such further and other relief in Defendants'/Counterclaimants' favor as the Court may deem just, proper, and equitable, in accordance with applicable law and the Ground Lease.

Dated:  New York, New York
        April 10, 2026

STEVEN BANKS
Corporation Counsel of the City of New York
*Attorney for Defendants/Counterclaimants*
100 Church Street
New York, New York 10007
Phone: (212) 356-2559
Email: rfunkhou@law.nyc.gov

By:  /s/ Robert Funkhouser
     Robert Funkhouser
     Deputy Chief, Commercial and Real
     Estate Litigation Division